ECF

FILED
SEP 15 2005
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **ENRON FEDERAL SOLUTIONS, INC.** ) | |
| **Plaintiff,** ) | |
| v. ) | Civil Action No. 05-1000C |
| **UNITED STATES OF AMERICA,** ) | |
| **Defendant.** ) | |

**COMPLAINT**

COMES NOW Enron Federal Solutions, Inc., by counsel, and for its Complaint against the United States of America alleges as follows:

**PARTIES**

1. Plaintiff Enron Federal Solutions, Inc. ("EFSI"), is a corporation organized and existing under the laws of the State of Delaware. On December 21, 2001, Plaintiff filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. By Order dated July 15, 2004, the U.S. Bankruptcy Court confirmed the Supplemental Modified Fifth Amended Plan of Affiliated Debtors Pursuant to Chapter 11 of the U.S. Bankruptcy Code, dated as of July 2, 2004 (the "Plan"). The effective date of the Plan was November 17, 2004.

2. The Defendant is the United States of America ("Government").

## JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 601-613.

## BACKGROUND

4. On January 22, 1999, the United States Army Corps of Engineers ("Army" or "Government") issued Solicitation No. DAC51-99-R-0006 ("Solicitation") seeking proposals from potential contractors to own, upgrade or replace as necessary, operate and maintain the electrical, natural gas, potable water, and wastewater utility systems ("Utility Systems") at the United States Army Garrison, Fort Hamilton, New York. The Solicitation was issued as part of the Government's initiative to privatize certain government-owned utility systems.

5. The Solicitation was amended ten times from March 1999 through November 1999.

6. EFSI submitted its technical proposal in response to the Solicitation on July 28, 1999. On August 27, 1999, EFSI submitted its Final Proposal Revision, reconfirming EFSI's July 27, 1999, Technical Proposal and submitting EFSI's Cost Proposal.

7. On December 2, 1999, the Army entered into Utilities Privatization Contract No. DACA51-00-C-0001 ("Contract") with EFSI. EFSI's proposal was incorporated into the Contract.

8. Under the terms of the Contract, EFSI was required to upgrade the Utility Systems as necessary by making whatever capital improvements were required to meet

standards listed in the Contract. The Contract also required EFSI to commence all utility distribution system upgrades or replacements at the beginning of the Contract term, and to operate and maintain the Utility Systems for a period of up to ten (10) years, commencing March 1, 2000.

9. Under the Contract, EFSI was required to fund agreed-upon capital improvements necessary for acquiring, maintaining and operating the Utility Systems. EFSI was also required to fund the cost of expansion or upgrade of these systems as a capital investment, which was to be recovered by EFSI over the contract period. In its Cost Proposal, EFSI estimated that the required capital improvements and upgrades would cost $11,616,000 to implement.

10. In return for EFSI's capital improvement work and operations and maintenance services, the Government promised to pay EFSI a fixed price of $25,377,637.62, as modified, in monthly installments over the term of the Contract. Each of the Government's scheduled monthly payments included a fixed amount for the amortization over the contract term of EFSI's price for its capital improvements and upgrades of the Utility Systems ($11,616,000, financed at 8% interest), and an amount for the operations and maintenance of those systems by EFSI for the invoiced month.

11. Should the Contract be terminated prior to the end of its term for any reason, the Contract required the Government to pay EFSI the amount of its unrecovered capital investment in the improvement and upgrade of the Utility Systems. Specifically, Sections C.4.7 and H.8 of the Contract provided that the termination liability of the Government for the unrecovered principal amount of the price for EFSI's capital improvements and upgrades of the Utility Systems shall be based upon the provisions of

Federal Acquisition Regulation ("FAR") Clause 52.241-10, Termination Liability (Feb. 1995).

12. Pursuant to FAR Clause 52.241-10:

> (a) If the Government discontinues utility service under this contract before completion of the facilities cost recovery period specified in paragraph (b) of this clause, in consideration of the Contractor furnishing and installing at its expense, the new facility described herein, the Government shall pay termination charges, calculated as set forth in this clause.
> (b) *Facility cost recovery period.* The period of time, not exceeding the term of this contract, during which the net cost of the new facility shall be recovered by the Contractor is ______ months. [*Insert negotiated duration.*]
> (c) *Net facility cost.* The cost of the new facility, less the agreed upon salvage value of such facility, is $_______. [*Insert appropriate dollar amount.*]
> (d) *Monthly facility cost recovery rate.* The monthly facility cost recovery rate which the Government shall pay the Contractor whether or not service is received is $ ____. [*Divide the net facility cost in paragraph (c) of this clause by the facility's cost recovery period in paragraph (b) of this clause and insert the resultant figure.*]
> (e) *Termination charges.* Termination charges = $ ____. [*Multiply the remaining months of the facility's cost recovery period specified in paragraph (b) of this clause by the monthly facility cost recovery rate in paragraph (d) of this clause and insert the resultant figure.*]
> (f) If the Contractor has recovered its capital costs at the time of termination there will be no termination liability charge.

13. EFSI's proposal, which was accepted by the Government and expressly incorporated into the Contract, included the following condition: "[i]n the event the contract is terminated, the Contractor shall be granted compensation for its capital costs in accordance with FAR 52.241-10 (Termination Liability) and for all of its other costs in

accordance with FAR 52.249-2 (Termination for Convenience)." Although the specific pricing information was not entered into the Termination Liability clause where indicated in paragraphs (b) through (d) of the clause, all of the information necessary to complete those paragraphs was included in EFSI's proposal, which was part of the Contract. (By its terms, the blank in paragraph (e) of the clause cannot be completed until the date of termination is known.)

14. EFSI commenced performance of the Contract on or about April 1, 2000.

15. By November 2001, EFSI had substantially completed its capital improvements and upgrades of Ft. Hamilton's potable water, natural gas and electric distribution systems, and completed, among other things, substantial portions of the capital improvements and upgrades on the storm and wastewater/sewer system as required by the Contract.

16. By November 2001, the Government had accepted and was using the upgraded potable water, natural gas and electric distribution systems and had accepted and was using the upgraded portion of the storm and wastewater/sewer system. In addition to its efforts to upgrade the Utility Systems, EFSI had also been providing operations and maintenance for those systems as required by the Contract.

17. Although the Government agreed to pay EFSI a fixed price for those capital improvements and upgrades at the monthly rate identified in its fixed price offer, the Government has paid EFSI only $1,279,861 against the principal amount owed to EFSI for its capital improvements and upgrades to the Utility Systems.

18. From April 2000 through December 2001, EFSI also provided operations and maintenance services for the Utility Systems. Under the terms of the Contract, EFSI

earned $1,476,956 for the services it provided through December 2001. During that same time, the Government has paid EFSI only $1,336,294 for EFSI's services, an amount that is $140,662 less than the amount the Government should have paid to EFSI under the Contract.

19. On December 2, 2001, Enron Energy Services Operations, Inc., EFSI's parent company, filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

20. By letter dated December 5, 2001, the Government issued a cure notice to EFSI. In the cure notice, the Government demanded that EFSI correct specific deficiencies in contract performance, including the provision of the name of an on-site Program Manager and Alternate, and the provision of a schedule for the completion of all outstanding upgrades to the utility distribution systems.

21. Subsequently, the Government issued a corrected cure notice to EFSI, which extended by seven (7) days the date by which EFSI was to correct the deficiencies cited in the original December 5, 2001 Cure Notice.

22. On December 21, 2001, EFSI filed a petition for reorganization under Chapter 11 of U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

23. The Government moved for and was granted a partial lift of the automatic bankruptcy stay to permit the Government to terminate the Contract.

24. On February 26, 2002, the Government terminated the Contract.

25. As of the date of termination, although EFSI had substantially performed the capital improvements and upgrades to the Utility Systems that were required by the

Contract, the Government had paid EFSI only $1,279,861 against the principal amount of $11,616,000, before contract modifications, that it had agreed to pay EFSI for the capital improvements and upgrades.

26. As of the date of termination, although EFSI has performed the operation and maintenance services for the Utility Systems that were required by the Contract through December 2001, the Government had paid EFSI only $1,336,294 of the $1,476,956 due to EFSI from the Government for those services.

27. Under the terms of the Contract, including the Termination Liability clause, after terminating the contract, the Government became liable for immediate payment to EFSI of $10,336,139 for the Utility Systems capital improvements and upgrades that were completed or substantially completed by EFSI under the Contract and that have been received, accepted and enjoyed by the Government. This amount is subject to a credit to the Government for capital improvements or upgrades that were required by the Contract but were not completed by EFSI (the "Remaining Work"), in an amount to be verified by the parties.

28. Notwithstanding the termination of the Contract, the Government remains liable to EFSI in the amount of $140,662 for the operation and maintenance of the Utility Systems by EFSI for November and December 2001.

29. From the date of termination through April 2005, EFSI made numerous demands upon the Government to be paid the amounts due to EFSI under the Contract.

30. Notwithstanding EFSI's demands for payment, the Government has refused to pay EFSI the amounts due to EFSI under the Contract for the capital

improvements and upgrades to the Utility Systems and for the operation and maintenance work performed by EFSI under the Contract.

31. On April 15, 2005, EFSI submitted to the Government a certified claim seeking payment under the Contract of the amounts due to EFSI for the capital improvements and upgrades made by EFSI to the Utility Systems and for the operation and maintenance of those systems. In its claim, EFSI demanded payment in the amount of $10,476,801, less a Remaining Work credit, plus applicable interest. A copy of EFSI's claim is attached as Exhibit 1.

32. By letter dated August 11, 2005, the Government issued a Contracting Officer's Final Decision ("COFD") denying EFSI's claim for payment of the majority of the amount due to EFSI for the capital improvements/upgrades made by EFSI to the Fort Hamilton utility distribution systems. A copy of the COFD is attached as Exhibit 2.

33. In the COFD, the Government conceded that the Government owes EFSI the amount of $211,262.95 for its November 2001 invoice, which includes the monthly amount for amortization of the Utility Systems improvements and upgrades and an amount for the Operations and Maintenance services for November 2001. Notwithstanding the Government's concession, the Government refuses to pay EFSI for that invoice until "it is decided whether EFSI or Liberty has a priority claim to those retained funds." Exhibit 2, unnumbered page 4. By failing to approve EFSI's claim in its entirety, and by delaying payment to EFSI unnecessarily, the Government has improperly denied EFSI payment to which it is entitled under the Contract in the amount of $10,476,801, less a Remaining Work credit.

**COUNT ONE**
**(Breach of Contract: Refusal to Pay for Capital Improvements/Upgrades)**

34. EFSI incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

35. The Government, under the Contract, agreed to pay to EFSI a fixed price for the capital improvements and upgrades EFSI was required to make to the Utility Systems under the Contract even if Contract was terminated prior to the end of the contract performance period.

36. By refusing to pay EFSI for the capital improvements and upgrades made by EFSI to the Utility Systems under the Contract, despite EFSI's demand therefor, the Government has materially breached its obligations under the Contract.

37. As a direct and proximate result of the Government's material breach of the Contract, EFSI has been damaged in an amount equal to $10,336,139 - the agreed price for EFSI's capital improvements and upgrades to the Utility Systems, which price remains unpaid by the Government notwithstanding the substantial performance of those improvements and upgrades by EFSI, and the receipt, acceptance, and enjoyment thereof by the Government - less a Remaining Work credit, plus interest at the rate provided for by the Contract Disputes Act, the Prompt Payment Act and any other applicable statute, regulation, or contract provision.

WHEREFORE, EFSI prays for a judgment in its favor and against the Government as to Count One in an amount of at least $10,336,139, less a Remaining Work credit, together with costs incurred in making demands upon the Government for payment, plus interest, attorneys' fees, costs and for such further relief as the Court deems appropriate.

**COUNT TWO**
**(Breach of Contract: Refusal to Pay for Operations and Maintenance Services)**

38. EFSI incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

39. Under the Contract, the Government agreed to pay EFSI a fixed price on a monthly basis to operate and maintain the Utility Systems.

40. EFSI operated and maintained the Utility Systems through December 2001.

41. By refusing to pay EFSI the amount due to EFSI for its operation and maintenance of the Utility Systems, despite EFSI's demand therefor, the Government has materially breached its obligations under the Contract.

42. As a direct and proximate result of the Government's material breach of the Contract, EFSI has been damaged in an amount equal to $140,662 - the amount unpaid by the Government to EFSI for EFSI's operation and maintenance of the Utility Systems through December 2001 - plus interest at the rate the rate provided for by the Contract Disputes Act, the Prompt Payment Act and any other applicable statute, regulation, or contract provision.

WHEREAS, EFSI prays for judgment in its favor and against the Government, as to Count Two, in an amount of at least $140,662, together with the costs incurred in making demands upon the Government, plus interest, attorneys' fees, costs and for such further relief as the Court deems appropriate.

**COUNT THREE**
**(*Quantum Meruit* / Unjust Enrichment - Capital Improvements and Upgrades)**

43. EFSI incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

44. By reason of the foregoing and, alternatively, EFSI is entitled to recover from the Government the sum of $10,336,139, less a Remaining Work credit, under *quantum meruit*, such amount representing the reasonable value of the capital improvements and upgrades to the Utility Systems provided by EFSI and received, accepted and enjoyed by the Government.

45. EFSI provided such capital improvements with the expectation of payment therefor, and which expectation was known to the Government.

46. The goods and services provided by EFSI resulted in the capital improvements and upgrades to the Utility Systems required by the Solicitation and the Contract. The provision of these goods and services was legally permissible and consistent with the contract requirement.

47. The reasonable value of the capital improvements to the Utility Systems provided by EFSI for which the Government has not paid EFSI is $10,336,139, less a Remaining Work credit.

48. The Government requested, received, accepted and is using the value of the capital improvements to the Utility Systems made by EFSI.

49. The Government has refused to pay EFSI for the capital improvements and upgrades to the Utility Systems provided by EFSI to the Government in an amount equal to their value. The Government has only paid EFSI for such improvements and services the sum of $1,279,861.

50. As a direct and proximate result of the Government's refusal to pay the entire value of the capital improvements and upgrades to the Utility Systems provided by EFSI, the Government has been unjustly enriched by the reasonable value of the capital infrastructure improvements and services in the amount of at least $10,336,139, less a Remaining Work credit.

WHEREFORE, EFSI prays for judgment in its favor and against the Government, as to Count Three, in an amount of $10,336,139, less a Remaining Work credit, together with the costs incurred in making demands upon the Government, plus interest, attorneys' fees, costs, and for such further relief as the Court deems appropriate.

**COUNT FOUR**
**(*Quantum Meruit* / Unjust Enrichment - Operation and Maintenance Services)**

51. EFSI incorporates by reference paragraphs 1 through 33 above as if fully set forth herein.

52. By reason of the foregoing and, alternatively, EFSI is entitled to recover from the Government the sum of $140,662 under *quantum meruit*, such amount representing the reasonable value of the operation and maintenance services for the Utility Systems that provided by EFSI and received, accepted and enjoyed by the Government.

53. EFSI provided such operation and maintenance services for the Utility Systems with the expectation of payment therefore, and which expectation was known to the Government.

54. The operation and maintenance services provided by EFSI pursuant to the Solicitation and the Contract were services whose provision was legally permissible.

55. The reasonable value of the operation and maintenance services for the Utility Systems that were provided by EFSI for which the Government has not paid EFSI is $140,662.

56. The Government requested, received, accepted and used the value of the operation and maintenance services for the Utility Systems provided by EFSI.

57. The Government has refused to pay EFSI for the operation and maintenance services for the Utility Systems that were provided by EFSI to the Government in an amount equal to their value.

58. As a direct and proximate result of the Government's refusal to pay the value of the operation and maintenance services for the Utility Systems that were provided by EFSI, the Government has been unjustly enriched by the reasonable value of those services in the amount of at least $140,662.

WHEREFORE, EFSI prays for judgment in its favor and against the Government, as to Count Four, in an amount of $140,662, together with the costs incurred in making demands upon the Government, plus interest, attorneys' fees, costs, and for such further relief as the Court deems appropriate.

**CONCLUSION**

EFSI, by counsel, therefore requests that this Court enter a judgment against the Government in the amount of $10,476,801, less a Remaining Work Credit, together with the costs requested above.

DATED: September 15, 2005

ENRON FEDERAL SOLUTIONS, INC.

By: John J. Pavlick, Jr. by Charles R. Marvin Jr.

John J. Pavlick, Jr.
VENABLE LLP
575 7th Street, N. W.
Washington, D. C. 20004
Telephone: 202/344-4000
Facsimile: 202/344-8300

OF COUNSEL
Charles R. Marvin, Jr.
VENABLE LLP
575 7th Street, N. W.
Washington, D. C. 20004
Telephone: 202/344-4000
Facsimile: 202/344-8300

James F. H. Scott
VENABLE LLP
8010 Towers Crescent Drive
Suite 300
Vienna, Virginia 22182
Telephone: 703/760-1600
Facsimile: 703/821-8949
*Counsel for Plaintiff*
*Enron Federal Solutions, Inc.*

41495-189863
DC1/200410.08

# ENRON FEDERAL SOLUTIONS, INC.
# FORT HAMILTON CONTRACT
# CLAIM FOR UNRECOVERED CAPITAL INVESTMENT AND UNPAID INVOICES

SUBMITTED
APRIL 15, 2005

**Enron Federal Solutions, Inc.**
**Fort Hamilton Contract**
**Claim For Unrecovered Capital Investment and Unpaid Invoices**

## I. Executive Summary

The United States Army Corps of Engineers sought a service provider to replace, own, operate, and maintain the Fort Hamilton electrical, natural gas, potable water, and wastewater utility systems (collectively referred to hereafter as the "Utility Systems") to distribute electricity, natural gas, and potable water, and to collect wastewater within the Fort Hamilton installation. The contract was part of the government's privatization initiative to privatize government owned utility systems. Enron Federal Solutions, Inc. ("EFSI")[1], a subsidiary of Enron Energy Services Operations, Inc. ("EESO"), which is a subsidiary of Enron Corporation ("Enron"), was awarded the Contract (Contract No. DACA51-00-C-0001) on December 2, 1999 (the "Contract") at a total amount of $25,377,637.62 (as modified). EFSI proposed significantly upgrading the electrical distribution system, replacing the natural gas distribution system and the potable water system, separating the wastewater discharge system from the storm water discharge system, and implementing a complete system Operations & Maintenance ("O&M") plan.

The Contract required that EFSI refurbish or replace the existing Utility Systems at its own expense. EFSI would then recover its capital investment over the ten-year life of the Contract in monthly increments along with monthly charges to operate and maintain the Utility Systems. The Contract expressly stated that EFSI would receive its unrecovered capital investment if the Contract was terminated.

[1] EFSI continues to exist but is no longer an operating entity.

At the time of termination, EFSI had completed work on three of the Utility Systems – electrical, natural gas, and potable water – and had substantially completed the fourth utility system, wastewater. In fact, the government has acknowledged, in related litigation in the United States Court of Federal Claims by a surety under the Contract, that "EFSI has substantially completed capital improvements on Fort Hamilton's potable water, natural gas, and electric supply systems, and some portion of the capital improvements required by the contract with regard to the storm/wastewater/sewer system." The government had received and accepted the benefit of the completed electrical, natural gas, and potable water systems and had begun to repay EFSI for its capital investment in those systems. The wastewater system was substantially completed, and final completion was delayed by the parties' negotiations over modifying the Contract with respect to certain out-of-scope work related to differing site conditions and other issues. Nonetheless, the government had received and accepted the benefit of the completed portion of the wastewater system, was using the completed portion of the wastewater system, and also had begun to repay EFSI for its capital investment in that system. The government thus has received, accepted, and enjoyed the benefit of EFSI's substantial infrastructure investment in the Utility Systems; however, as a result of the termination of the Contract, EFSI did not completely recover its capital investment as contemplated by the Contract. Moreover, EFSI was not fully reimbursed for all of its O&M costs and all of its other costs due and owing under the Contract.

EFSI filed a voluntary petition under Chapter 11 of the Bankruptcy Code on December 21, 2001. The government issued a cure notice to EFSI on December 5, 2001 and a corrected cure notice on December 12, 2001. The government moved for and was

granted a motion to partially lift the automatic stay to permit termination of the Contract. The Contract was terminated for default on February 26, 2002.

Pursuant to this claim, EFSI seeks to recover $10,336,139 in unrecovered capital investment for the substantial infrastructure investment received, accepted, and enjoyed by the government and $140,662 for its unreimbursed O&M costs and all of its other costs due and owing under the Contract for a total amount claimed of $10,476,801.

## II. Factual Background

Solicitation No. DACA51-99-R-0006 (the "Solicitation") was issued by the United States Army Corps of Engineers on January 22, 1999 seeking a contractor to own (or replace and own), operate, and maintain electrical, natural gas, potable water, and wastewater utility systems, to distribute electricity, natural gas, and potable water, and to collect wastewater within the Fort Hamilton, New York installation. There were ten amendments to the Solicitation – 0001 on March 2, 1999; 0002 on February 24, 1999; 0003 on March 22, 1999; 0004 on April 1, 1999; 0005 on April 9, 1999; 0006 on July 7, 1999; 0007 on August 19, 1999; 0008 on September 3, 1999; 0009 on September 24, 1999; and 0010 on November 24, 1999. In addition, there were certain modifications to the Contract issued by the Military District of Washington that increased the Contract amount to $25,377,637.62.

This procurement reflected the Government's privatization policy. Specifically, the Solicitation explained that:

> *Privatization Policy*. The Chief, Army Power Procurement Directorate, U.S. Army Center for Public Works is supporting the Military District of Washington (MDW) and Fort Hamilton's decision to seek one Contractor to assume ownership of the Installation's electric, natural gas, potable water and wastewater distribution systems. The initiative is referred to as

> "Privatization of Government-owned Utility Systems." Privatization is defined as the transfer of ownership, responsibilities, investments, upgrade, plant replacement, continued operation and maintenance of the Army-owned utility systems to the non-Department of Defense sector.

Solicitation, ¶ C-2, Background.

EFSI proposed significantly upgrading the electrical distribution system, replacing the natural gas distribution system and the potable water system, separating the wastewater discharge system from the storm water discharge system, and implementing a complete system O&M plan. The costs associated with EFSI's proposal were included in a firm-fixed price.

The solicitation provided for an "Annual Initial Upgrade," which was defined as "[t]he Contractor's initial capital investment price, amortized over a desired period at an annual interest rate, for system improvements to comply with utility standards and any other required/requested services . . . or new utility distribution system design, construction, installation and applicable tax payments on the upgraded utility components." Solicitation, ¶ B.2.1, Annual Initial Upgrade. The duration of the Contract was to be for a period of ten (10) years. <u>See</u> Solicitation, ¶ C.18, Duration of Contract. The Contractor was required to submit invoices on a monthly basis (Solicitation, ¶ G.3, 52.400-4010, Invoice Payment and Reimbursement Vouchers), and payment was to be made on a monthly basis "upon certification of satisfactory performance of work and approval of the Contractor's monthly invoice by the Contracting Officer." Solicitation, ¶ G.4(b)(1), Payment.

The Solicitation provided that the Contractor would recover its unrecovered capital investment if the Contract was terminated. Specifically, ¶ C.4.7, Disposition

Upon Expiration or Termination, provided that "[t]he Contractor's unrecovered investment will be determined as set forth in Paragraph H.8, Termination Liability. See also Termination for Default, Termination for the Convenience of the Government, and Termination Liability, in Section I, Contract Clauses." Solicitation, Amendment 0002. Likewise, Clause H.8.1, Termination Liability, provided that "[t]he termination liability of the parties with respect to the provisions of electric, natural gas, potable water and wastewater utility service under this contract shall be based upon FAR 52.241-10 Termination Liability (Feb 1995). See Section I, Contract Clauses." Solicitation, Amendment 0007.

Section I of the Solicitation incorporated by reference Clause 652.241-10, Termination Liability (Feb 1995), which provided that:

> As prescribed in 41.501(d)(4), insert a clause substantially the same as the following:
>
> Termination Liability (Feb 1995)
>
> (a) If the Government discontinues utility services under this contract before completion of the facilities cost recovery period specified in paragraph (b) of this clause, in consideration of the Contractor furnishing and installing at its expense, the new facility described herein, the Government shall pay termination charges, calculated as set forth in this clause.
>
> (b) Facility cost recovery period. The period of time, not exceeding the term of this contract, during which the net cost of the new facility shall be recovered by the Contractor is _____ months (To be negotiated).
>
> (c) Net facility cost. The cost of the new facility, less the agreed upon salvage value of such facility, is $_____. (To be determined).
>
> (d) Monthly facility cost recovery rate. The monthly facility cost recovery rate which the Government shall pay the Contractor whether or not the service is received is $_____ (Subparagraph c divided by subparagraph b).

(e) Termination charges. Termination charges = $____. (The remaining months of the facility's cost recovery period (subparagraph (b)D] multiplied by subparagraph (c) [sic].[2]

(f) If the Contractor has recovered its capital costs at the time of termination there will be no termination liability charge.

Solicitation, Amendment 0003.

Section I of the Solicitation also incorporated by reference FAR 52.249-8, Default (Fixed-Price Supply and Service) (Apr 1984) and FAR 52.249-2, Termination for Convenience of the Government (Fixed-Price) (Sep 1996). See Solicitation, ¶ I.46 and ¶ I.47. The Default clause, FAR 52.249-8, provides that "[t]he Government shall pay contract price for completed supplies delivered and accepted. The Contractor and the Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property." FAR 52.249-8(f).

Moreover, EFSI's proposal identified certain assumptions and clarifications, including the following assumption:

> In the event the contract is terminated, the Contractor shall be granted compensation for its capital costs in accordance with FAR 52.241-10 (Termination Liability) and for all its other costs in accordance with FAR 52.249-2 (Termination for Convenience).

EFSI Cost Proposal, Final Proposal Revision, Proposal Assumptions and Clarifications. EFSI's technical and cost proposals were incorporated into the Contract as awarded.

At the time of termination, EFSI had completed work on three of the Utility Systems – electrical, natural gas, and potable water – and had substantially completed the fourth utility system, wastewater. In litigation brought by the surety under the Contract,

[2] The reference should be to subparagraph (d).

Liberty Mutual Insurance Company, the government has admitted in its Answer that "EFSI had substantially completed capital improvements on Fort Hamilton's potable water, natural gas, and electric supply systems, and some portion of the capital improvements required by the contract with regard to the storm/wastewater/sewer system." See Defendant's Answer, Response to Paragraph 17, Liberty Mutual Insurance Co. v. The United States, COFC No. 04-254C (Judge Sypolt). The government had accepted the benefit of the completed electrical, natural gas, and potable water systems and had begun to repay EFSI for its capital investment in those systems. The wastewater system was substantially completed, and the government had accepted the benefit of the wastewater system, was using the completed portion of the wastewater system, and also had begun to repay EFSI for its capital investment in that system. Full completion of the wastewater system was delayed by the parties' negotiations over modifying the Contract with respect to certain out-of-scope work related to differing site conditions and other issues. At the time that the Contract was terminated, the government and EFSI were working on resolving this out-of-scope work issue.

Under the terms of the Contract, EFSI is entitled to recover its unrecovered capital investment in these systems completed or substantially completed. The government has accepted the benefit of these systems and is obligated to reimburse EFSI for its capital investment. EFSI also is entitled to recover its unreimbursed O&M costs and all of its other costs due and owing under the Contract.

## III. Legal Basis of Entitlement

The Contract provided that EFSI would recover its unrecovered capital investment if the Contract was terminated for default. Specifically, the Contract included

FAR 52.249-8, Default (Fixed-Price Supply and Service) (Apr 1984), which entitles a defaulted contractor to payment for completed supplies delivered and accepted and manufacturing materials delivered and accepted. See FAR 52.249-8(f). Several other Contract clauses reference or specifically provide for the recovery of unrecovered capital investment in the event of termination. See ¶ C.4.7, Disposition Upon Expiration or Termination; ¶ H.8.1, Termination Liability; Clause 652.241-10.

Although the Default clause, FAR 52.249-8, is silent on the method of payment for goods delivered and accepted under a contract subsequently defaulted, the normal reimbursement is a lump sum. A lump sum recovery of EFSI's unrecovered capital investment is contemplated by the relevant provisions of the Contract. See ¶ C.47, Disposition Upon Expiration or Termination; ¶ H.8.1, Termination Liability; Clause 652.241-10. While Contract Clause 652.241-10 is not completed with all of the precise figures, it and other previously cited Contract Clauses do indicate that the government acknowledged that if the Contract was terminated before Contract completion, the Contractor would be entitled to the unrecovered present value of its ten-year investment stream.

The government has received, accepted, and enjoyed the benefit of EFSI's substantial infrastructure investment; however, as a result of the termination of the Contract, EFSI did not recover its entire capital investment as contemplated by the Contract. At the time of termination, EFSI had completed work on three of the Utility Systems – electrical, natural gas, and potable water – and had substantially completed the fourth utility system, wastewater. EFSI submitted monthly invoices that were approved

and paid by the government. Payment of the invoices indicated the government's satisfaction with EFSI's performance of the work. See ¶ G.3; ¶ G.4(b)(1).

The government's actions clearly indicate that it had accepted the benefit of the completed systems and the substantially completed wastewater system at the time of termination, and the government is therefore obligated to reimburse EFSI for its unrecovered capital investment under the Contract. See John C. Kohler Co. v. United States, 204 Cl.Ct. 777 (1974) (government impliedly accepted boiler and was required to bear loss resulting from boiler explosion where government had custody of and operated boiler over prolonged period); Silent Hoist & Crane Co., Inc., ASBCA No. 9872, October 14, 1964, 1964 BCA ¶ 4488 (having accepted the used parts list, government was obligated to pay for it); Flight Test Engineering Company, ASBCA No. 7661, November 19, 1962, 1962 BCA ¶ 3606 (finding that the government's retention and use of certain parts constituted acceptance, and that the government must pay for the parts under the "Payments" clauses, which provided that the contractor shall be paid for the supplies delivered and accepted); Environmental Tectonics Corp., VABCA No. 1032, April 30, 1972, 73-1 BCA ¶ 10,202 (although there was no evidence of a formal written acceptance of centrifuges, Board considered the fact of acceptance clearly established by, in part, evidence of payment); Trio-Tech, Inc., VABCA No. 598, January 29, 1968, 68-1 BCA ¶ 6828) (same as Environmental Tectonics, supra).

Procurement law and regulation have long provided that even defaulted contractors are entitled to be paid for goods and services provided under the contract and used by the government. This includes situations where there was constructive acceptance and the government received a benefit from the contractor's work. For

example, in Ventilation Cleaning Engineers, Inc., ASBCA No. 16774, June 9, 1972, 72-2 BCA ¶ 9537, the Board concluded that the appellant's contract for digging ditches was properly terminated for default. The appellant sought payment for work accepted by the government. The Board explained that:

> We are not unmindful of the argument of respondent that the contract provided only that appellant would be paid for services performed and accepted by the contracting officer and that none have been accepted. Strictly speaking, this is correct. Appellant had, however, accomplished substantial cleaning of ditches and the Government has obtained the benefit of the work. Hence there was to that extent a constructive acceptance by the Government of appellant's work. The Government contends, however, that the work done was not of any benefit or value to it. We cannot agree. The record contains 'before' and 'after' pictures of some of the ditches involved. We see a marked difference between them. Much of the work may have been defective but there was a decided improvement over what had been there before. We find that the Government received a benefit from the work which was accomplished and that appellant should be paid therefor [sic].

This rationale applies even more in the case of EFSI's substantial infrastructure investment and the fact that it had completed work on three of the Utility Systems – electrical, natural gas, and potable water – and had substantially completed the fourth utility system, wastewater. There can be no doubt that the Government has received a benefit, a very significant benefit, from the work accomplished by EFSI, and that EFSI should be compensated for that work as contemplated by the Contract. See also Ventilation Cleaning Engineers, Inc., ASBCA No. 18580, September 30, 1974, 74-1 BCA ¶ 10,873 (noting that the proposition of the appellant that it should be paid for work performed and accepted gains support from the Payments clause, which specifically provided for "services rendered and accepted" and for payment of partial deliveries which were accepted).

In Anchorage Telephone Utility, GSBCA No. 5623, January 6, 1982, 82-1 BCA ¶ 15,547, the appellant appealed a contracting officer's final decision denying its claim for capital investment in certain telephone equipment that the government ordered permanently removed from a leased private branch exchange telephone system. Appellant had included certain mechanisms in its pricing methodology in its proposal to ensure full recovery of its capital investment. The Board concluded that these mechanisms were a term of appellant's contract despite the government's arguments to the contrary. The Board emphasized that "[a]ppellant's offers were premised upon the fact that appellant would recover its total investment," that this was a "fundamental premise on which appellant contracted," and that "[a]ppellant's offers made clear that it contracted with the intention of recovering its total investment plus a profit." Here, there can be no doubt that EFSI's offer was premised upon the fact that it would recover its capital investment, and the Contract terms clearly set forth this premise.

Thus, under procurement law and regulation, and the express terms of the Contract, EFSI is entitled to recover its unrecovered capital investment even in light of the termination for default of the Contract. The government has received, accepted, paid for, and enjoyed the benefit of the improvements to the four utilities, and EFSI should be fully compensated for its unrecovered capital investment as contemplated by the Contract.

EFSI also should be fully compensated for its unreimbursed O&M costs and for all its other costs due and owing under the Contract.

## IV. Summary Basis of Estimate

Payment for Unrecovered Capital Improvements

Improvements to all four systems under the contract, electrical, natural gas, potable water, and wastewater systems, were completed or substantially completed according to contract specification and accepted or constructively accepted. EFSI claim is determined by calculating the unrecovered portion of the contract price for these capital improvements, less the cost of work remaining on the four accepted systems.

| | |
|---|---|
| Contract Price for Capital Investment | $11,616,000.00 |
| Less: Principal Paid by Gov't (Exhibit 1) | $ 1,279,861.00 |
| Balance Due EFSI | $10,336,139.00 |

EFSI acknowledges that there are "punch list items" for all four Utility Systems. In addition, EFSI acknowledges that there is some work remaining over and above the punch list items on the wastewater system even though the government had accepted the benefit of the completed portion of that system. The cost to complete the punch list items and the wastewater system, within the scope of the original Contract as awarded, should be deducted from EFSI unrecovered capital investment. However, the exact cost of these punch list items and remaining work has not been verified at this time. The government has provided preliminary figures on the cost of the work to complete the punch list items and other additional work on the wastewater system. Further, the government declined to provide its recent consultant's report that would likely have more information about these costs. Therefore, as EFSI does not know the precise costs at this time, and EFSI has not been able to verify them, EFSI merely notes that there will be some downward price

adjustment in its claim to address this remaining work and defers the precise application of these costs to the total amount claimed until after further fact finding and verification.

Outstanding Accounts Receivables

EFSI claims the full amount of the O&M and other costs set forth in the two unpaid invoices submitted for work. See Exhibit 2. These services were performed for and accepted by the government. EFSI notes that the surety, Liberty Mutual Insurance Company, may have made payments under its Payment Bond to EFSI's subcontractor(s) that performed these services. Having paid this and other unpaid invoices from subcontractors for services that were performed for EFSI pursuant to the Fort Hamilton contract, Liberty Mutual has filed first a claim and then brought suit in the United States Court of Federal Claims against the government as a subrogee to EFSI under this Contract.

| | |
|---|---|
| O & M and other costs of Account Receivables | $140,662 |
| Total Claimed Unpaid Invoices | $140,662 |

Summary of Total Claim

| | |
|---|---|
| Unrecovered Capital Investment | $10,336,139 |
| Unpaid Invoices | 140,662 |
| Total Claimed | $10,476,801 |

## V. Certification

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contact adjustment for which EFSI believes the government is liable; and that I am duly authorized to certify the claim on behalf of EFSI.

PHK 4/15/05

Scott Mills
President and Chief Operating Officer
Enron Federal Solutions, Inc.

Dated: April 15, 2005.

**EXHIBITS**

Exhibit 1 – Principal Paid by Government

Exhibit 2 – Unpaid Invoices

DC1/169450

Exhibit 1

# Exhibit 1

**Enron Federal Solutions, Inc.**
**Fort Hamilton Contract**
**Claim for Unrecovered Capital Investment and Unpaid Invoices**
**April 15, 2005**

| Invoice # | Invoice Date | Payment Date | Service Period | Invoice Amount | Amount Paid | Outstanding AR Balance | Principal | Interest | O&M and other charges |
|---|---|---|---|---|---|---|---|---|---|
| 000187j8i | 4/6/2000 | 11/6/2000 | 4/1-4/30/00 | $194,596 | $194,596 | $0 | $64,605 | $76,327 | $53,665 |
| 000187sxz | 5/5/2000 | 11/6/2000 | 5/1-5/31/00 | $194,596 | $194,596 | $0 | $62,499 | $78,432 | $53,665 |
| 000187zs7 | 6/6/2000 | 11/6/2000 | 6/1-6/30/00 | $194,596 | $194,596 | $0 | $65,440 | $75,492 | $53,665 |
| 000188ejd | 8/14/2000 | 9/11/2000 | 7/1-7/31/00 | $194,596 | $194,596 | $0 | $63,368 | $77,564 | $53,665 |
| 000188eji | 8/14/2000 | 11/13/2000 | 8/1-8/31/00 | $194,596 | $194,596 | $0 | $63,798 | $77,134 | $53,665 |
| 000188hrt | 9/1/2000 | 10/30/2000 | 9/1-9/30/00 | $194,596 | $194,596 | $0 | $66,706 | $74,226 | $53,665 |
| 000188kmu | 10/3/2000 | 10/30/2000 | 10/1-10/31/00 | $194,753 | $194,753 | $0 | $64,684 | $76,247 | $53,821 |
| 000188ndq | 11/1/2000 | 12/27/2000 | 11/1-11/30/00 | $211,263 | $211,263 | $0 | $67,569 | $73,363 | $70,331 |
| 000188q16 | 12/1/2000 | 1/3/2001 | 12/1-12/31/00 | $211,263 | $211,263 | $0 | $65,582 | $75,349 | $70,331 |
| 000188sn6 | 1/2/2001 | 2/15/2001 | 1/1-1/31/01 | $211,263 | $211,263 | $0 | $66,028 | $74,904 | $70,331 |
| 000188v6y | 2/1/2001 | 3/6/2001 | 2/1-2/28/01 | $211,263 | $211,263 | $0 | $73,681 | $67,250 | $70,331 |
| 000188yuj | 3/1/2001 | 3/29/2001 | 3/1-3/31/01 | $211,263 | $211,263 | $0 | $66,976 | $73,956 | $70,331 |
| 0001894hp | 4/2/2001 | 5/9/2001 | 4/1-4/30/01 | $211,263 | $211,263 | $0 | $69,802 | $71,130 | $70,331 |
| 00018989i | 5/1/2001 | 6/13/2001 | 5/1-5/31/01 | $211,263 | $211,263 | $0 | $67,905 | $73,027 | $70,331 |
| 000189d2u | 6/1/2001 | 7/9/2001 | 6/1-6/30/01 | $211,263 | $211,263 | $0 | $70,707 | $70,225 | $70,331 |
| 000189ii7 | 7/2/2001 | 8/8/2001 | 7/1-7/31/01 | $211,263 | $211,263 | $0 | $68,846 | $72,086 | $70,331 |
| 000189prf | 8/1/2001 | 9/10/2001 | 4/6-10/3/00 | $211,263 | $211,263 | $0 | $69,313 | $71,618 | $70,331 |
| 000189w8q | 9/4/2001 | 10/19/2001 | 8/1-8/31/01 | $116,510 | $116,510 | $0 | $0 | $0 | $116,510 |
| 000189w8u | 9/4/2001 | 10/19/2001 | 9/1-9/30/01 | $211,263 | $211,263 | $0 | $72,079 | $68,853 | $70,331 |
| 00018a4e7 | 10/1/2001 | 11/15/2001 | 10/1-10/31/01 | $211,263 | $211,263 | $0 | $70,273 | $70,658 | $70,331 |
| **Sub-total payments received** | | | | $4,013,996 | $4,013,996 | $0 | $1,279,861 (Total Principal Paid) | $1,397,840 | $1,336,294 |
| Outstanding Invoices | | | | | | | | | |
| 00018acjv | 11/1/2001 | 11/1/2001 | 11/1-11/30/01 | $211,263 | $0 | $211,263 | $73,015 | $67,917 | $70,331 |
| 00018aj8r | 11/29/2001 | 1/13/2002 | 12/1-12/31/01 | $211,263 | $0 | $211,263 | $71,246 | $69,685 | $70,331 |
| **Sub-total accounts receivable** | | | | $422,526 | $0 | $422,526 | $144,261 | $137,602 | $140,662 (Outstanding O&M and other charges) |
| **Grand Total** | | | | $4,436,522 | $4,013,996 | $422,526 | $1,424,122 | $1,535,443 | $1,476,956 |

# Exhibit 2

APR-15-2005 11:23 ENRON P.23

# Invoice Summary

Invoice Summary Page 1

ENRON

Enron Energy Services

Please direct billing questions to:

*Fred Dirla*
*215-599-7042*

Fort Hamilton
Director of Public Works
Bldg 129, Fort Hamilton Military Community
Brooklyn, NY 11252

Attention: DFAS- DIR Network OPS/Capital Region

| | |
|---|---|
| Invoice Number: | 00018ACJV |
| Invoice Date: | 11/1/2001 |
| Billing Cycle: | 2001/44 |
| Due Date: | 12/16/2001 |
| EES Customer ID: | 100000583 |

| Product | From | To | Charges |
|---|---|---|---|
| **Misc./Taxes/Admn Fees/Adjs** | | | |
| Monthly Invoice Amount | 11/01/2001 | 11/30/2001 | $211,262.95 |
| **Misc./Taxes/Admn Fees/Adjs Total** | | | **$211,262.95** |
| **Total Charge** | | | **$211,262.95** |

Contract #: DACA51-00-C0001

Wire Transfer Remittance Address
Enron Energy Services
Citibank
Account #: 30489694
ABA #: 021000089

If contract requires automatic payment, please forward EFT to stated Wire Transfer Remittance Address. If contract allows for payment by check, please include coupon with payment.

If paying by check, please detach here and include with payment.

Mail to: Enron Energy Services
P.O. Box 203148
Houston, TX 77216-3148

Sent by: Fort Hamilton
Director of Public Works
Bldg 129, Fort Hamilton Military Community
Brooklyn, NY 11252

| | |
|---|---|
| Amount Due: | $211,262.95 |
| Invoice Number: | 00018ACJV |
| Invoice Date: | 11/1/2001 |
| Billing Cycle: | 2001/44 |
| Due Date: | 12/16/2001 |
| EES Customer ID: | 100000583 |

ENRON

Location Detail

**Fort Hamilton**
Director of Public Works Bldg. 129,
Fort Hamilton Military Community
Brooklyn, NY 11252

| Misc/Taxes/Admn Fees/Adjs | Description | Date | Amount |
|---|---|---|---|
| Monthly Invoice Amount | | 11/01/2001 | $211,262.95 |
| Subtotal | | | $211,262.95 |
| Misc/Taxes/Admn Fees/Adjs Total | | | $211,262.95 |

**Location Total** $211,262.95

APR-15-2005 11:24 ENRON P.25

# Invoice Summary

Invoice Summary Page 1

ENRON

Enron Energy Services

Please direct billing questions to:

*Fred Dirla*
*215-599-7042*

Fort Hamilton
Director of Public Works
Bldg 129, Fort Hamilton Military Community
Brooklyn, NY 11252

Attention: DFAS- DIR Network OPS/Capital Region

| | |
|---|---|
| Invoice Number: | 00018AJ8R |
| Invoice Date: | 11/29/2001 |
| Billing Cycle: | 2001/48 |
| Due Date: | 1/13/2002 |
| EES Customer ID: | 100000583 |

| Product | From | To | Charge |
|---|---|---|---|
| Misc./Taxes/Admn Fees/Adjs | | | |
| Monthly Invoice Amount | 12/01/2001 | 12/31/2001 | $211,262.95 |
| Misc./Taxes/Admn Fees/Adjs Total | | | $211,262.95 |
| **Total Charge** | | | **$211,262.95** |

Contract #: DACA51-00-C0001

Wire Transfer Remittance Address:
Enron Energy Services
Citibank
Account #: 30469694
ABA #: 021000089

If contract requires automatic payment, please forward EFT to stated Wire Transfer Remittance Address. If contract allows for payment by check, please include coupon with payment.

If paying by check, please detach here and include with payment.

Mail to: Enron Energy Services
P.O. Box 203148
Houston, TX 77216-3148

Sent by: Fort Hamilton
Director of Public Works
Bldg 129, Fort Hamilton Military Community
Brooklyn, NY 11252

| | |
|---|---|
| Amount Due: | $211,262.95 |
| Invoice Number: | 00018AJ8R |
| Invoice Date: | 11/29/2001 |
| Billing Cycle: | 2001/48 |
| Due Date: | 1/13/2002 |
| EES Customer ID: | 100000583 |

ENRON

**Fort Hamilton**
Director of Public Works Bldg. 129,
Fort Hamilton Military Community
Brooklyn, NY 11252

| Misc./Taxes/Admn Fees/Adjs | Description | Date | Amount |
|---|---|---|---|
| Monthly Invoice Amount | | 12/01/2001 | $211,262.95 |
| Subtotal | | | $211,262.95 |
| Misc./Taxes/Admn Fees/Adjs Total | | | $211,262.95 |

**Location Total** **$211,262.95**

**DEPARTMENT OF THE ARMY**
ARMY CONTRACTING AGENCY
HEADQUARTERS, NORTHERN REGION
CAPITAL DISTRICT CONTRACTING CENTER
9410 JACKSON LOOP, SUITE 101
FORT BELVOIR, VIRGINIA 22060-5134

REPLY TO
ATTENTION OF:

SFCA-NR-CDCC

11 August 2005

VIA FIRST CLASS MAIL
AND FAX 202-344-8300

Mr. John Pavlick, Jr.
575 7th Street, NW
Washington, District of Columbia 20004

Mrs. Pamela Kavieff
Enron Federal Solutions, Inc.
1221 Lamar Street, Suite 1600
Houston, TX 77010

Enron Federal Solutions, Inc.
P.O. Box 1188
Houston, TX 77251-6058

Re: Enron Federal Solutions, INC. and Fort Hamilton Utility System Contract Claim

Dear Mr. Pavlich and Mr. Mills:

This final decision is in response to the claim submitted on April 15, 2005 by Enron Federal Solutions, INC. (EFSI) claiming Unreimbursed Capital Expenditures and Unpaid Invoices involving the Fort Hamilton Utility System Contract ((FHNY)(Contract No. DACA51-00-C-0001)). The claim is denied.

**Operative Facts**

The United States Army and Enron Federal Solutions, Inc. entered into Contract No. DACA51-00-C-0001 on December 2, 1999. Pursuant to the contract, EFSI was to obtain legal ownership of four utility systems at Fort Hamilton, New York, upgrade the systems, and then operate and maintain them for ten years. The RFP reflected the Army's clear intent – consistent with DoD privatization policy -- to combine in one broad contract the complete package of construction, operation, maintenance, and capital/risk management services related to the FHNY utilities enterprise. The contract provided that Government would pay EFSI the monthly service fee as long as EFSI remained in general compliance with contract terms, and "upon certification of satisfactory

performance of work and approval of the contractor's monthly invoice by the Contracting Officer." The contract required EFSI to "use reasonable diligence to provide an uninterrupted supply of electric, natural gas, potable water and wastewaster service at each service location" EFSI's final proposal dated 27 Aug 1999 addressed this requirement by proposing an ambitious initial capital improvements program. EFSI's performance during the first year of contract performance was successful and in conformance with all contract requirements. EFSI's progress on capital improvements during this time was either on or ahead of schedule. Full payment of fixed monthly service fees invoiced by EFSI was made during this time.
Enron abandoned performance of the contract on December 3, 2001.

On 3 December 2001, Mr. Dirla, EFSI's project manager, contacted the Government's contract specialist and COR and stated that both he and the alternate project manager had been fired by Enron and were in the process of vacating the EFSI jobsite. When the contract specialist asked whom the Army should contact to assure continuity of performance, Mr. Dirla was unable to provide any information. Mr. Dirla further indicated he did not know whether EFSI's FHNY staff would be replaced. Subsequently, the Army's contract specialist placed additional phone calls to both EFSI and Enron's offices in an attempt to determine whether and how the contract would be staffed. These calls were not answered; the first contact the Army was able to establish with any party related to EFSI was with Mr. Andrew Ralston, an Enron Corp. in-house attorney, on 5 December 2001; and Mr. Ralston was unable at that time to respond to any specific concerns. In fact, no EFSI representatives returned to the FHNY jobsite after 3 December 2001 and the FHNY emergency response hotline (to enable round-the-clock reporting of utilities outages) was unmanned after this date. The Army sent Enron a cure notice by letter dated December 5, 2001. The Army did not receive a reply from Enron to its cure notice. Enron never resumed performance of the contract. After discussions with the bankruptcy court and corresponding delays associated with Enron's bankruptcy the Army terminated the contract for default effective February 26, 2002.

**Reasoning and Contract Clauses**

EFSI in its claim states that the FHNY contract mandates– in the event of early termination dollar-for-dollar compensation of EFSI's actual capital improvement costs. The clauses EFSI has cited in support of this argument are FAR 52.241-10, Termination Liability, and FAR 52.249-8, Termination for Default (Supplies and Services). Neither of the cited clauses – even if applicable -- can be stretched to confer such a windfall on EFSI. This is especially true when one considers that this assumption of risk from the government was exactly what, as EFSI stated in its proposal, EFSI wanted to accomplish. By "front loading" its capital costs and risks EFSI had ensured increased profit through increasing the efficiency of the system early as opposed to over the period of the contract EFSI would be able to operate the system with less yearly costs after the initial year's expenditures resulting in reduced O&M costs over the life of the contract. As stated in its own proposal "EFSI engineers selected upgrade/replacement projects, which will reduce the long-term life cycle costs of operating the three systems." EFSI acknowledged "by 'front loading' capital improvements in the first year, EFSI will reduce the need for larger

amounts of capital in the later years of the contract." This bargain was exactly what EFSI was negotiating for; the onus can not now be placed on the government to make EFSI whole after the contract has failed and been Terminated for EFSI's Default.

In addition to EFSI's claim for unreimbursed capital improvements included in EFSI's claim were two invoices that EFSI claims have gone unpaid. The first reflects the final invoice that was received by the government for EFSI's performance in November 2001 in the amount of $211,263. The government, as addressed below, stands ready to disburse that money as soon as it is clear whether the surety or EFSI has the controlling claim. The second invoice attached states that it is for services performed during the period of 1 Dec 01–31 Dec 01. On the first working day in December, 3 December 2001, Mr. Dirla, EFSI's project manager, contacted the Government's contract specialist and COR and stated that both he and the alternate project manager had been fired by Enron and were in the process of vacating the EFSI jobsite. Since no work was done in December the government denies that payment should be made on the 1 Dec 01–31 Dec 01 invoice.

**FAR 52.241-10 had no legal force or effect in the FHNY Contract**

FAR 52.241-10 clearly does not entitle EFSI to recover its unreimbursed capital expenditures on a cost-reimbursement, value-added, or any other basis. This is for the simple reason that no FAR 52.241-10 terms were never negotiated, agreed to, or incorporated in the FHNY contract.

FAR 52.241-10, as published in the FAR, is a "skeleton" provision that – while opening the amount of termination liability to negotiation – stops short of fixing the amount of liability in the absence of agreement between the parties.

Absent agreement on the four critical fill-ins identified in the clause, regulations impose no requirement to include FAR 52.241-10 or any comparable clause in utilities privatization contracts. Instead, FAR 41.501(d) provides that the clause shall be inserted "under the prescribed conditions" listed in FAR 41.501(d)(4). FAR 41.410(d)(4) circularly identifies those "prescribed conditions" as "when payment is to be made to the contractor upon termination of service in conjunction with or in lieu of a connection charge upon completion of the facilities". The FAR, states that 52.241-10 shall be incorporated in a contract only where the parties have negotiated an advance agreement quantifying liability for termination.

It is true that the solicitation that resulted in award of the contract incorporated FAR 52.241-10 first by reference and subsequently in full text. In so doing, however, the Government stressed the consensual nature of the clause repeatedly in communications with offerors. In RFP Amendment 5, the Government -- while holding out the *possibility* that capital cost recovery could be negotiated in advance under FAR 52.241-10 – expressly refused to commit itself to any specific dollar figure or terms for termination liability. Moreover, the Government explicitly stated that – in the absence of agreement on critical 52.241-10 fill-in terms -- the contractor's sole compensation for an

early termination would be based on either the Termination for Convenience or Termination for Default clauses incorporated in the solicitation.[1]

Simply stated, the Government's advertised position, in soliciting competitive proposals for the FHNY requirement, was that it wanted to consider offers for negotiation of advance agreements quantifying termination liability. Unless and until agreement on those specific terms could be reached, however, the contractor's only avenue for claiming unrecovered capital costs consisted of either the Termination for Convenience and Termination for Default clauses.

Faced with this clear message, it was incumbent on EFSI and other offerors to propose any terms necessary to "fill in the blanks" left by FAR 52.241-10. In reality, EFSI's proposal completely failed to fill this void. EFSI's final proposal (as incorporated in the contract) contained detailed fill-ins to various clauses included in the Government's solicitation as issued . . . but not with respect to FAR 52.241-10.[2] Under these circumstances, EFSI's omission of FAR 52.241-10 terms can only be interpreted as a conscious business decision by EFSI not to negotiate termination liability in advance…and it cannot now second-guess that omission. See *Communications International*, ASBCA No. 30976 *et al.*, 88-1 BCA Para. 20,208 (no postaward relief granted under doctrine of unilateral mistake when contractor, due to an oversight, failed to include profit in its cost proposal).

Even if FAR 52.249-10 was part of the contract, it doesn't apply here, as it only applies when utility services were terminated by the Government, which never happened here.

**EFSI is not entitled to recover its costs of performance under the contract's "Termination for Default" clause**

---

1 Shortly after incorporating FAR 52.241-10 by full text into the RFP, the Government included the following exchange in Amendment 5 for clarification purposes:

> Question: Will the Government amend the Solicitation to include provisions whereby the contractor may terminate the contract and "put" the facility back to the Government upon the occurrence of certain defined events (e.g. a base closing or sale of the base to a private party) and pursuant to a price determinable by formula?
>
> Answer; The solicitation includes termination for convenience of the Government and termination for default clauses (both exercised at the option of the Government). One of these clauses will control the situation described in the question.

Amendment 5

2 EFSI's final proposal did provide as follows:

> In the event the contract is terminated, the Contractor shall be granted compensation for its capital costs in accordance with FAR 52.241-10 (Termination Liability) and for all its other costs in accordance with FAR 52.249-2 (Termination for Convenience).

FAR 52.249-8(f) provides that in the event of a default termination, the defaulting contractor is entitled to recover "*contract price for completed supplies delivered and accepted*." Even accepting that the capital improvements at issue in this case could qualify as "supplies" for purposes of this clause, it is clear that this provision is effectively irrelevant to EFSI's claim.

As a threshold matter, it appears that FAR 52.249-8 was mistakenly incorporated in this contract, or at least (per *United States v. G.L. Christian*, 160 Ct. Cl. 58 (1963)) should have been replaced by FAR 52.249-10 as to that segregable portion of the contract covering capital improvements. See FAR 49.504(c)(1) ("[t]he contracting officer shall insert the clause at 52.249-10, Default (Fixed Price Construction), in solicitations and contracts for construction, when a fixed price contract is contemplated and the contract amount is expected to exceed the simplified acquisition threshold. . . .") FAR 36.101(c) plainly provides that where – as here -- a contract is for both construction and supplies or services, and where the construction/services portions are "divided into parts," the contract should incorporate "the clauses applicable to each portion." Clearly, the implementation of capital improvements was a pure construction activity because it involved improvements to real property, including "plants, .. sewers, mains, power lines, .... pumping stations" (see FAR 2.101); and just as clearly, the construction of capital improvements was a part of the contract separate and distinct from performance of O&M services. Thus, the terms of FAR 52.249-10, not the terms of FAR 52.249-8, dictate EFSI's entitlement; and FAR 52.249-10 (in contrast to FAR 52.249-8(f)) contains no provision allowing a defaulting contractor to recover for unfinished construction.

Moreover, even if FAR 52.249-8(f) governs, the fact is that EFSI has already received full "contract price" (in the form of incremental fixed monthly payments) for work performed at the FHNY jobsite up to and including 31 October 01.[3] The contract did not provide for traditional progress payments to EFSI as work proceeded on capital improvements. Instead, the contract provided for payment of a fixed monthly service fee to EFSI as long as EFSI remained in general compliance with contract performance requirements and conditions. The Government paid the required fixed monthly fee to EFSI in full and on schedule (with the exception of the monthly payment for Nov 01, which the contracting officer withheld only after EFSI's default was apparent). Thus, even if FAR 52.249-8(f) is said to dictate the amount of EFSI's recover, EFSI has already received the contract price due (less approximately $211,262.95) for utilities coverage for the period November 2001. And, the Government stands ready to disburse that $211,262.95 as soon as it is decided whether EFSI or Liberty has a priority claim to those retained funds.

EFSI is not interested in simply recovering its contract price, but wants to shift the onus of its bad bargain onto the Government by recovering its actual costs as well. This

---

[3] Upon learning that EFSI had abandoned the FHNY jobsite on 3 Dec 01, the Government elected to hold with no action EFSI's invoice for the month of November 2001. Because EFSI performed acceptably during November 2001, the Government concedes that this single payment (amounting to $211,262.95) should be included in any "earned contract balance" to which EFSI would be entitled.

it cannot do. As a defaulting contractor under a fixed price contract, EFSI is not entitled to the recovery it seeks under any standard "Default" clause that might apply, whether it be FAR 52.249-8 or 52.249-10.

**EFSI is not entitled to recover its capital improvement costs under common law breach of contract or restitution theories**

Here, EFSI had no legitimate expectation to recover the costs of capital improvements on a cost-reimbursement basis. EFSI's only expectation was to receive fixed monthly service fees for as long as it remained in general compliance with the performance obligations of the FHNY contract. EFSI well understood – and expressly acknowledged in its proposal – that its agreement to complete capital improvements at the "front end" of the contract represented an assumption of significant risk by EFSI. Indeed, under the privatization model, the essence of the Government's bargain was to shift that risk onto the contractor. Having negotiated to assume that risk – and having presumably built that risk into its fixed monthly service fee – EFSI cannot now benefit from its own breach by repudiating the bargain it entered into freely.

The Government satisfied its payment obligations to EFSI for as long as EFSI remained in place to cover the privatized utilities. The Government has paid, on time and in full, all invoices for monthly service fees submitted by EFSI for performance up to and including 31 Oct 01 (for a total of $4,225,102.24 in payments over the life of the contract). Indeed, the only invoice not paid by the Government (the invoice for November 2001, in amount of $211,262.95) was one that was pending at the time of EFSI's default on 3 December 2001. Upon learning EFSI had abandoned the jobsite, the Government was processing that November 2001 service fee invoice; upon learning of the default, the contracting officer ordered payment to be suspended, to protect the equitable rights of Liberty, the Government itself, and other interested parties.

The Government admits that the amount of any earned contract balance deemed due to EFSI must include this $211,262.95 retained payment. Further, the Government is willing to disburse this amount once a definitive determination has been made as to the priority of interested parties in contract balances. But this $211,262.95 is the extent of any "earned" monies undisbursed to EFSI. Once EFSI vacated the site and abandoned the work, the Government had no further duty to EFSI and was excused from further payment. It is well established that, "[w]here performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance." Restatement (2d) of Contracts, Section 253.

The import of these rules is abundantly clear: restitution may not be awarded on a *pro tanto* basis, but must be reduced to reflect the nature of the risks and obligations borne by the parties to the contract. Here, the very principle of privatization contemplates that the contractor, in return for receiving a dependable fixed monthly service fee over a long term, will incur risk as appropriate to assure that the privatized systems continue as a viable, going concern. Indeed, the privatization model even

requires the contractor to assume actual, legal ownership and liability for the systems, thus incentivizing economically appropriate investments by the contractor.

That the risk of financing and performing capital improvement was to be shifted to the privatization contractor was eminently clear under the terms of the contract as solicited. But EFSI, in submitting its proposal and negotiating with the Government, upped the ante even further. EFSI's proposal acknowledged that its plan to "frontload capital improvements" by completing them in the first year of a ten-year contract term. EFSI's proposal acknowledged that this required a "major infusion of capital" at the contract's inception. Further, EFSI's proposal underscored EFSI's willing assumption of risks involving "cost control, capital/financing, emergency capital, insurance, material procurement, disaster funding, expense fluctuation, inflation, and interest rates." The following excerpt from EFSI's final price proposal is significant, and reflects EFSI's all-too-clear understanding of the risks it assumed as FHNY utilities privatization contractor:

- EFSI's fixed price approach provides the Government with a stable and predictable price from month-to-month and year-to-year. EFSI's technical approach combined with the fixed price structure allows for a consistent, predictable stream of cash flows.

- EFSI's technical approach proposes to perform the upgrades and replacements in the first year in order to amortize those costs over the full term of the contract. This will provide the Government with several key benefits.

- The government will receive the benefits from the upgrades and replacements as early as possible in the contract term as opposed to incrementally over several years. New and upgraded systems and system components will result in decreased O&M costs over the term of the contract.

- This approach allows EFSI to finance major improvements over a longer term in order to stabilize the Government's payments. By "front loading" capital improvements in the first year, EFSI will reduce the need for larger amounts of capital in the later years of the contract.

Further review of EFSI's proposal establishes moreover that "frontloading" of capital improvements construction was not adopted primarily for the Government's benefit, but for EFSI's own. EFSI's proposal acknowledged that, in identifying areas for capital improvement, "EFSI engineers selected upgrade/replacement projects, which will reduce the long-term life cycle costs of operating the three systems." EFSI acknowledged "by 'front loading' capital improvements in the first year, EFSI will reduce the need for larger amounts of capital in the later years of the contract." The rationale for this decision was the O&M costs on the existing, antiquated systems would be higher, and that an immediate modernization of those systems would allow EFSI to lower its O&M costs in the out years of performance. Indeed, an analysis of the cost figures presented by EFSI

indicates that it expected capital improvements to cut O&M costs virtually in half.[4] EFSI's model was effective and had they not defaulted on the contract due to their illegal activities and subsequent bankruptcy, they were on their way to making a substantial profit.

The Government and EFSI did not bargain for a traditional construction contract in soliciting and awarding the FHNY utilities privatization requirement. Instead, both parties rejected a traditional model in favor of one that divested the Government of its interest in utilities operations, and gave the contractor unprecedented opportunities for flexibility and profit. A critical element of the deal was that EFSI would, for a price, assume the financial risk of implementing capital improvements. The essence of that bargain must now be effectuated despite the fact that contract performance – through EFSI's, not the Government's, fault – was cut short. The bargain is only frustrated if the Government reassumes EFSI's capital risks. Even assuming EFSI would be entitled to some restitution of its sunk but unreimbursed capital investment costs, those costs must be discounted by a factor that properly takes the parties' agreement into account; and that does not unduly reward EFSI's breach. Based on the rational laid out above your claim is denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Very respectfully,

WILLIAM CAMPBELL
Contracting Officer

---

[4] EFSI's proposal reiterated that it could expect to incur higher O&M costs "during the initial period due to maintaining the older systems until the new/upgraded systems are commissioned." O&M costs for the first six months (O&M of legacy systems), was estimated at $345,400 or a monthly rate of almost $60,000; this monthly estimate was about twice the approximately $30,000 monthly O&M cost estimated for the remaining 9 years and 6 months term. EFSI's total estimated O&M cost for the entire 10-year term of the contract was $3,799,000, as set forth in figure 3 of its final proposal. Figure 3a indicates that the total estimated O&M costs for the first 6 months are $345,400 (meaning a monthly O&M cost for this period of $57,566.66). If the total 10-year estimate is deducted by $345,400 (for the first six month period) and divided by 114 (the number of months remaining in the contract term after the initial 6-month period), the resulting monthly figure for O&M after the first six months is $30,294.74.