**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENRON FEDERAL SOLUTIONS, INC., et. al.,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **No. 05-1000C (04-254C) (Consolidated) (Judge Block)** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S BRIEF IN RESPONSE TO COURT'S REQUEST FOR POST-HEARING BRIEFING IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COUNTS THREE AND FOUR AND FOR SUMMARY JUDGMENT WITH REGARD TO PLAINTIFF ENRON FEDERAL SOLUTIONS, INC.'S COMPLAINT AND DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to this Court's Order of April 18, 2007, defendant, the United States, respectfully submits the following Brief in Support of its Motion to Dismiss Counts Three and Four and for Summary Judgment with Regard to Plaintiff Enron Federal Solutions, Inc.'s Complaint (Dkt. No. 17) ("Defendant's Motion" or "Def. Mot.") and in Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment (Dkt. No. 19) (Plaintiffs' Cross-Motion" or "Pl. Cross-Mot.").

Contract Interpretation

1) Is the contract a hybrid of a services and construction contract, or is it strictly a services contract? What effect, if any, does that determination have on the parties' responsibilities? Does the definition of the contract as a services contract or as a hybrid contract limit or mandate the use of FAR provisions?

As Enron Federal Solutions, Inc. ("EFSI" or "Enron") acknowledged in its proposal, the contract is a services contract. Enron submitted its proposal "to own, operate, and maintain the Fort Hamilton . . . utility systems . . ." Defendant's Appendix Attached to Motion to Dismiss ("Def. App."), 12. Enron's proposal continues by stating "[w]e view the proposed contract as a

long-term opportunity, not just 10 years." Def. App., 15. The contract solicitation contains similar language stating that Fort Hamilton seeks a "utility service provider to . . . own (or replace and own), operate, and maintain the Fort Hamilton electrical, natural gas, potable water and collect wastewater within the Fort Hamilton installation boundary." Def. App., 4 (Contract § B.1.1).

As discussed in more detail below in response to Question 7, FAR § 41.101 defines "Utility service" as "a service such as furnishing electricity, natural or manufactured gas, water, sewerage, thermal energy, chilled water, steam hot water, or high temperature hot water." This definition and the contract language clearly support the Government's position that this is a service contract because the contract refers to a "utility service provider . . . to own" the facility and provide the same utilities included in the definition of FAR § 41.101.

As a services contract, FAR § 41.501 provides a list of mandatory FAR provisions that must be incorporated into services contract, some of which must only be included under certain conditions. See FAR § 41.501 (stating the "Contracting officer shall" include certain FAR provisions); FAR § 41.201 (stating that a written utilities services contract "must included the clauses required by 41.501"). These mandatory provisions are incorporated into the contract in Section I.

2) What is the significance of the fact that this was a privatization contract?

The fact that the contract was entered into in an effort to privatize the utilities services at Fort Hamilton explains the parties' motivations for entering into the contract. However, that the purpose of the contract was to privatize the facilities is not legally significant because the contract should be interpreted according to its express terms, and we are not aware of any case,

statutory or regulatory law that applies to privatization contracts.

FAR Interpretation

3) What FAR provisions must be read into this contract as a matter of law? May parties to a contract negotiate to alter a mandatory FAR provision? Or are mandatory FAR provisions to be incorporated strictly?

No additional FAR provisions must be read into the contract as a matter of law. Under the Christian doctrine, "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." S.J. Amoroso Construction Co., Inc. V. U.S., 12 F.3d 1072, 1075 (Fed. Cir. 1993)(citations omitted).

In Amoroso, the plaintiff argued that the Christian doctrine only applied where a FAR clause was inadvertently omitted from the contract. Plaintiff continued by arguing that the doctrine did not apply to the contract at issue where one FAR clause was intentionally substituted for another. The court disagreed holding that the purpose of the Christian doctrine was to prevent "procurement policies [from] being **'avoided or evaded (deliberately or negligently by lesser officials.'**" Id. (emphasis original)(citing G.L. Christian & Assoc. v. United States, 312 F.2d 418, aff'd on reh'g, 320 F.2d 345, 351 (1963)). The court continued stating that the "Christian doctrine 'guard[s] the dominant legislative policy against ad hoc encroachment or dispensation by the executive' and prevents 'hobbling the very policies which the appointed rule-makers consider significant enough to call for . . . mandatory regulation.'" Id. Clearly, the purpose of the Christian doctrine is to ensure that procurement policies are not circumvented by officials by including in all contracts any mandatory contract clause that "expresses a significant or deeply ingrained strained of public procurement policy." Amoroso,

12 F.3d at 1075.

FAR provisions are regulatory in nature and thus carry the force of law. The FAR, however, permits deviations when authorized pursuant to specific criteria and limitations. See FAR §§ 1.400-1.405. Because none of the criteria or limitations were met, or in any way requested, on formulation of this contract, the applicable FAR contract clauses were required to be incorporated strictly in accordance with the guidance provided in the FAR.

4) What case law or other support is there for these conflicting interpretations? In other words, is FAR § 52.241-10 a general termination clause applicable to both terminations for convenience and default termination situations, or is it strictly a termination for convenience clause? How do the termination process and procedures established by the FARs affect the above respective interpretations? Is § 52.241-10 a mandatory clause or can it be altered and adopted at the parties' discretion? What case law exists regarding interpretation of § 52.241-10? What "legislative" history exists regarding the promulgation of FAR § 52.241-10?

We are not aware of any case law or legislative history that is helpful in interpreting FAR § 52.241-10. As discussed below in response to Question 6, FAR § 52.241-10 is incorporated into Section I of the contract by Amendment 5. "Contract interpretation begins with the plain language of the agreement." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991), citing Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 413 (Fed. Cir. 1988); accord Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 390 (1965). Thus, the court should employ a "plain meaning" analysis in any contract dispute. Aleman Food Services, Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993). It is clear that FAR § 52.241-10 is a termination for convenience clause based on the plain meaning of the language of the clause which states "[i]f the Government discontinues utility service under this contract . . ." FAR § 52.241-10 (Feb. 1995) (emphasis added). The plain meaning of this clause is that it applies only to terminations for convenience where the government terminates the utility services. In this

case, EFSI terminated the utility services by abandoning the facility and turning it back over to the Government. Opinion and Order at 2, No. 04-254C (Feb. 27, 2006); EFSI Comp., Ex. 2, p. 2 (Contracting Officer's final decision (Aug. 11, 2005)). Furthermore, if this clause is interpreted as a termination for default clause rather than a termination for convenience clause, it makes the contract's termination for default clause, (FAR § 52.249-8) incorporated into the contract at Section I.46, meaningless. Clause 52.241-10 cannot be a general termination clause because by its plain language it only applies when "the Government discontinues utility service" which can only occur when the Government initiates a termination for convenience.

5) Did both contracting parties believe FAR § 52.241-10 applied to a default termination situation? If so, why, and where is this demonstrated in the contract or by extrinsic evidence? Was there a mutual mistake by the contracting parties regarding FAR § 52.241-10? What case law exists regarding mutual mistake in this type of situation?

Here, the contract at issue is unambiguous so the contract cannot be supplemented with terms that are not set forth in the contract. TEG-Paradigm Envir., Inc. V. United States, 465 F.3d 1329, 1340 (Fed. Cir. 2006) (the court cannot use "extrinsic sources to impart ambiguity into an otherwise unambiguous contract"); Schwartz v. Fla. Bd. of Regents, 807 F.2d 901, 905-06 (11th Cir. 1987) (court cannot add words to unambiguous contract). Certainly the Government understood that FAR § 52.241-10 applies only to terminations for convenience based on the unambiguous language at the beginning of the clause stating "[i]f the Government discontinues utility service." FAR § 52.241-10 (emphasis added). EFSI also necessarily understood that this clause pertained to termination for convenience, because any other interpretation would be unreasonable. Moreover, this clause cannot be a termination for default clause because that would make the contract's default clause, (FAR § 52.249-8) incorporated

into the contract at Section I.46, meaningless.

As stated above, the Government has never believed that the Termination Liability clause contained in Section H.8 of the contract applied to terminations for default. Because the Government did not believe that the Termination clause applied to terminations for default, there cannot be a mutual mistake with regard to this clause and the Court should enforce the unambiguous meaning of the clause by ruling that it is inapplicable because it only applies to terminations for convenience. The Government's answer on page 4 of Amendment 5 does not show that the Government adopted EFSI's interpretation of § 52.241-10. Instead, it only shows that the Government responded to EFSI's concern that § 52.241-10 was not incorporated into Section I by implementing Amendment 3 to add § 52.241-10 to Section I.

6) Does the question and answer language on page 4 of Amendment 5 to the Solicitation, which addresses FAR § 52.241-10, demonstrate that the government adopted EFSI's interpretation of § 52.241-10?

No. First, the beginning of this section of questions and answers is clearly labeled as "For Information Purposes Only." Amendment 5 at 2. As a result, any answer to these questions are not part of the contract and are not binding on the parties. Second, and more importantly, the answer on page 4 of Amendment 5 to the Solicitation states that FAR § 52.241-10 is included in the contract. The beginning of the question states "Section H.8 indicates that termination liability shall be based upon FAR 52.241-10, but is not incorporated at Section I." Amendment 5 at 4. The Government responded that "The clause is included in amendment 0003." Id. Amendment 3 states "Add the following clause to Section I [-] 52.241-10 - - Termination Liability (Feb 1995)[.]" Amendment 3 then continues by including the entire text of the clause, 52.241-10, which, as stated above, begins by stating "If the Government

discontinues utility service under this contract . . ." Amendment 3 at 3. Again, beginning the clause with the phrase "if the Government" clearly makes this a termination for convenience clause, not a termination for default clause.

7) How should the applicable FAR provisions be read in the contract? Does one FAR provision trump another? What about FAR § 41.101, the definitions section of the FAR for utility services?

As stated above in response to Question 3, no additional FAR provisions must be read into the contract as a matter of law.[1] Moreover, under the interpretation advanced by the Government in its Motion to Dismiss, the FAR provisions do not conflict with one another. The provisions of a contract should not be construed as being in conflict "unless no other reasonable interpretation is possible." United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983). As the Federal Circuit stated:

> The provisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.

Gould, Inc., 935 F.2d at 1274 (citation omitted).

Furthermore, as discussed above in response to Question 3, parties to a contract may not alter FAR provisions without specific authority to do so. The "Christian doctrine 'guard[s] the dominant legislative policy against ad hoc encroachment or dispensation by the executive' and prevents 'hobbling the very policies which the appointed rule-makers consider significant

[1] In addition, Section I of the contract incorporates FAR § 52.241-2 which provides "In the event of any inconsistency between the terms of this contract (including the specifications) and any rate schedule, rider or exhibit incorporated in this contract by reference or otherwise, or any of the Contractor's rules and regulations, the terms of this contract shall control."

enough to call for . . . mandatory regulation.'" Id. Clearly, the purpose of the Christian doctrine is to ensure that procurement policies are not circumvented by lesser officials by including in all contracts any mandatory contract clause that "expresses a significant or deeply ingrained strained of public procurement policy." Amoroso, 12 F.3d at 1075. Because the purpose of the Christian doctrine is to ensure that public officials follow public procurement policies, it follows that the parties may not alter mandatory FAR provisions.

The definitions section of FAR § 41.101 defines "Utility service" as "a service such as furnishing electricity, natural or manufactured gas, water, sewerage, thermal energy, chilled water, steam hot water, or high temperature hot water." This definition of "Utility service" supports the Government's position that the contract between the Government and EFSI is a service contract not a construction contract. The solicitation for the contract states that the Government "seeks (1) qualified utility service provider or contractor . . . to own (or replace and own), operate and maintain the Fort Hamilton electrical, natural gas, potable water and collect wastewater within Fort Hamilton . . ." Def. App., 4 (Contract § B.1.1) (emphasis added). The contract language clearly supports that this is a service contract because the contract refers to a "utility service provider . . . to own" the facility and provide the same utilities included in the definition of FAR § 41.101.

Amortization Payments

8) What is the significance of the amortization payments? Why were they contracted that way?

There is no dispute that the contract contemplated that EFSI would have to make a substantial investment into the facility during the first year of the contract. Def. App., 4-5 (Contract §§ B.2.1, C.7). The solicitation stated that the "following items are to be proposed in a

Firm Fixed Price, lump sum methodology in Schedule B-1, but detailed justification and rationale will be required to evaluate appropriate responses for technical sufficiency." Def. App., 4-5 (Contract § B.2.1). The contract goes on to list components to the "Total Annual Price." Def. App., 5 (Contract § B.2.5). The Total Annual Price is composed of the Annual Initial Upgrade, Annual Distribution Charge, Annual Capital Improvement and the Annual Purchase Price. Def. App., 4,-5 (Contract § B.2). The contract defines the "Annual Initial Upgrade as the "initial capital investment price, amortized over a desired period at an annual interest rate, for system improvements to comply with utility standards . . ." Def. App., 4 -5 (Contract § B.2.1). Annual Distribution Charge is defined as the "total annual service charge for the nominal ownership, operation and routine maintenance" of the facility. Def. App., 5 (Contract § B.2.2). Annual Capital Improvements is defined as the price of "any capital related investments [for the facility] . . . forecasted on an annual basis." Def. App., 5 (Contract § B.2.3). Annual Purchase Price is a credit that the Government receives "for the fair value of the utility distribution systems." Def. App., 5 (Contract § B.2.4). This amount was to be returned to the Government "in the form of an annual credit to the utility distribution bill." Def. App., 5 (Contract § B.2.4). Reading all of these requirements together, it is clear that the purpose of the amortization payments was to provide a "detailed justification and rationale" for the prospective service provider's Total Annual Price. The amortization component to the price was simply for justification of the total price and did not imply that the Government was purchasing the facility given that the contract clearly provides that the service provider will "own . . . operate, and maintain the Fort Hamilton" utility services facility. Def. App., 4 (Contract § B.1.1). The Government certainly realized that EFSI was making a significant investment in the facility and

that the Total Annual Price paid by the Government had to be sufficient to allow EFSI to recoup its investment over the ten-year term of the contract. The fact that amortization costs were considered by the Government in evaluating bids of prospective service providers does not mean that the Government agreed to purchase the facility. It simply shows that the Government required justification for the contract price.

Available Remedies

9) Can the Court award general contract damages in this case in light of the incorporated FAR termination provision, other provisions in the contract, or other FAR provisions incorporated by law? What about other damage or equitable remedies? Any case precedent?

We explained in our motion to dismiss that this Court generally lacks subject matter jurisdiction over quantum meruit claims and that jurisdiction over such claims has only been recognized in the narrow case where an express contract between a contractor and the Government contained a defect which rendered it invalid or unenforceable. Def. Mot. at 8-9 (quoting Perri v. United States, 340 F.3d 1337, 1343-44 (Fed. Cir. 2003)). The case before this Court does not present such a case; the contract between EFSI and the Government was valid and enforceable, and both parties performed under that contract until EFSI abandoned performance following the collapse of its parent. The Termination Liability clause is not defective; its express terms simply did not apply when the contractor discontinued providing utility service under the contract before completion of the facilities cost recovery.

Similarly, plaintiffs' attempts to find jurisdiction based upon an alleged implied-in-fact contract are misplaced. Plaintiffs themselves concede in their brief that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp. v. United

States, 895 F.2d 745, 754-55 (Fed. Cir. 1990) (citing ITT Federal Support Services, Inc. v. United States, 531 F.2d 522, 528 n. 12 (Ct. Cl. 1976)), cited in Pl. Mot. at 34. See also Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002), cert. denied, 539 U.S. 910 (2003). The case law recognizing such a implied-in-fact contract is predicated upon a finding of a void or illegal contract. The Termination Liability clause was not "defective," see Pl. Mot. at 34-35, because its express terms would have provided EFSI with a vehicle to recoup its costs if the Government had chosen to discontinue utility service under the contract before completion of the facilities cost recovery. In that case, the Government's actions would have deprived EFSI of the means to recover its costs through full contract performance over a ten-year period, and the Termination Liability clause sensibly would have shifted the risk of such a loss away from EFSI where the contractor was blameless. However, applying the Termination Liability clause to the situation at hand would allow the contractor to walk away from the Fort Hamilton contract as soon as it completed the system upgrades – as, in fact, EFSI essentially did – and the Government would be obliged to pay for all of the upgrades, even though the Government had contracted for EFSI to make the upgrades and retain title to the upgrades after performing for ten years. See Def. App. at 6 (Contract § H.1), 9 (Contract § H.6). In sum, there is no case precedent for this Court to award EFSI any general or equitable damages.

Lastly, "the Government's financial obligation to anyone who has furnished materials or services to the Government under a contract is to be found 'within the four walls of the contract'" Rolin v. United States, 160 F.Supp. 264, 268 (Ct. Cl. 1958) (citing Steel Products Engineering Co. v. United States, 78 Ct. Cl. 410, 419 (1933). In the situation at hand, the four walls of the contract simply does not provide for damages in the event that EFSI walks away

from the facility prior to completing the ten year period required by the contract.

10) What about the government's legislative remedy argument? What case law or statutory support exists for the government's position?

Any party that is unhappy with a judicial decision has the option of attempting to obtain a legislative remedy that it desires. As stated in detail in our Motion to Dismiss, this Court only has limited jurisdiction with respect to quantum meruit claims. As plaintiffs' claim does not fit within this Court's limited quantum meruit jurisdiction, plaintiffs may attempt to convince the legislative branch that the Government should pay plaintiff for the initial investment that it made in the Fort Hamilton facility because no judicial remedy is available. If the FAR or the law is "unfair or unsound for any reason, the remedy is legislative, not judicial." United States v. Pew Fisheries Co., T.D. 42,571 (Cust.App. 1928). While plaintiffs are free to pursue a legislative remedy with the Congress, this Court does not have jurisdiction to provide a remedy.

11) Does EFSI have to specifically plead quantum meruit in order to recover quantum meruit damages?

There is no need for plaintiffs to specifically plead quantum meruit because this Court simply does not possess jurisdiction to award quantum meruit damages. While RCFC 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires," any changes that plaintiffs make to their complaint will not cure the defects. As the Court explained in Saladino v. United States, 62 Fed. Cl. 782 (2004), "Notwithstanding the liberal standard in granting . . . motions [pursuant to RCFC 15(a)], leave to amend a complaint should not be granted when the amendment would be futile." 62 Fed. Cl. at 795 (citing, among others, Foman v. Davis, 371 U.S. 178, 182 (1962)). See also Slovacek v. United States, 40 Fed. Cl. 828, 834 (1998) (citing Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 292 (3d Cir.

1988)). Where, as here, any amendment would not cure the jurisdictional defects in the complaint, it is clear that amendment of the complaint would be an act in futility. Accordingly, plaintiffs' request for leave to amend the complaint should be denied.

## CONCLUSION

For the foregoing reasons and the reasons set forth in our motion to dismiss and for summary judgment and our reply brief, defendant, the United States, respectfully requests this Court to dismiss Counts Three and Four of EFSI's complaint for lack of jurisdiction to consider the subject matter of those counts, pursuant to RCFC 12(b)(1). Defendant further respectfully requests that the Court enter summary judgment in its favor and against plaintiff, EFSI, upon the ground that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law, pursuant to RCFC 56(b).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ Robert C. Bigler
ROBERT C. BIGLER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-0315
Facsimile: (202) 514-8624
Attorneys for Defendant

May 25, 2007

NOTICE OF FILING

I hereby certify that on May 25, 2007, a copy of foregoing "DEFENDANT'S BRIEF IN RESPONSE TO COURT'S REQUEST FOR POST-HEARING BRIEFING IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COUNTS THREE AND FOUR AND FOR SUMMARY JUDGMENT WITH REGARD TO PLAINTIFF ENRON FEDERAL SOLUTIONS, INC.'S COMPLAINT AND DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system and that parties may access this filing through the Court's system.

s/ Robert C. Bigler