**No. 05-1000 C (04-254C) (Consolidated)**
**(Judge Block)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENRON FEDERAL SOLUTIONS, INC., et al.,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFFS' SUBMISSION IN RESPONSE TO SCHEDULING ORDER DATED APRIL 18, 2007

---

**Timothy J. Heffernan**
**WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.**
**7929 Westpark Drive, Suite 400**
**McLean, Virginia 22102**
**Telephone 703/749-1000**
**Facsimile: 703/749-0699**

**Attorney for Liberty Mutual Insurance Co.**

**John J. Pavlick, Jr.**
**VENABLE LLP**
**575 7th Street, N. W.**
**Washington, D. C. 20004**
**Telephone: 202/344-4000**
**Facsimile: 202/344-8300**

**OF COUNSEL**

**Charles R. Marvin, Jr.**
**VENABLE LLP**
**575 7th Street, N. W.**
**Washington, D. C. 20004**
**Telephone: 202/344-4000**
**Facsimile: 202/344-8300**

**Attorneys for Enron Federal Solutions, Inc.**

**Electronically Filed on May 25, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENRON FEDERAL SOLUTIONS, INC.,** <br> **et.al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 05-1000C (04-254C)** |
| | ) | **(Consolidated)** |
| **UNITED STATES OF AMERICA,** | ) | **(Judge Block)** |
| **Defendant.** | ) | |

**PLAINTIFFS' SUBMISSION IN RESPONSE TO SCHEDULING ORDER DATED APRIL 18, 2007**

Pursuant to the Scheduling Order entered by this Court on April 18, 2007, (Docket No. 33), plaintiffs, Enron Federal Solutions, Inc. ("EFSI") and Liberty Mutual Insurance Company ("Liberty Mutual"), by and through undersigned counsel, respectfully submit the following responses to the questions posed by the Court in its Order dated April 18, 2007. For ease of reference, this submission provides plaintiffs' specific responses for each question posed in the Court's Order in the order in which the Court's questions were posed. Subparts to the Court's questions are identified and addressed separately where appropriate and necessary for clarity.

**Contract Interpretation**

**1. Is the contract a hybrid of a services and a construction contract or is it strictly a services contract?**

The Contract was a hybrid in that it contained both construction and services requirements. Under the Contract, EFSI was to upgrade and replace the utility systems at Fort Hamilton to identified standards and then maintain these systems and provide related utility services. The improvements to be made to the systems by EFSI under the Contract were not discretionary - the Contract specifically required that "[a]ll utility distribution system upgrades or replacements shall be completed by the end of the second year of the contract." Contract, ¶ B.2.1. EFSI had to pay initially for these improvements and then recover its capital investment, amortized over the ten-year term of the contract at an annual interest rate, through payments from the Government. Contract, ¶¶ B.2.1., B.2.5. EFSI was also required to provide specified services related to the operation and maintenance of the utility systems throughout the term of the Contract. Contract, ¶ B.2.2. Compensation for these services was specifically defined as another component of the contract price and the monthly payments from the Government. Contract, ¶¶ B.2.2.,B.2.5. Although combined in one monthly payment, the Contract, including EFSI's Final Proposal, which was specifically incorporated into the Contract, made clear that the Government was to make payments to EFSI for two segregable portions of the Contract - the utility replacement and upgrade construction work, i.e., EFSI's "capital investment" in the Fort Hamilton utility systems, and the provision of ongoing utility services. What was obvious from the Contract was confirmed by the Contracting Officer, William Campbell, in his August 11, 2005 final decision on EFSI's claim that is the basis

for this litigation. There, he clearly stated that the Contract was "for both construction and supplies or services" and that the "construction/services portions are 'divided into parts.'" EFSI's Complaint, Exhibit 2, Contracting Officer's Final Decision, August 11, 2005, at p. 5.

**a. What effect, if any, does that determination have on the parties' responsibilities?**

Regardless of how the Contract is characterized, the Contract specifically contains a construction component initially "financed" by EFSI (EFSI's capital investment) and states that EFSI will recover this capital investment through periodic payments from the Government. The fact that the price for this work is amortized over a period of time and that the payments to be made by the Government would include interest on the amount still owing reflects the parties' understanding and agreement that the contractor is providing assets of immediate and permanent value to the Government, the costs of which were to be recovered by EFSI.

Consistent with these contract provisions, Clause H.8. of the Contract computes the termination liability of the Government in terms of the unrecovered value of the capital investment made by the contractor. As plaintiffs demonstrated in their June 2, 2006 filing, whether one considers the effect of a termination for default under FAR 52.249-8, the Termination clause included in the Contract, or under FAR 52.249-10, the Termination clause appropriate for Construction Contracts, the Government must pay the terminated contractor for the services (whether utility or construction) the benefits of which it has received and retained. *See* Plaintiffs' Cross Motion for Partial Summary Judgment and Plaintiffs' Opposition to Defendant's Motion to Dismiss Counts Three and

Four and for Summary Judgment with regard to Plaintiffs' (EFSI's) Complaint ("Plaintiffs' Cross Motion"), Docket # 19, June 2, 2006, Plaintiffs' Cross Motion, pages 17-25.

**b. Does the definition of the contract as a services contract or as a hybrid contract limit or mandate the use of FAR provisions?**

Plaintiffs believe that the terms of the Contract, read together, establish that in the case of termination of the Contract for any reason prior to the recovery by EFSI of its utility replacement and upgrade price, the Government is required to pay EFSI the unamortized portion of EFSI's price for those replacements and upgrades, using the mechanism established by the Termination Liability clause, FAR 52.241-10, referenced in Clause H.8. While the Government could have expressly included in the Contract the specific FAR clauses pertaining to construction to govern that portion of the Contract (as suggested by the Contracting Officer in his Final Decision), the effect on the Government's liability to EFSI for its replacement and upgrades of the Fort Hamilton utility systems, for purposes of this litigation, would not change. *See* Plaintiffs' Cross Motion, pages 25-29.

**2. What is the significance of the fact that this was a privatization contract?**

The most material result of the fact that this contract was identified as a "privatization" contract is the effect of that label upon the discernment of the government's intent in the interpretation of the contract language at issue. The concept underlying the privatization contract was that a contractor would become the owner of the utilities and pay for the upgrades and replacements necessary for the systems to operate within applicable codes and regulations. The contractor would then operate the

systems for ten years, during which period the Government would compensate the contractor for the replacements and upgrades necessary to comply with the Contract and for the utility services provided by the contractor throughout that period. At the end of the contract term, the Government would then decide whether it wanted to continue private ownership or to purchase back the utilities.

A defining aspect of the privatization concept is that the Government would not have to expend the funds "up front" to make needed replacements and upgrades to its utility systems. Instead, by transferring the utility systems to a private contractor and paying the contractor for the replacements and upgrades over time, the Government spread the costs of its needs for utility services and capital expenditures over time.

The Contract contemplated that the Government would transfer title to the utility systems to the contractor shortly after award. The Contract, however, also contained a provision allowing the Government to delay title transfer until receiving the contractor's assessment that the systems were safe. Amendment 3, Answer to Questions, pages 5-6. In fact, transfer of title was delayed. As a result of the decision to delay the transfer of title until the construction of the utility system replacements and upgrades were completed and the parties agreed that the systems were safe, the construction work performed by EFSI on the utility systems was work performed on Government property, not on property owned by EFSI. While this effectively altered the terms of the contract, EFSI believes that the express provisions of the Contract as awarded still allow it to be made whole for its capital investments in the utility systems at Fort Hamilton, the benefits of which were retained and are still being enjoyed by the Government.

If the Court disagrees, however, and does not find that the express terms of the Contract as awarded allow for the recovery by EFSI of its price for the replacement and upgrade of the Fort Hamilton utility systems, then the Court must inquire into the Contract as actually performed by the parties. Under this scenario, the Court should consider incorporating into the Contract by operation of law the appropriate clauses addressing construction and upgrades to government property. *See* FAR 36.101(c)(2). As plaintiffs have demonstrated, regardless of the approach used, the result is the same - EFSI is entitled to recover the price or value of its replacements and upgrades to the Fort Hamilton utility systems. *See* Plaintiffs' Cross Motion, pages 25-29.

**FAR Interpretation**

**3. What FAR provisions must be read into the contract as a matter of law?**

Regardless of whether it is included in a federal government contract and agreed by the parties thereto, "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963), *reh'g denied*, 320 F.2d 345, *cert. denied*, 375 U.S. 954 (1963), quoted in *S.J. Amoroso Construction Co., Inc. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993); *G.L. Christian & Assoc. v. United States*, 312 F.2d 418 (Ct. Cl. 1963). The *Christian* doctrine also incorporates into a contract "less fundamental or significant mandatory procurement contract clauses if not written to benefit or protect the party seeking incorporation." *Ryco Construction, Inc. v. United States*, 55 Fed. Cl. 184, 198 n. 11 (2002), quoting General Engineering & Machine Works v. O'Keefe, 991 F.2d 775, 780

(Fed. Cir. 1993). Plaintiffs believe that there is no need to read any clauses into the Contract by operation of law. *See* Plaintiffs' response to 1(b) above.

**a. May parties to a contract negotiate to alter mandatory FAR provisions?**

As a general rule, a contracting officer may not modify a FAR provision or clause unless the FAR authorizes its modification. FAR 52.104(a). An authorized "modification" is defined by the FAR as "a minor change in the details of a provision or clause that is specifically authorized by the FAR and does not alter the substance of the provision or clause (see 52.104)." FAR 52.101(a). For example, FAR 41.501(a) states that the contract provisions governed by FAR Part 41 are prescribed for use on a "substantially the same as" basis. The FAR defines the phrase "substantially the same as" in the following manner:

> "Substantially as follows or *substantially the same as*, when used in the prescription and introductory text of a provision or clause, means that authorization is granted to prepare and utilize a variation of that provision or clause to accommodate requirements that are peculiar to an individual acquisition; provided that the variation includes the salient features of the FAR provision or clause, and is not inconsistent with the intent, principle, and substance of the FAR provision or clause or related coverage on the subject matter."

FAR 2.101 (emphasis added). Accordingly, the clauses prescribed by FAR Part 41 for inclusion on "substantially the same as" basis, such as FAR 52.241-10, the Termination Liability clause, may be altered by the parties within the range described by the definition of the phrase "substantially the same as" that is contained in the FAR.

Ultimately, the parties may negotiate to alter a mandatory FAR provision, but if the desired alteration is so substantial as to require approval of a "deviation" under the FAR, i.e., it is not an authorized modification, the contracting officer may not agree to

include the provision without having obtained approval for the deviation. *See* FAR Subpart 1.4. Deviations are required, *inter alia*, for the use of a contract clause, method, or practice of conducting acquisition actions that are inconsistent with the FAR, for omission of a solicitation provision or contract clause where a prescription requires its use, or for alterations or modifications not authorized by the FAR. *See* FAR 1.401.

**b. Or, are mandatory FAR provisions to be incorporated strictly?**

See response to 3(a) above.

**4. What case law or other support is there for the parties' conflicting interpretations of FAR 52.241-10?**

We have been unable to find any reported cases in the databases for the U.S. Court of Appeals for the Federal Circuit, the U.S. Court of Federal Claims, or the Boards of Contract Appeals addressing the Termination Liability clause at issue here (FAR 52.241-10). Our research into the legislative history of 10 U.S.C. § 2688, the statute providing authority for the conveyance by the Department of Defense of utility systems under its jurisdiction to private entities, has neither provided support for, nor raised an obstacle to our interpretation of the Termination Liability clause.

The primary support for plaintiffs' interpretation of the Termination Liability clause is contained in the analysis presented in plaintiffs' cross-motion for summary relief and the inequitable result that obtains from enforcing the Government's proffered interpretation. As plaintiffs demonstrated in their Cross Motion, not only was the use of the Termination Liability clause authorized and appropriate for this Contract but the Contract also reflects that parties actually agreed to use the clause in the manner urged by the plaintiffs before this Court. *See* Plaintiffs' Cross Motion, pages 14-21.

Nothing in the definitions or prescriptive provisions of FAR Part 41 precludes the use of the Termination Liability clause to determine the Government's liability for unamortized contractor investment in the utility systems subject to the Contract. *Id.* at 15-17. Moreover, the express provisions of the Contract reflect the parties' agreement to use the Termination Liability clause to measure the Government's liability for EFSI's unrecovered investment in the utility system replacements and upgrades if the Contract ended before its term under any circumstances. *Id.* at 17-21. Indeed, the only way to interpret the Contract in a manner that gives force and effect to Contract Schedule provisions (i.e., ¶ B.2.1, ¶ C.4.7, ¶ H.8), and EFSI's Final Proposal, which was incorporated into the Contract without modification at award, is to interpret the Contract to require the Government to compensate EFSI for the unamortized portion of the price of EFSI's capital investment in the replacement and upgrade of the utility systems at Fort Hamilton.

**a. Is FAR 52.241-10 a general termination clause applicable to both termination for convenience and default termination situations, or is it strictly a termination for convenience clause?**

Contrary to the Government's litigation position with respect to the effect to be accorded to a prefatory phrase carried into the Contract with the body of the Termination Liability clause, the Termination Liability clause does not establish any prerequisite to the imposition of liability upon the Government for a contractor's unrecovered investment in its replacement and upgrade of utility systems upon termination of the Contract for default. Instead, the Termination Liability clause provides, in essence, the formula for determining the amount of the Government's liability when the contractor

has expended its funds to improve utilities systems on government property under the contract. The use of the Termination Liability clause in this manner and under the circumstances of this case is wholly consistent with the type of contract, the other express provisions of the Contract, and the body of case law interpreting the FAR requirements relating to the duties and responsibilities of the Government to a terminated contractor where the Government elects to retain the benefits it received through the performance of the terminated contract, including those cases where the contract was terminated by the Government for default. *See* Plaintiffs' Cross Motion, pages 14-29.

**b. How do the termination process and procedures established by the FARs affect the above restrictive interpretations?**

The termination process and procedures established by the FARs are consistent with the plaintiffs' interpretation of the Termination Liability clause, FAR 52.241-10, namely, that the Termination Liability clause provides the mechanism for the determination of the amount that the Government would pay the contractor in the event that the Contract was terminated prior to recovery by the contractor of the value of the upgrades and improvements made to the utility systems under the contract. As demonstrated in Plaintiffs' Cross Motion, regardless of whether a contract is terminated by the Government for its convenience or as a result of the default of the contractor, the termination clauses require the Government to pay the price of goods or services for which the Government retains the benefit post termination. *See* Plaintiffs' Cross Motion, pages 14-19.

**c. Is FAR 52.241-10 a mandatory clause or can it be altered and adopted at the parties' discretion?**

Under FAR 41.501(d)(4), the prescriptive clause for FAR 52.241-10, the contracting officer is directed to insert a clause "substantially the same as" FAR 52.241-10 "when payment is to be made to a contractor upon termination of service in conjunction with or in lieu of a connection charge upon completion of the facilities." Under FAR 1.401(d), "The use of a solicitation provision or contract clause prescribed by the FAR on a 'substantially the same as' basis (see definitions in 2.101 and 52.101(a)), [only constitutes a deviation from the FAR, and thus requires authorization under the FAR procedures at FAR Subpart 1.4] if such use is inconsistent with the intent, principle, or substance of the prescription or related coverage on the subject matter in the FAR." FAR 2.101 states that:

> Substantially as follows or substantially the same as, when used in the prescription and introductory text of a provision or clause, means that authorization is granted to prepare and utilize a variation of that provision or clause to accommodate requirements that are peculiar to an individual acquisition; provided that the variation includes the salient features of the FAR provision or clause, and is not inconsistent with the intent, principle, and substance of the FAR provision or clause or related coverage on the subject matter.

Notably, neither FAR 41.501(d)(4), the prescriptive clause for FAR 52.241-10, nor any other provision in the FAR limits the use of the Termination Liability clause to circumstances where the Government has abandoned the supported site or otherwise no longer needs the contracted utility services at all. Moreover, application of the mechanism in the Termination Liability clause to calculate the Government's liability to EFSI for its unrecovered investment in the utility systems at Fort Hamilton upon termination of the Contract, including its amortization payment provisions, is completely

consistent with the intent, principle, or substance of the prescription or related coverage on the subject matter in the FAR. Consequently, the use of the clause in the manner interpreted by plaintiffs was not only permissible under the FAR, but wholly consistent with the other provisions of the Contract. *See* Plaintiffs' Cross Motion, pages 14-21.

**5. Did both contracting parties believe FAR 52.241-10 applied to a default termination situation?**

Contrary to the litigation position urged by the Government before this Court, the evidence of record indicates that both parties contemplated the recovery by EFSI of the value of its improvements and upgrades to the utility systems at Fort Hamilton through the use of the mechanism established by the Termination Liability clause, FAR 52.241-10, upon termination of the Contract for any reason.

**a. If so, why, and where is this demonstrated in the contract or by extrinsic evidence?**

The parties belief or intention that in the event of termination of the Contract before the end of its term, EFSI should recover the price or value of its replacements and upgrades to the utility systems at Fort Hamilton through the use of the mechanism established by the Termination Liability clause, FAR 52.241-10, is reflected in the structure of the Contract itself. Specifically, Paragraph C.4.7 Disposition Upon Expiration or Termination, provides that

> *Upon expiration or termination of this contract*, the Government shall have the option to negotiate a sole source contract with the Contractor or reacquire the facilities as described in Section H. Reacquisition of the utility facilities will be performed only when it is determined to be in the best interest of the Government. . . . *The Contractor's unrecovered investment will be determined as set forth in Paragraph H.8, Termination Liability.* See also *Termination for Default, Termination for the*

> *Convenience of the Government, and Termination Liability*, in Section I, Contract Clauses.

Contract, ¶ C.4.7 (emphasis added). If the Termination Liability clause were to be applied as suggested by the Government, the reference (italicized above) to the three Section I clauses would be rendered meaningless, or at best redundant. The only reasonable interpretation of ¶ C.4.7 of the Contract clause is that the Termination Liability clause will be used to pay the contractor's unrecovered capital investment regardless of the circumstances under which the contract is ended, whether by expiration or any type of termination. Indeed, this interpretation is supported further by the fact that the Contracting Officer incorporated EFSI's Final Proposal, which reflected the same interpretation, into the Contract, without modification, at award. *See* Plaintiffs' Cross Motion, pages 14-21; Plaintiffs' response to question 4 above.

We have not been able to find any extrinsic evidence not presented in Plaintiffs' Cross Motion that is relevant to EFSI's or the Government's interpretation of the applicability of the Termination Liability clause to the determination of the parties' relative responsibilities under a default termination.

**b. Was there a mutual mistake by the contracting parties regarding FAR 52.241-10?**

There is no evidence that suggests that the parties made a mistake of any kind regarding the use of the mechanism in FAR 52.241-10 to calculate the Government's liability for, and EFSI's entitlement to payment of EFSI's unrecovered investment in the replacements and upgrades to the utility systems at Fort Hamilton should the Contract be terminated for any reason. To establish mutual mistake, there must be a genuine mistake

of an operative fact which pre-existed the contract and which is material to the basis of the bargain. *See* Plaintiffs' response to question 5(c) below.

Whether FAR 52.241-10 applies under the circumstances of this claim is a legal issue, not a mistake of fact. The resolution of such issues, i.e., whether a clause is required to be incorporated into a contract, does not proceed under the mistake of fact doctrine, but under the *Christian* doctrine, which can result in the incorporation of the required clauses into a contract, i.e., reformation, such that the parties are bound thereby as if the clauses had been present at award. *See* Plaintiffs' response to question 3 above.

A conclusion that the parties were mutually "mistaken" with respect to any facts relevant to the scope or manner of operation of the Termination Liability clause under these circumstances is wholly unsupported by the facts, notably, the terms of the Contract, including the terms of EFSI's Technical Proposal, which was incorporated into the Contract at award. Indeed, if the Court finds that both parties believed that the Termination Liability clause was to be used in the circumstances of this case, then the Court should interpret the Contract accordingly, since the parties' belief would contravene no FAR requirement or procurement principle.

**c. What case law exists regarding mutual mistake in this type of situation?**

The Federal Circuit's standard for a mutual mistake of fact is well-established. "Where there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation, rescission, and restitution may be available to the adversely affected party." *Roseburg Lumber Co. v.*

*Madigan*, 978 F.2d 660, 665 (Fed. Cir. 1992). Recently, the Federal Circuit reiterated the standard for finding a mutual mistake and the availability of reformation as a remedy:

> Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof of four elements:
>
> (1) the parties to the contract were mistaken in their belief regarding a fact;
> (2) that mistaken belief constituted a basic assumption underlying the contract;
> (3) the mistake had a material effect on the bargain; and
> (4) the contract did not put the risk of the mistake on the party seeking reformation.

*Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (quoting *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990)).

Even if mutually committed, not all mistakes can support a finding of mutual mistake. "A prediction or judgment regarding an event to occur in the future, if erroneous, does not constitute a 'mistake,' as the term is contemplated within the doctrine of mutual mistake of fact." *ECC Int'l Corp. v. United States*, 43 Fed. Cl. 359, 371 (1999). Rather, the mutual mistake must be regarding a fact existing at the time of contract. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1203 (Fed. Cir. 1994).

Under the facts of this case, it does not appear that the parties were mistaken concerning the existence at the time of award of any material fact relevant to this litigation. Thus, the doctrine of mutual mistake appears to be inapplicable.

**6. Does the question and answer language on page 4 of Amendment 5 to the Solicitation, which addresses FAR 52.241-10, demonstrate that the government adopted EFSI's interpretation of FAR 52.241-10?**

The question and answer referenced by the Court's question is the following:

> Question: Section H.8 indicates that termination liability shall be based upon FAR 52.241-10, but is not incorporated at Section I. Recommendation to the Government - Please consider the following language which is adapted from the Fort Carson RFP "Termination Liability will be determined primarily by the method of accounting/finance proposed by the Offeror. The Contractor(s) shall establish a termination schedule for each system at the beginning of the contract term. The termination schedule shall be updated monthly during the contract term, recording initial and periodic capital investment, payments for capital recovery, and providing a reconciliation for payments and unrecovered capital investment. *The Government's termination liability associated with the system shall be limited to the Contractor's unrecovered capital investment at the point of termination plus any additional termination liability in accordance with FAR 52.249-2, Termination for the Convenience of the Government (Fixed Price).* The Government retains the right of First Offer.
>
> "Additional termination costs that may be included in the termination liability are reasonable and documented costs that the Contractor(s) may have incurred to discontinue its requirements to provide the service required under this contract." The Contracting Officer shall notify the Contractor if available funds are or are expected to be insufficient to funds (sic) the termination liability for any six month period. In the event the Contractor, at its option, may elect a termination for convenience."
>
> Answer: The clause is included in Amendment 0003.

Solicitation, Amendment 0005, page 4 (emphasis added).

EFSI' "real" question here was a request for clarification regarding the manner in which the Government would ensure that it would have sufficient funds to pay EFSI's unrecovered capital investment upon early termination. The italicized portion of EFSI's question assumes such payment by the Government under any type of termination, since it separates, as does the Contract and EFSI's Final Proposal, the Government's liability for payment of EFSI's unrecovered capital investment in the event of termination from the Government's liability under the Termination for Convenience clause.

By providing this "non-answer" to EFSI's "real" question, the Government did nothing to provide the additional guidance requested by EFSI, nor did the Government

state anything to indicate to EFSI that the scope and operation of the Termination Liability clause was considered by the Government to be narrower or different in any respect from EFSI's statement in the question, the essence of which was repeated in EFSI's Final Proposal. Moreover, the Government incorporated EFSI's Final Proposal, which contained EFSI's understanding of the scope and operation of the Termination Liability clause and related clauses, into the Contract without modification. Consequently, considered in the context of the facts surrounding the award of the Contract, the implications of the Government's non-answer are consistent with EFSI's interpretation of the Contract, i.e., that the Government would be liable to pay EFSI for its unrecovered capital investment in the utility systems at Fort Hamilton if the Contract was terminated for any reason and that the Termination Liability clause provided the mechanism to calculate the Government's liability.

**7. How should the applicable FAR provisions be read in the contract?**

A basic tenet of contract interpretation is that the provisions of a contract, in this case, the FAR clauses that were incorporated into the contract, should be interpreted "in a manner that gives meaning to all of its provisions and makes sense. *Jowett Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (citations omitted) (quoted in *Travelers Casualty and Surety Company of America v. United States*, ___ Fed. Cl. ___, Docket No. 04-487, March 19, 2007, Slip Opn., page 15; *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616 (2005) (stating that "an interpretation of a contract giving meaning to all of its provisions is favored over one leaving 'a portion of the contract useless, inexplicable, void or superfluous'" (citations omitted)).

**a. Does one FAR provision trump another?**

Under the interpretive rule stated above, no FAR provision incorporated into the Contract, or any other provision of this Contract, should be determined to "trump" another FAR provision so incorporated. The appropriate inquiry is to determine the circumstances under which the apparently conflicting provisions can be applied/enforced in a manner that resolves the conflict and allows the Contract to be read harmoniously, giving effect to every provision. Plaintiffs have provided such an analysis in their Cross Motion. *See* Plaintiffs' Cross Motion, pages 17-21.

**b. What about FAR 41.101, the definitions section of the FAR for utility services?**

FAR 41.101 contains the following definitions:

> *Connection charge* means all nonrecurring costs, whether refundable or nonrefundable, to be paid by the Government to the utility supplier for the required connecting facilities, which are installed, owned, operated, and maintained by the utility supplier (see Termination liability).
>
> . . .
>
> *Termination liability* means a contingent Government obligation to pay a utility supplier the unamortized portion of a connection charge and any other applicable nonrefundable service charge as defined in the contract in the event the Government terminates the contract before the cost of connection facilities has been recovered by the utility supplier (see "Connection charge").

FAR 41.101.

Notably, in its definition of "Termination liability," the FAR defines the only contingency limiting the Government's obligation to be "in the event that the Government terminates the contract before the cost of connection facilities has been recovered by the utility supplier…." FAR 41.101. By using the mechanism in the Termination Liability clause in the manner EFSI believed it would be used upon

termination of the Contract for any reason, there would be no conflict between any FAR provision in the Contract, whether incorporated by the Government or by operation of law. *See* Plaintiffs' responses to questions 2 & 4 above.

**Amortization Payments**

**8. If part of the monthly payments were "amortization payments," that would seem to go against a "services contract only" argument. What is the significance of the amortization payments?**

The significance of the use of "amortization payments" is that it reflects the intent of the Government to pay EFSI for its replacement of and upgrades to the utility systems at Fort Hamilton over time, rather than in a lump sum, as is allowed by the statute authorizing such transfers. *See* 10 U.S.C. §2688(c). The use of this method of payment, and the identification of this payment component in the Contract itself, *see* Contract, ¶ B.2.1, supports the finding that the parties understood and agreed that the Government would owe EFSI for those replacements and upgrades as a separate "line item," and that the Government's liability for that work was not contingent upon the complete performance of the services portion of the Contract. *See* Plaintiffs' Cross Motion, at page 18; Plaintiffs' responses to questions 1 & 2 above.

**a. Why were they contracted that way?**

Plaintiffs cannot confirm the rationale used by the Government for its selection of the structure and provisions of the Contract. Plaintiffs can only surmise that the amortization method and the provisions relating to that method were employed by the Government in a manner that was consistent with the specific statutory authority granted to Department of Defense under 10 U.S.C. § 2688 (a), (c), and (g).

10 U.S.C. § 2688 (a) grants the Department of Defense authority to convey all or part of a utility system under DOD jurisdiction "to a municipal, private, regional, district, or cooperative utility company or other entity." 10 U.S.C. § 2688 (c) requires DOD to obtain consideration for such a conveyance, whether by a lump sum payment or a reduction in charges for the utility services provided by the entity to which the system was conveyed. 10 U.S.C. § 2688 (g) authorizes DOD to use funds appropriated to carry out a military construction project to construct, repair, or replace a utility system to facilitate the conveyance of the system under the statute "by making a contribution toward the cost of the construction, repair, or replacement of the utility system by the entity to which the utility system is being conveyed." Further, DOD is required to consider any such contribution in the economic analysis it is required to perform under 10 U.S.C. § 2688(e).

Plaintiffs believe that the Contract, as structured by the Government and interpreted by plaintiffs, especially with respect to the amortization, with interest, of the Government's liability to EFSI for the replacements and upgrades to the Fort Hamilton utility systems, is completely consistent with the structure and intent of, and the authority granted to DOD by 10 U.S.C. § 2688.

**<u>Available Remedies</u>**

**9. Can the Court award general contract damages in this case in light of the incorporated FAR termination provision, other provisions in the contract, or other FAR provisions incorporated by law?**

Generally, the Government's liability upon termination is circumscribed by the terms of the applicable termination clause. For example, "[i]t is well-settled that the

presence of a termination-for-convenience clause "restricts the damages recoverable for [government] breach to those which would have been allowable under the convenience-termination clause, had it been invoked." *Inland Container, Inc. v. United States*, 206 Ct. Cl. 478, 490, 512 F.2d 1073 (1975) (citations omitted). Under the circumstances in this case, where the Government terminated the contract for default and recovery is sought in Counts I and II under the Contract, the remedies are limited to those available through the default termination provisions in the contract, whether incorporated therein by the Government or by operation of law.

**a. What about other damage or equitable remedies?**

Whether other legal or equitable remedies would be available depend upon the nature of the legal or equitable basis for such recovery. If, notwithstanding the analysis presented in plaintiffs' responses to question 5(b) & (c) above, the Court were to find the existence of a mutual mistake, the remedies of reformation, rescission, and restitution would be available. If the Court were to find the existence of an implied-in-fact contract, as alleged in the alternative by EFSI in Counts III and IV of its Complaint, then the Court could grant recovery in an amount determined through *quantum meruit*.

**b. Any case precedent?**

Applicable case law has been cited in plaintiffs' responses to questions 5(c) above and 11 below.

**10. What about the government's legislative remedy argument?**

The Government's proffered disposition, i.e., diverting plaintiffs to the U.S. Congress for relief, would only delay the resolution of this case - it would not avoid the requirement for this Court to render a decision on the merits. If EFSI were to submit a

request for payment of its price for the replacement and upgrade of the Fort Hamilton utility systems to Congress in a private bill, Congress is likely to refer the bill to the Chief Judge of the Court of Federal Claims for review under 28 U.S.C. § 1492.

Congressional reference cases are processed using the procedures in 28 U.S.C. § 2509. Under those procedures, the Chief Judge of the U.S. Court of Federal Claims designates a judge of the Court to be a hearing officer for the case. The hearing officer makes factual determinations and conclusions "sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant," along with "facts claimed to excuse the claimant for not having resorted to any established legal remedy." 28 U.S.C. § 2509(c).

The findings and conclusion of the hearing officer are then reviewed by a panel of three judges, with argument by the parties. 28 U.S.C. § 2509(d). The panel determines by majority vote whether to adopt or modify the findings and conclusions of the hearing officer. *Id.* The panel's report is then transmitted back to Congress. 28 U.S.C. § 2509(e).

Ultimately, should plaintiffs seek the remedy sought in this Court instead through a private bill introduced in the U.S. Congress, it is likely that any action by the U.S. Congress on that bill would be preceded by a reference to this Court for a determination of the facts and legal basis for Plaintiffs' claims, the same facts and claims that are currently before this Court. *See generally J.L. Simmons Company, Inc. v. United States*, 60 Fed. Cl. 388 (2004) (private bill seeking payment of prejudgment interest and litigation expenses by Government referred to this Court for determination of legal basis

for claim); *Barlow v. United States*, 53 Fed.Cl. 667 (2002)(private bill for relief from alleged wrongful termination and suspension of security clearances by Government referred to this Court for determination of legal basis of claim); *Banfi Products Corporation v. United States*, 41 Fed.Cl. 581 (1998) (private bill for payment of damages for negligent recall by Government of wine products referred to this Court for determination of legal basis of claim). Consequently, the Government's proposed diversion would only result in a delay in this Court's consideration of the merits of Plaintiffs' claims.

**a. What case law or statutory support exists for the government's position?**

There is no case law or statutory provision of which plaintiffs are aware that would prevent the U.S. Congress from referring to this Court any private bill submitted to it by plaintiffs for a determination of the existence of a basis for plaintiffs' claim under law or equity. Indeed, the process described above appears to be the norm, not the exception.

**11. Does EFSI have to specifically plead quantum meruit in order to recover quantum meruit damages?**

A plaintiff in the Court of Federal Claims can recover the reasonable value of goods or services rendered on a *quantum meruit* or *quantum valebant* basis, under an implied-in-fact contract theory. *See United States v. Amdahl*, 786 F.2d 387, 393 (Fed. Cir. 1986); *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1154 (Fed. Cir. 1983); *Fluor Enter., Inc. v. United States*, 64 Fed. Cl. 461, 495-96 (2005); *Gold Line Ref., Ltd. v. United States*, 43 Fed. Cl. 291, 295 (1999) ("The Court of Appeals for the Federal Circuit

has recognized the equitable remedy of *quantum meruit* as a basis of recovery under an implied-in-fact contract.").

In its Complaint, EFSI seeks, in the alternative, *quantum meruit* recovery under an implied-in-fact contract theory. Notwithstanding the general rule that where, as here, there is an express contract, an implied-in-fact contract will not be found, *see Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990), where an express contract fails to contain a substantive provision regarding a material right of the parties, the Court may find that an implied-in-fact contract exists regarding that provision. *See Barrett Ref. Corp. v. United States*, 242 F.3d 1055, 1060 (Fed. Cir. 2001). In addition, where a portion of an express contract between the parties is defective or unenforceable, this Court and the Federal Circuit have held that an implied-in-fact contract existed with respect to the defective provisions. *See Urban Data Sys., Inc.*, 699 F.2d at 1154 (finding implied-in-fact contract where it was "plain that only the price terms of the two subcontracts were invalid – not any other part of those agreements"); *Gold Line Ref., Ltd.*, 43 Fed. Cl. at 294 ("As a matter of law, the court concludes that Gold Line's contract with [the Government], to the extent not express, is implied-in-fact and is subject to this court's jurisdiction"). Thus, where, as here, the defendant has argued that a portion of EFSI's contract, i.e., the Termination Liability clause, is inapplicable or unenforceable such that the Contract fails to address certain rights of the parties upon termination, this Court may find that an implied-in-fact contract existed between the parties with respect to that subject matter.

EFSI need not specifically plead *quantum meruit* as a prerequisite to recovery of *quantum meruit* damages. Under Rules of the United States Court of Federal Claims

("RCFC") 8(a), "[a] pleading which sets forth a claim for relief ... shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." RCFC 8(a). RCFC 8(a) is largely identical to Fed. R. Civ. P. 8(a). Under that analogous rule, "[a] claimant does not have to set out in detail the facts on which the claim for relief is based, but must provide a statement sufficient to put the opposing party on notice of the claim." JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE 3D § 8.04[1] (3rd ed. 2006) [hereinafter MOORE]; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002) (holding that Rule 8 notice was the standard by which to measure the adequacy of a pleading and rejecting the proposition that a pleading assert specific facts establishing each element of a claim). "Rule 8(a)(2) does not require a claimant to set forth any legal theory justifying the relief sought on the facts alleged, but does require sufficient factual averments to show that the claimant may be entitled to some relief." MOORE at § 8.04[3]. "If a claim for relief does set forth a legal theory, any relief finally granted usually is not limited strictly to that theory." *Id.* Similarly, the "demand for judgment can be stated in general terms." MOORE at § 8.05. Further, "[t]he demand for judgment will not limit the relief that can be ordered by the court, except for awards arising from default judgments." *Id.*

Similarly, RCFC 9 imposes no requirement to plead *quantum meruit* damages specifically. RCFC 9(g) states that "[w]hen items of special damage are claimed, they shall be specifically stated." RCFC 9(g). However,

> [w]hen a claim may result in the recovery of both general and special damages, general damages are defined as the actual damages that are the natural consequence of the wrongful act, while special damages are those that, although resulting from the commission of the wrong, are unusual for the claim in question and not normally associated with the claim. For example, damages for personal injury are unusual in contract cases but

> normal in automobile accident cases, while lost profits are normal in contract cases and unusual in automobile accident cases.

MOORE at § 9.08[1][a]. Consequently, where, as here, the recovery sought (quantum meruit) is the usual type of remedy sought and granted where an implied-in-fact contract is found and liability of the Government thereunder is established, there is no requirement to plead such damages specifically.

## Conclusion

As demonstrated in Plaintiffs' Cross Motion and related filings before this Court, the Contract cannot be interpreted reasonably to allow the Government to retain the substantial and valuable benefits it received and continues to enjoy from the work performed by EFSI to replace and upgrade the utility systems at Fort Hamilton. On the contrary, the interpretation of the Contract proffered by plaintiffs in this action, which is the same interpretation reflected in EFSI's Final Proposal, is the only interpretation that gives all of the provisions of the Contract meaning and effect in the course of effecting a just and equitable result. Consequently, plaintiffs respectfully request that this Court find that the Contract requires the Government to compensate EFSI for the unrecovered portion of the price of EFSI's replacements and upgrades to the utility systems at Fort Hamilton accomplished by EFSI under the Contract.

Respectfully submitted,

May 25, 2007

/s/ John J. Pavlick, Jr.

John J. Pavlick, Jr.
VENABLE LLP
575 7th Street, N. W.
Washington, DC 20004
Telephone: 202/344-4000
Facsimile: 202/344-8300

OF COUNSEL
Charles R. Marvin, Jr.
VENABLE LLP
575 7th Street, N. W.
Washington, DC 20004
Telephone: 202/344-4000
Facsimile: 202/344-8300

Attorneys for Enron Federal Solutions, Inc.

/s/ Timothy J. Heffernan

Timothy J. Heffernan
WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
7929 Westpark Drive, Suite 400
McLean, VA 22102
Telephone 703/749-1000
Facsimile: 703/749-0699

Attorney for Liberty Mutual Insurance Co.

DC1/242259.3

NOTICE OF FILING

I hereby certify that on May 25, 2007 a copy of the foregoing "PLAINTIFFS' SUBMISSION IN RESPONSE TO SCHEDULING ORDER DATED APRIL 18, 2007" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John J. Pavlick, Jr.