# The United States Court of Federal Claims

**No. 05-1000 C**
**(Consolidated with No. 04-254)**
**February 7, 2008**

---

**ENRON FEDERAL SOLUTIONS, INC., *et al.*,**

***Plaintiffs*,**

**v.**

**THE UNITED STATES OF AMERICA,**

***Defendant*.**

---

Privatization; Summary Judgment; Motion to Dismiss for Lack of Jurisdiction; Material Breach Doctrine; Dependent Promises; Termination for Default; Termination for Convenience; FAR § 52.241-10; FAR § 52.249-8; FAR § 52.249-10; *Quantum Meruit*/Unjust Enrichment

*John J. Pavlick, Jr.*, Venable LLP, Washington, D.C., for the plaintiff Enron Federal Solutions, Inc.

*John Warshawsky*, Commercial Litigation Branch, United States Department of Justice, Washington, D.C., for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

### I. INTRODUCTION

The current action is a part of the global fallout from the Enron Corporation's ("Enron Corp") collapse. Prior to that collapse, in 1999, Enron Federal Solutions Inc. ("EFSI"or "Enron"), a subsidiary of Enron Corp, entered into a privatization contract (the "Contract") with the United States Army to own, operate and maintain the power, water and waste systems ("utility systems") at the United States Army Garrison at Fort Hamilton, Brooklyn, New York.

More specifically, the Contract called for EFSI to make certain capital improvements within the first year of a ten-year contract in order to be able to more effectively provide energy, water and waste utility service to the base. EFSI was to obtain title to the utility distribution systems and to provide Fort Hamilton service for the ten-year period of the Contract. The Army, in return, was to make monthly installment payments that represented combined charges for the services and capital improvements. On December 2, 2001, Enron Corp filed for Chapter 11

Bankruptcy, which spawned "one of the most extensive investigations into allegations of corporate fraud and wrongdoing in the nation's history." *In re Enron Corp.*, 314 B.R. 524, 529 (Bankr. S.D.N.Y. 2004). After Enron Corp filed for bankruptcy, EFSI defaulted on its Contract with the Army, which in turn, terminated the Contract for default. At that time, EFSI had completed the capital improvements, but had only provided just over two years of utility service to the base.

EFSI seeks compensation for the capital improvements that EFSI made to the energy, water and waste utility systems at Fort Hamilton before it defaulted on the Contract. The legal issue facing this Court is whether the Contract requires the Army to compensate EFSI for the capital improvements it made prior to breaching the Contract and being terminated for default. On September 15, 2005, EFSI filed suit against the government in this Court, raising four claims: (1) breach of contract: refusal to pay for capital improvements/upgrades; (2) breach of contract: refusal to pay for operations and maintenance services; (3) "*Quantum Meruit*/Unjust Enrichment—Capital Improvements and Upgrades"; and (4) "*Quantum Meruit*/Unjust Enrichment—Operation and Maintenance Services." Pl.'s Cmpl.

Before the Court are the government's May 2, 2006, motion for summary judgment on Counts I and II under United States Court of Federal Claims ("RCFC") Rule 56 for judgment as a matter of law and a motion to dismiss Counts III and IV of the Complaint under RCFC 12(b)(1) for lack of subject matter jurisdiction. On June 2, 2006, EFSI filed its opposition to the government's motion to dismiss, as well as a cross-motion for summary judgment. On December 12, 2006, the parties filed supplemental briefs discussing the legal significance of the Army's failure to transfer title of the utility systems to EFSI. The Court held a hearing on liability and other issues on April 12, 2007. Supplemental briefing was filed by both parties on May 25, 2007, and responses to those briefs were filed on June 29, 2007.

As fully explained below, EFSI's material breach of contract terminated the defendant's obligations to EFSI pursuant to the Contract. In addition, the unambiguous terms of the Contract entitle the defendant to judgment as a matter of law. The Court also rejects EFSI's contention that it be compensated under what it termed "*Quantum Meruit*/Unjust Enrichment."

## II. FACTUAL BACKGROUND

### A. Solicitation and Contract History

On January 22, 1999, the United States Army Corps of Engineers ("Corps") published Solicitation No. DAC51-99-R-0006 ("Solicitation"). PPFUF[1] ¶ 1. Under a December 17, 1999 Contract Modification, the Military District of Washington Acquisition Center replaced the Corps as the signatory to the Contract, and, along with the Corps, will collectively be referred to as the "Army." Contract Modification P00001. In essence, the Solicitation proposed that a

[1] "PPFUF" represents Plaintiff EFSI's Proposed Findings of Undisputed Facts. "Pl. App." is Plaintiff EFSI's Appendix to Plaintiff's Cross-Motion for Partial Summary Judgment. "DPFUF" represents Defendant's Proposed Findings of Undisputed Facts. Facts drawn from the PPFUF, Pl. App., DPFUF, or the Complaint are undisputed.

contractor purchase and upgrade certain utility systems at Fort Hamilton by the end of the first year of the Contract, and thereafter, supply water, waste and energy service to the Fort for a total of ten years. Solicitation ¶¶ B.1.1, C.1.1, C.18. In return, title to the facilities was to transfer to the contractor after congressional notification.[2] Solicitation ¶ C.2.1. Additionally, the Army was to make scheduled, monthly payments to the contractor. Solicitation ¶¶ B.2.4, C.11. These monthly payments, which represented the Army's payment for the cost of the utility service and the amortized costs of the capital improvements minus credit for the amortized portion of the purchase price, were to be made at agreed-upon intervals over the ten years of the Contract. Solicitation ¶¶ B.2, H.3.1, H.3.2.

Through the Solicitation, the Army sought to further a federal government policy of privatization by the "transfer of ownership, responsibilities, investments, upgrade, plant replacement, continued operation and maintenance of the Army-owned utility systems to the non-Department of Defense sector." *Id.* In other words, the Army was attempting to get out of the utility, energy production, and supply business. Indeed, the Solicitation was part of a military initiative referred to as the "Privatization of Government-Owned Utility Systems,"[3] Solicitation ¶ C.2.1, which is itself part of the federal government's contribution to the worldwide movement

---

[2] "The transfer of ownership of Government-owned property is currently subject to Congressional notification and all agreements made pursuant to this notification are subject to final congressional notification." Solicitation ¶ C.2.1. 10 U.S.C.A. § 2688, the provision that provides the Secretary of a military department the authority to convey utility systems, provides a notice-and-wait requirement. 10 U.S.C.A. §2688(e). The notice-and-wait requirement states in part: "The Secretary concerned may not make a conveyance . . . until the Secretary submits to the Committee on Armed Services and the Committee on Appropriations of the Senate and the Committee on National Security and the Committee on Appropriations of the House of Representatives an economic analysis . . . demonstrating that the long-term economic benefit of the conveyance to the United States exceeds the long term economic costs . . ." *Id*

[3] The Department of Defense ("DOD") issued Defense Reform Initiative Directive No. 9 ("DRID No. 9"), "Privatizing Utility Systems," on December 10, 1997, which directed the military to develop a plan to privatize all utility systems by January 1, 2000, except for those needed for security reasons or where privatization is uneconomical. This date was extended by Defense Reform Initiative Directive No. 49. The Directives were issued pursuant to authority delegated by Congress in 10 U.S.C. § 2688(a), which provides that:

> The Secretary of the military department may convey a utility system, or part of utility system, under the jurisdiction of the Secretary to a municipal, private, regional, district, or cooperative utility company or other entity. The conveyance may consist of all right, title, and interest of the United States in the utility system or such lesser estate as the Secretary considers appropriate to serve the interests of the United States.

10 U.S.C. § 2688(a). For a good history of the military privatization program, see Jeffrey A. Renshaw, *Utility Privatization in the Military Services: Issues, Problems, and Potential Solutions*, 53 A.F. L. REV. 55, 58 (2002).

towards privatization of public activities that are non-governmental in nature.[4] The underlying theory behind privatization is that the free market is a far more efficient means for the production and distribution of goods and services than the government. In addition, privatization limits the political power of the government, thereby promoting economic freedom and protecting individual liberty.[5] While the verity of this theory for privatization is of no relevance here, its ramifications are clearly relevant to contract interpretation because it provides a context for understanding this Contract and its allocation of risk.

Specifically, the Solicitation sought a "qualified utility service provider or contractor ('Contractor/Offeror') to own (or replace and own), operate, and maintain the Fort Hamilton electrical, natural gas, potable water and wastewater utility systems . . . ." Solicitation ¶ C.1.1. As owner of the facilities, "the Contractor, at its expense, [was to] furnish, install, operate and maintain all facilities required to furnish the service" subject to the Contract. *Id.* at ¶ C.4.5.

The Army "anticipated that the natural gas, potable water, and wastewater utility distribution systems [would] need either major capital repair or complete reconstruction to comply with modern, stringent industry standards." Solicitation ¶ B.2.1. As a result, the contractor was required to initiate and complete any "substantial initial utility system upgrade or utility system replacement" by "the end of the first contract year." Solicitation ¶ H.1. The Army took no responsibility for the initial facility upgrade process. To the contrary, the Army placed on the contractor, "at its expense, [the responsibility to] furnish, install, operate and maintain all facilities required to furnish the service" required by the Contract. Solicitation ¶ C.4.5.

Funding responsibility for the capital investments related to acquisition, maintenance and operation of the Fort Hamilton utility systems is covered in Section H of the Solicitation. Solicitation ¶¶ H.1, H.3, H.6. Under Section H, the contractor is responsible for "funding all capital investments required to acquire, maintain and operate" the Fort Hamilton utility systems. Solicitation ¶ H.1.1. The cost of the utility systems acquisition was to be "capitalized and recovered over a desired amortization period." *Id.* Further, the costs for expansion or upgrade of the systems were to be "funded as capital investment and recovered over a period that is consistent with the Contractor's standard capital investment recovery process." *Id*. These ¶ H.1.1

---

[4] *See generally* PRIVATIZATION AND THE FEDERAL GOVERNMENT: AN INTRODUCTION, *CRS Report for Congress* (December 28, 2006) at 1 ("the CRS Report"). The CRS Report contends there is no standard definition of privatization. *Id*. The CRS Report noted that the Oxford English Dictionary "defines the term broadly to mean 'the policy process of making private as opposed to public.'" *Id.* at 3 (quoting OXFORD ENGLISH DICTIONARY, *available at* http://dictionary.oed.com/). On the other hand, the CRS Report characterizes the Congressional Budget Office (CBO) definition of the term as more narrow, referring "to activities that 'involve a genuine sale of assets and termination of a federal activity.'" *Id.* (quoting Congressional Budget Office, THIRD PARTY FINANCING OF FEDERAL PROJECTS, ECONOMIC AND BUDGET ISSUE BRIEF, June 1, 2005, at 5). It is this latter sense that is implicated in the case at bar.

[5] *See generally* MILTON FRIEDMAN AND ROSE FRIEDMAN, CAPITALISM AND FREEDOM, (40th anniversary ed. 2002); *CRS Report* at 4–9 (citing at 6 n.24, DAVID OSBORNE AND TED GAEBLER, REINVENTING GOVERNMENT (1992), ch. 3).

capital investments can be viewed as "initial upgrade investments"—those that are needed immediately to acquire the systems and get up and running. Solicitation ¶ B.2.1.

In addition to responsibility for the initial upgrade investments, the contractor also was to be responsible for any capital investment required for all system upgrades or enhancements *not* associated with new or renovated facilities. Solicitation ¶ H.1.2 (emphasis added). These capital investments would be the upgrades and enhancements required throughout the course of the Contract—annual capital improvement investments. Solicitation ¶ B.2.3. Any capital investments not associated with new or renovated facilities were to be subject to negotiation between the contractor and the Army. *Id*. Further, any of these type of capital improvements would require "budgetary cost estimates as requested by the federal Contracting Officer." *Id*.

Under the Solicitation, the Army agreed to pay a "monthly consolidated utility service charge" ("MCUSC"). Solicitation ¶ H.3.2. The rate structure for the MCUSC was "to consist of four components: 'Initial Upgrade,' 'Distribution Charge,' 'Capital Investments,' and 'Purchase Price.'" Solicitation ¶ H.3.2. Each of these four differing components were to be combined in a single "consolidated utility service" charge to be paid by the Army each month. Solicitation ¶ H.3.2. The "Initial Upgrade" component comprised of EFSI's initial investment price—the cost of major utility replacement or repair needed at the beginning of the Contract in order for the systems to comply with modern, strict utility industry standards. Solicitation ¶ B.2.1. The "Distribution Charge" consisted of the annual service charge for the ownership, operation and maintenance of the utility distribution systems by the contractor. Solicitation ¶ B.2.2. "Capital Investment" included any capital-related investments for the utility system upgrades or repairs forecasted on an annual basis. Solicitation ¶ B.2.3. The "Purchase Price" consisted of EFSI's price to purchase the utility systems at Fort Hamilton. Solicitation ¶ B.2.4. With regard to the purchase price, the Solicitation required that it be "amortized over a desired period at an annual interest rate and returned to Fort Hamilton in the form of a credit to the Contractor's utility bill for the services rendered in the contract." *Id*. Significantly, the Solicitation required amortization of the purchase price and crediting to the utility bill because "Fort Hamilton [did] not desire an up-front lump sum cash payment for the fair value of the utility distribution systems.

Other provisions in the Contract are similarly important for the Court's analysis. One is how risk was apportioned in the Contract. The Contract placed the risk of ownership squarely on the contractor. Solicitation ¶ C.4.1. This ownership risk included construction and maintenance of the facilities. *Id*. In addition, the contractor accepted the risks inherent in a fixed-price contract for capital improvement and maintenance activities. Solicitation ¶ B.2. The Army thus bore no risk for the capital improvement and maintenance activities. As such, the contractor bore the risk of constructing appropriate facilities according to the standards set by the Contract and maintaining those facilities at the sum agreed to in the Contract. *Id*. *See, e.g.*, *Seaboard Lumber Co. v. U.S.*, 308 F.3d 1283, 1293–96 (Fed. Cir. 2002) (holding that a contractor entering into a fixed-price contract bears the risk of market price increases).

While the Contract required EFSI take title to the utility systems at Fort Hamilton,[6] both parties agree that no transfer of title actually took place during the first two years of the Contract, and title today remains with the government. Pl.'s 12/7/06 Submission; Def's 12/7/06 Suppl. Brief.[7] However, as explained in Section III-C, n.14 of this opinion, the Court believes that this is of no legal significance.

EFSI's Final Cost Proposal ("Proposal"), submitted August 27, 1999, makes clear that the fixed-price and privatization structure of the Contract give at least seven benefits to Fort Hamilton and the Army:

> (1) the approach assures that the goals of the program will be achieved with minimal government oversight thereby fostering cooperation with the contractor-owner and thereby limiting administrative and supervisory costs. ("This is a pacesetting contract for privatization and we believe that it offers wide-reaching opportunities for Fort Hamilton and EFSI to work together in the spirit of cooperation and mutual respect." *Id.*);
> (2) the approach assures the proper maintenance and upgrades of the water and energy capital assets at a fixed price, as well as creates incentives for EFSI as the contractor to assure safety and efficiency;
> (3) the approach transfers all financial risk to EFSI (this is the traditional view of the effect of "fixed price" contracts cited above);
> (4) the approach "stabilizes" payments made by the Army to EFSI (that is, provides a great degree of "certainty"), as well as making more efficient and stable energy, water and hygienic supplies and services provided by EFSI to Fort Hamilton;
> (5) an up-front "lump sum" for capital improvements does not have to be made by the Army—instead, the costs can be amortized over the ten year life of the contract;
> (6) relatedly, the benefits (increased energy supplies and more efficient services) of this "front loading" (this is the term used in the proposal) accrue early in the contract and not incrementally;

---

[6] Solicitation ¶ C.4.5, Contractor's Facilities, provides in part:

> Unless otherwise provided for in this contract, the Contractor, at its expense shall furnish, install, operated and maintain all facilities required to furnish the service hereunder. Title to all these facilities shall remain with the Contractor and it shall be responsible for all loss of or damage to these facilities, except that arising out of the fault or negligence of the Government, its agents or its employees . . . .

[7] Further, the fact that EFSI did not take title to the utility systems is confirmed by EFSI's Statement of Financial Affairs, filed in its bankruptcy proceedings. *In re Enron Federal Solutions, Inc., Debtor*. Case No. 01-16431 (Bankr. S.D.N.Y. 2002).

> and, finally;
> (7) the "payment stream" is also made stable by placing the risk of "natural disasters' and "equipment failure" on EFSI as the contractor.

Proposal ¶ 1.1. To further support this statement, the Proposal included a "Risks Transferred" chart that demonstrated who would be responsible for certain financial risks. *Id*. The chart indicated that EFSI would be responsible for all financial risk associated with material procurement, capital financing, expense fluctuation, as well as others issues that might arise throughout the Contract. *Id*.

The Proposal also purported to show how EFSI would own, operate, and maintain the Fort Hamilton electrical, natural gas, potable water, storm water and wastewater systems. In the Proposal, EFSI stated that its privatization approach would provide the Army with the "best value," for all the services requested. Proposal at 7.

On December 2, 1999, the Army and EFSI entered into the Contract subject to this suit. PPFUF ¶ 3. The Contract incorporated the Solicitation, Solicitation Amendments 1 through 10, EFSI's Final Technical Proposal, dated July 28, 1999, and EFSI's Final Price Proposal, dated August 27, 1999. Contract Award Document at 2. The fixed price of the Contract was $25,377,637.62. Contract Modification P00011. The estimated portion of the Contract attributable to capital improvements and upgrades was $11,616,000. Pl. App. 16–17. The costs for the capital improvements, including Enron's financing charges to obtain the funds to finance the capital improvements, were to be recouped through the monthly payment formula described above. *Id*. The contract commenced on March 1, 2000. Contract Modification P00002.

Upon expiration or termination of the Contract, the Army had "the option to negotiate a sole source contract with the Contractor or reacquire the facilities. . . ." *Id.* at C.4.7. The option to reacquire the facilities would only be exercised if it was determined that reacquisition was "in the best interest of the Government." *Id*. If the Contract were to expire or be terminated, "the Contractor's unrecovered investment [was to] be determined as set for in Paragraph H.8, Termination Liability." *Id*. H.8 provides, "The termination liability of the parties with respect to the provision of electric, natural gas, potable water and wastewater utility service under this contract shall be based upon [Federal Acquisition Regulation, hereinafter FAR] FAR 52.241-10 Termination Liability (Feb 1995). *See* Section I, Contract Clauses."[8] Contract ¶ H.8. In addition to Contract ¶ C.4.7, the Contract provided the government with a "Right of First Offer." Contract ¶ C.4.8. Under this contract provision, EFSI was not allowed to sell any part of the utility system without first offering to sell the system back to the Army. *Id*.

---

[8] As will be discussed fully later in the opinion, EFSI places particular emphasis on FAR § 52.249-8, Default (Fixed-Price Supply and Service), one of the many contract clauses incorporated by reference in the Contract. FAR § 52.249-8 is incorporated by reference in Contract ¶ I.46. The specific language of FAR § 52.249-8 upon which EFSI relies is sub-part (f), which reads: "The Government shall pay contract price for completed supplies delivered and accepted."

It is undisputed that by November 2001, EFSI had substantially completed all of the capital improvements and upgrades to Ft. Hamilton's potable water, natural gas, and electrical distribution systems, and had completed portions of the capital improvements to storm and wastewater/sewer systems as required by the Contract. PPFUF ¶ 18; Def's Statement of Genuine Issues ("Def's SGI") ¶ 18. It is also undisputed that from April 2000 through December 2001, EFSI successfully provided all of the contractually-required utility services at the base. PPFUF ¶ 19; Def's SGI ¶ 19.

On December 3, 2001, following its bankruptcy, Enron terminated all EFSI employees at the Fort Hamilton site and EFSI ceased performance of the Contract. DPFUF ¶ 11. In response, on December 5, 2001, the Army issued a cure notice to EFSI, in which the Army demanded EFSI correct its contract performance deficiencies. Complaint ¶ 20. On February 26, 2002, after EFSI failed to respond to the Army's cure notice and EFSI renounced its Contract with the Army in its bankruptcy hearing, the Army terminated the Contract for default. *Id.*

On April 15, 2005, EFSI submitted to the government a certified claim requesting payment of fees owed under the Contract. Complaint ¶ 31. In its claim, EFSI demanded payment of $10,476,801, less a remaining work credit, plus applicable interest as payment for the capital improvements and for its services in operating and maintaining the utility systems.[9] PPFUF ¶ 23. The Contracting Officer denied EFSI's claim by a letter dated August 11, 2005. PPFUF ¶ 24. It is undisputed that from the beginning of Contract until December 3, 2001, the Army paid EFSI $4,225,102.24 per the terms of the Contract.[10] PPFUF ¶ 20.

**B. The Contracting Officer's Decision**

On August 11, 2005, the Contracting Officer ("CO") issued his final decision regarding EFSI's claim for unreimbursed capital expenditures involving the Fort Hamilton Utility Systems Contract, rejecting EFSI's claims. Contracting Officer's Final Decision ("COFD"). The CO stated three primary reasons for his decision to reject EFSI's claim: 1) FAR § 52.241-10 had no legal force or effect on the Contract; 2) EFSI was not entitled to recovery under the Contract's "Termination for Default" clause; and 3) EFSI was not entitled to recover its capital improvement costs under common law breach of contract or restitution theories.

The CO's first stated reason for rejecting EFSI's claim was that FAR § 52.241-10 did not provide EFSI a basis for recovery. COFD at 3. FAR § 52.241-10, as will be discussed later, is a termination liability clause which sets out a formula for calculating termination charges the government would owe a contractor in the event the government discontinues utility service before the end of a contract. 48 C.F.R. § 52.241-10. Within the formula, there are blank sections that need to be filled in by the contracting parties. *Id.* These blanks, referred to as "fill-ins" by

---

[9] The Court presumes familiarity with this Court's February 27, 2006 order consolidating *Liberty Mutual Insurance Co. v. United States*, (04-254) with the instant matter.

[10] The government does not dispute that EFSI has earned an additional $211,262.95 for utility services provided. However, the government has withheld this payment pending resolution of whether Liberty Mutual Insurance Company or EFSI is entitled to this payment. PPFUF ¶ 25.

the CO, are: negotiated facility cost recovery period, negotiated net facility cost, and negotiated monthly facility cost recovery rate. 48 C.F.R. § 52.241-10(b)–(d). The formula calculates what the government would owe by taking the time left on the Contract, and multiplying that by a cost recovery rate, which is determined by the "salvage value" of the property divided by the time left on the Contract.

All these fill-ins, as evidenced by the formula, according to the CO, must have been negotiated into the Contract in order for the provision to make any sense. COFD at 3. Since no fill-ins were ever "negotiated, agreed to, or incorporated" into the Contract, the CO reasoned, FAR § 52.241-10 would be inapplicable and would not provide EFSI with a basis for recovery. *Id*. The CO did, however, acknowledge that the Solicitation itself incorporated FAR § 52.241-10 both by reference and subsequently in full text. *Id*. Nevertheless, the CO stressed that without agreement as to the fill-ins of FAR § 52.241-10, FAR § 52.241-10 was inapplicable on the theory that EFSI committed a unilateral mistake. *Id.* EFSI's only remedy would therefore be based on either the Termination for Convenience or the Termination for Default clauses of the Contract. Alternatively, the CO stated that even if § 52.241-10 did apply, it only applied "when utility services were cancelled by the Government, which never happened here." *Id*. at 4.

The CO's second articulated reason for rejecting EFSI's claim was that EFSI is not entitled to recover under the Contract's "Termination for Default" provision. *Id*. at 5. FAR § 52.249-8(f), the Termination for Default provision to which the CO refers, provides that in the event of a default termination, the defaulting contractor is entitled to recover the "contract price for completed supplies delivered and accepted." 48 C.F.R. § 52.249-8(f). However, the CO maintained that FAR § 52.249-8 was incorporated into the Contract mistakenly, and instead should have been replaced with FAR § 52.249-10, Default (Fixed-Price Construction) because of the nature of the capital improvement work. "Clearly, the implementation of capital improvements was a pure construction activity . . . and just as clearly, the construction of capital improvements was a part of the contract separate and distinct from performance of [operations and management] services. Thus, the terms of FAR § 52.249-10, not the terms of FAR § 52.249-8 dictate EFSI's entitlement; and FAR § 52.249-10 (in contrast to FAR § 52.249-8(f)) contains no provision allowing a defaulting contractor to recover for unfinished construction." *Id.*

Alternatively, the CO continued, even if FAR § 52.249-8 did govern, EFSI "already received full 'contract price' (in the form of incremental fixed monthly payments) for work performed . . . ." *Id*. The CO stated that the Contract, instead of providing for traditional progress payments to EFSI as work was completed, actually provided for payment of a fixed, monthly service fee to EFSI as long as EFSI remained in general compliance with contract performance requirements. As soon as EFSI abandoned the project, it forfeited its right to recover continued payment of the monthly service fee. "EFSI is not interested in simply recovering its contract price," the CO stated, "but wants to shift the onus of its bad bargain onto the Government by recovering its actual costs as well." *Id*. Ultimately, the CO argued, "as a defaulting contractor under a fixed-price contract, EFSI is not entitled to the recovery it seeks under any standard 'Default' clause that may apply, whether it be FAR 52.249-8 or 52.249-10." *Id*.

Relatedly, the CO maintained that EFSI was not entitled to recover its capital improvement costs under common law breach of contract or restitution theories. *Id*. at 6. To the

contrary, the CO believed the Contract was eminently clear—the risk of financing and performing the capital improvements was to be on the privatization contractor. *Id*. at 7. EFSI's "only expectation was to received fixed monthly service fees for as long as it remained in general compliance with the performance obligations of the contract." *Id*. at 6. Once EFSI abandoned the job site and the work, the Army had no further duty to EFSI and was excused from further payment. *Id*. at 7.

The CO emphasized the fact that "the Government and EFSI did not bargain for a traditional construction contract in soliciting and awarding the utility privatization contract." *Id*. at 8. Instead, in exchange for "unprecedented opportunities for flexibility and profit," EFSI assumed the financial risk of implementing capital improvements. *Id*. To the CO, the nature of the privatization contract "contemplates that the contractor, in return for receiving a dependable fixed monthly service fee over a long term, will incur risk as appropriate to assure that the privatized systems continue as a viable, going concern." *Id.* at 6. Further supporting this position is the fact that in its proposal, EFSI "upped the ante even further." *Id*. at 7. The CO stated that EFSI upped the ante by proposing to "front load capital improvements." *Id*. The front-loading of the capital improvements, the CO continued, was not done for the benefit of the Army, but was for EFSI's own benefit. *Id*. By improving the systems in the first year, EFSI could lower its operations and management costs over the course of the entire contract, resulting in significant savings for EFSI. *Id*. Clearly, the CO concluded, EFSI intended to assume the financial risk of implementing capital improvements. The unique contract that the Army and EFSI bargained for would only be "frustrated if the Government reassume[d] EFSI's capital risks" after EFSI defaulted on the Contract. *Id*. at 8. Accordingly, the CO denied EFSI's claim.

## III. THE SUMMARY JUDGMENT MOTIONS

### A. Standards for Summary Judgment

As initially stated, both parties have proffered cross-motions for summary judgment pursuant to RCFC 56 based on differing legal theories of contract interpretation, and the defendant also has moved to dismiss Counts III and IV of the claim for lack of jurisdiction pursuant to RCFC 12(b)(1). This latter motion, predicated on the contention that these Counts are equitable in nature and thus, this Court lacks jurisdiction, will be dealt with in Section IV.

Concerning summary judgment, the Court stresses once again that it may only be granted "if . . . [the record] shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Summary judgment is not a disfavored shortcut, but rather is an integral part of the Court's rules designed to secure a just, speedy and inexpensive determination of the facts. *Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84 (1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). A dispute is considered to be "genuine" if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. If a fact "might affect the outcome of the suit under the governing law," it will be deemed "material." *Id.* at 248. When deciding a motion on summary judgment, the Court must resolve all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v.*

*Diebold, Inc*., 369 U.S. 654, 655 (1962)). No genuine issue of material fact exists if a rational finder could reach only one reasonable conclusion. *See, e.g.*, *Matsushita*, 475 U.S. at 587.

The burden of establishing that no genuine issue of material fact exists rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). The non-moving party is required to point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P 56(e)). In considering summary judgment, the Court will *not* weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at 249. To be sure, all "reasonable inferences and presumptions are resolved in favor of the non-moving party." *Id.* at 255. This Court must thus resolve all doubt over factual issues in favor of the non-moving party. *Matsushita*, 475 U.S. at 587. Usually, each party's cross-motion for summary judgment must be evaluated on its own merits following the above precepts. *California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001). However, in this case, both motions raise the same primary interpretative issue: does the Contract require the government to pay EFSI for the capital improvements it made to the infrastructure even though EFSI was later terminated for default?

To be sure, issues of contract interpretation are generally recognized as questions of law that are particularly well suited for summary judgment. *Gov. Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (citing *P.J. Maffei Bldg. Wrecking v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). Nevertheless, interpretation of contract language may involve mixed questions of material fact and law, and thus not present a simple, pure question of law. *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988). Such is not the case here, as the primary and secondary issues both deal with the interpretation of contract language and thus summary judgment is appropriate in this case.

**B. The Primary Contentions of the Parties**

The government's motion for summary judgment, filed on May 2, 2006, Def's Mot. for Summ. J., is predicated on the notion that it is not responsible for the remaining capital improvement costs because EFSI was terminated for default. The government argues that because EFSI abandoned performance and was terminated for default, as opposed to being terminated for the convenience of the government, EFSI is not entitled to compensation for the capital investments it made at Fort Hamilton. The government maintains that it is only "where a contractor has been terminated for the convenience of the Government, that it is entitled to recover its initial costs and preparatory expenses for terminated work." *Id*. at 13. Here, to the contrary, it is undisputed that EFSI was terminated for default approximately two years into the ten-year contract.

In its cross-motion for summary judgment, EFSI argues the reverse—that the Contract requires the Army to pay for the capital improvement costs *regardless* of why the Contract was terminated. Stated simply, EFSI's contention boils down to the fact that "the government promised to pay EFSI for capital upgrades and improvements to its utility systems at Fort Hamilton." Pl.'s Mot. for Summ. J. at 9. EFSI points to three Contract provisions which it claims require the Army to pay for the capital improvements it made pursuant to this privatization contract despite the fact EFSI was terminated for default. These clauses are: (1) the

Termination Liability Clause (48 C.F.R. § 52.241-10), which the Contract expressly incorporates; (2) the Default Clause (48 C.F.R. § 52.249-8) also allegedly incorporated into the Contract; and (3) by operation of the FAR construction provisions, including the Default Clause (48 C.F.R. § 52.249-10), which EFSI claims must be incorporated into the Contract through invocation of the *Christian* doctrine.[11] Pl. Mot. for Summ. J. at 14.

**C. The Rules for Contract Interpretation Support the View That EFSI Should Not Prevail**

The standard rules for contract interpretation that bind this Court inexorably lead to the conclusion that the government need not compensate EFSI for the capital improvements. At first blush, it appears that EFSI should be compensated—after all, EFSI did the work. But appearances can be deceiving, and first impressions often fail the test of time.

In short, and as will be elaborated below, the Contract must be viewed in the context of privatization. It was a sales agreement; the Army—as part of the government's policy of privatization—intended to get out of the utility business. Thus, the Contract called for the sale of the utility systems in exchange for the contractor supplying the base with energy, water and waste collection services over the ten years of the Contract. Also, in exchange for the sale of the utility systems, the Contract imposed on EFSI the requirement to provide the capital improvements intended to make the services more efficient. The capital improvements were a condition precedent to the Contract, a type of a preparatory activity. The costs of the capital improvements were to be amortized and, along with the utility service charges, paid in monthly installments to the contractor. Additionally, the contractor was not required to pay the Army an up-front lump sum purchase price; instead, the purchase price was also amortized via deduction from the Army's monthly payments. Consequently, one cannot divorce the capital improvements from the rest of the Contract. These promises were all dependent upon one another. In other words, this is what is termed a "contract in the entirety." EFSI's material breach and default excused the Army from performing its obligations under the Contract.

Accordingly, under these circumstances it would be unfair to force the government to pay an accelerated lump sum payment for the capital improvements when the Contract called for

[11] The so-called *Christian* doctrine derives from the United States Court of Claims' decision in *G.L. Christian & Assocs. v. United States*, 160 Ct. Cl. 1, *aff'd on reh'g*, 160 Ct. Cl. 58 (1963). In *Christian*, a contractor sued the government for damages resulting from the government's termination for convenience of a federal housing project. Despite the lack of a termination for convenience clause in the contract, the Court of Claims ruled in favor of the government, holding that such a clause should be read into the fixed-price construction contract under the Armed Services Procurement Regulations because these regulations were issued under statutory authority. Accordingly, the court included the missing cancellation provision into the contract by operation of law. As a result of its decision in *Christian*, the Court of Claims established what has become known as the *Christian* doctrine, which provides that mandatory federal regulations should be read into a government contract, even if not physically included or incorporated by reference therein. In other words, parties to a government contract are deemed to have agreed to contract terms required by law to be included in the contract. *See generally* 2 BRUNER & O'CONNOR CONSTRUCTION LAW § 7:51 (2007) (and cases cited therein).

staggered, monthly installment payments for the capital improvements combined with the service payments over the ten-year life of the Contract. In other words, a plaintiff cannot recover for only partial performance on the Contract after it materially breached the same contract. Supporting this view is the salutary fact that the Contract place on the contractor the risks of price increases, the lack of availability of material, and the actual loss of the capital improvements. This is no more than the price of ownership. The Contract cedes the benefit of ownership to EFSI, yet EFSI seeks to insulate itself from the burden of ownership. This the law will not allow.

In reaching this conclusion, the Court notes three primary rules of contract interpretation. First, the Court must start with the plain meaning of the Contract's text. *See, e.g.*, *ACE Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). In interpreting a contract, one must "begin with the plain language," *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996), and "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). Indeed, the language of the Contract must be given the meaning that a "reasonably intelligent person acquainted with the contemporaneous circumstances" would afford it. *Allied Tech. Group, Inc. v. United States*, 39 Fed. Cl. 125, 138 (1997) (internal quotation marks omitted).

The second relevant rule that must be applied is what can be termed the whole agreement rule. "We must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (citing *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996) (describing as a "settled principle of contract interpretation" that courts "view the contract as a whole"); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). *See generally* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed. 1999). This is merely another way of saying that context defines a contract and the issues deriving thereof. Accordingly, when interpreting a contract, the language of the contract must be given "the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999).

One other precept of contract interpretation relating to context is also helpful to the Court. The mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous. *See Cmty Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed. Cir. 1993); *Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed. Cir. 1991). Not every disagreement as to the meaning of a provision constitutes either a latent or patent ambiguity. *Cmty Heating*, 987 F.2d at 1578. A contract provision or clause is ambiguous *only* if it is susceptible to two different and reasonable interpretations, each of which is found to be consistent with the contract language. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000). And before "making a conclusive determination about an agreement's ambiguity, or lack thereof, the court should consider the context in which the agreement was executed." *W&F Bldg. Maint. Co. v. United States*, 56 Fed. Cl. 62, 69 (2003).

With these three rules in mind, one is reminded of the golden rule of real estate: "location, location, location."[12] Here the golden rule must be context, context, context. Looking at the plain meaning of this Contract, the Contract read as a whole, and the Contract interpreted in context, the Court sees a privatization contract, whereby EFSI was to provide the utility upgrades and maintenance and certain utility service to the Army for a period of ten years at a fixed price. This is not a contract under which the Army is buying boilers or pencils from EFSI whereby the Army must pay EFSI for boilers or pencils it has accepted. No credible evidence exists that either party intended anything but a fixed-price privatization contract with the risks associated with such a contract being allocated per the Contract. Solicitation ¶ B.2.

Utility privatization is "the sale of government-owned on-base utility distribution systems to a private entity that will then operate the systems and provide utility services to the base's buildings and activities." Renshaw, *supra* note 2, at 58. In utility privatization contracts, the government sells its on-base utility systems to a private entity. The contractor purchasing the systems is then responsible for their operation and maintenance. Solicitation ¶ B.1.1. To be clear, the government is not retaining ownership of the systems and contracting out their operation and maintenance—it is selling the systems outright. *See* Renshaw, *supra* note 2, at 58. The stated goal of privatization is "to get the Department of Defense ('DoD') out of the business of owning, managing, and operating utility systems by privatizing them." *Id*. (citing DRID No. 49). In addition to this stated goal, the DOD has issued utility privatization guidance. *Id*. It is helpful to quote again the relevant portion of that guidance:

> The purpose of privatization is to allow the Defense Components to focus on core defense missions and functions by relieving them of those installation management activities that can be done more efficiently and effectively by others. Historically, military installations have been unable to fully upgrade and maintain utility systems due to inadequate funding and competing installation management priorities. Utility privatization will allow military installations the opportunity to benefit from *private sector financing and efficiencies to obtain improved utility systems and services*. *Id*. (citing Draft Policy Guidance, Office of the Deputy Undersecretary of Defense (Installations & Environment), subject: Privatizing Defense Utility Systems) (emphasis added).

The Contract in this case was issued under an Army initiative referred to as "Privatization of Government-Owned Utility Systems."[13] Contract ¶ C.2.1. EFSI is now shutting its eyes to the

---

[12] The true origin of the phrase may be lost to history. It has attributed to, among others, New York City real estate developer William Zeckendorf, who bought the Roxy Theater and demolished it to add rooms to the Taft Hotel in the 1950s, http://www.fluther.com/disc/5364/**,** and to William Dillard, http://www.isearchquotations.com/quotes/location_location_location--/2303.html.

[13] As mentioned in Section II above, the Court takes judicial notice of the fact that the privatization initiative is in response to legislation, 10 U.S.C. § 2688 (2000), in which Congress granted the Secretary of a military department the authority to sell utility distribution systems to private third parties with the objective of reducing the cost of utility services. 10 U.S.C. § 2688 (2000). The legislation allows the conveyance subject to congressional notice—the Secretary

fact this is a very specific type of contract—a privatization contract. What is more, the contract involved in this case is not a construction contract or a contract for the sale of supplies. It is clear that by selling off its utility systems on military installations to private parties, the government wanted to avoid worrying about any maintenance or upgrade issues for those utility systems. What the Army essentially wanted to do through this Contract is what the average private utility consumer does—use water, power, sewage, and other utilities provided to it by a private utility company, and then pay a bill at the end of each month for what it used. It did not want to have to maintain the infrastructure itself or directly pay to have the utility systems upgraded. To be sure, this is the only explanation of why the Contract allocated all the risks associated with the capital improvements, including loss of the facilities, to the contractor, not the Army. *See* Contract ¶ C.4.5.

EFSI's argument that the terms of the Contract itself indicated that the parties intended for the Army to pay for the capital upgrades, regardless of why the Contract was terminated is without merit. Pl's Cross-Mot. Summ. J. at 9. It is completely contrary to the parties' intended result of the Contract as a whole. The Army wanted to receive continued utility service throughout the course of the fixed-price contract. With continued service, EFSI could expect to receive fixed, monthly service fees. However, upon early termination of service, EFSI knew that it would stop receiving the fixed, monthly payments, and the credit for the amortized purchase price for the facility. Under the privatization model, the very essence of the Contract was to shift the risk of capital improvements onto the contractor. EFSI therefore bore the risk of the capital improvements, and when it defaulted, could not then shift its burden to the Army. *See United States v. Spearin*, 248 U.S. 132, 136 (1918) (noting that where "one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforseen difficulties are encountered").

Nothing in the Contract contradicts that the purpose of the Contract was for the Army to buy, and EFSI to sell, certain utility services at a certain fixed price. The cost of those services included the amortization of the capital improvements necessary to supply the utility services, but this is true for most contracts. Solicitation ¶ B.2.3. When someone buys a hamburger, part of the cost of the hamburger covers the cost of the stove used to cook it. However, the person buying the hamburger is not buying the stove. If a party enters into a contract with someone to supply them with a certain number of hamburgers and ends up with the stove instead, why should it have to pay for the stove? This is true even if the stove is a brand new top-of-the-line model. *See, e.g.*, *Bel-Mar Ford Tractor v. Woods & Copeland Mfg., Inc.*, 602 F.2d 1199, 1200 (5th Cir. 1979) (holding that defendant who terminated the contract without breach is not liable for plaintiff's preparatory costs incurred in reliance on the contract); *Penn. Exchange Bank v. United States*, 170 F. Supp. 629, 631–33 (Ct. Cl. 1959) (holding that the plaintiff's significant partial performance did not merit compensation when the plaintiff was unable to fulfill the contract because of bankruptcy and a subsequent assignment, even though the assignee was willing and able to perform); *Malott & Peterson Grundy, Inc. v. Reynolds Const. Co.*, 472 P.2d 701, 702

---

must first file an economic analysis with both the Senate and House of Representatives Committees on Appropriations which demonstrates that the long-term, economic benefit of such a conveyance outweighs the long-term costs. *Id*. Obviously, all of this sets the stage for the Court's context analysis.

(Colo. App. 1970) (holding that even 90% completion of a construction was not substantial performance as a matter of law, "particularly where the facts are undisputed that this 10% was the most difficult part of the job").

True, this case is unique in that the party buying the utility services (Army) first transferred the dilapidated infrastructure to the party selling the utility services (EFSI), but that fact is irrelevant. This case is also unique in that the party buying the utility services (Army) now has the new and improved infrastructure that it never wanted in the first place, but this does not mean that party (Army) should have to pay for it.[14] The next section discusses the common law basis that supports the Court's interpretive conclusions.

**D. The Application of the Material Breach Rule Demonstrates That EFSI Should Not Prevail**

**1. The material breach rule**

Initially, it is important to stress that the law governing government contracts has its basis in the common law. The government enters into contracts as does a private person, and its contracts are generally governed by the common law—which protects the rights and privileges of the contracting parties. *Lynch v. United States*, 292 U.S. 571, 579 (1934); *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564 (Fed. Cir. 1987) (citing *Torncello v. United States*, 681

---

[14] It is worth reiterating that throughout the course of the Contract, title to all the facilities was to remain with the contractor. Solicitation ¶ C.4.5. Whether title was transferred or not is, nevertheless, of no legal import. Transfer was not effectuated because of EFSI's material breach; EFSI should not be rewarded for such behavior. *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1251 (Fed. Cir. 2007) (observing that courts often place liability on the party that committed the first material breach). The Court must construe a contract based on the obligations of the parties and the consequences of a breach are always construed from the point-of-view of the non-breaching party, who generally is awarded the economic benefit of its bargain. *See generally* ARTHUR L. CORBIN, CORBIN ON CONTRACTS, § 992 (1964); 11 WILLISTON § 1338; CHARLES T. MCCORMICK, DAMAGES § 561 (1935). Regardless of failure in title transfer, the Army was to "provide easements and/or right of way access to the equipment and/or facilities conveyed to the Contractor." Solicitation ¶ C.13. Further, EFSI was responsible for "obtaining easement and right of ways for access to equipment and/or facilities not conveyed by the contract and for any new or rerouted systems to be covered or to be covered by the contract." *Id.* With regard to the rest of Fort Hamilton, the Army was to "grant the Contractor a revocable permit or license to enter the service premises for any proper purpose under the Contract. [The] permit or license [covered] the use of the site or sites agreed upon by the parties for the installation, operation, maintenance and repair of the facilities of the Contractor located upon the service premises." *Id.* ¶ C.14.1. All this, coupled with the risk provisions, show that EFSI had a present possessory interest with a future interest in fee upon the transfer of title. It is interesting to note, although not binding here, that at common law this contractual arrangement would be interpreted as a fee simple absolute under the Rule in Shelley's Case, 1 THOMPSON ON REAL PROPERTY, THOMAS EDITION § 5.04(c)(1)(iv) (David A. Thomas ed., 1994), or a fee simple defeasible, 2 THOMPSON ON REAL PROPERTY, SECOND THOMAS EDITION § 20.05 (David A. Thomas ed., 2006).

F.2d 756, 762 (Ct. Cl. 1982)). As such, the traditional common law contract doctrines limit the government's power to contract just as they limit the power of any private person. *Torncello*, 681 F.2d at 762. As this Court has previously explained, the government's entry into the field of contracts is not like its selective creation of rights and entitlements in other fields. *Id*. In the field of contracts, the government may only trespass the bounds of general contract doctrines pursuant to specific legislation. Therefore, this Court will read the Contract in this case as it would read any contract between private parties and will give or deny effect to any contract term, and the Contract as a whole, as dictated by the general of contract law, except to the extent that statute and regulation (such as the FAR) supersede the common law by substantive alterations or by added procedures. *Id.*

Applying common law contract law, the issue between EFSI and the government in this case then turns on whether EFSI's breach was indeed *material*. If this is so, the government is excused from performance and EFSI is not entitled to its requested relief. The materiality of a breach acts as a trigger to certain consequences. These consequences are discussed immediately following in subsection 2.

When, then, is a breach material? In *Thomas v. Dep't Housing and Urban Develop.*, 124 F.3d 1439 (Fed. Cir. 1997) (discussed in more detail below), the court stated that "[a] breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." (citing ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1104 (1964)). In some cases, a determination of whether or not a breach is material is a mixed question of fact and law. *Mass. Bay Transp. Auth. v. United States,* 129 F.3d 1226, 1231 (Fed. Cir. 1997). Where, as in the case between EFSI and the government, the facts are undisputed, the determination of whether there has been material non-compliance with the terms of a contract, and hence a material breach, necessarily is reduced to a question of law. *See Carborundum Co. v. Molten Metal Equip. Innovations*, 72 F.3d 872, 878 (Fed. Cir. 1995) (stating that where "the only issue is one of law to be applied to an undisputed set of facts, we have plenary review of the court's decision").

A material breach "relates to a matter of vital importance, or goes to the essence of the contract." *Thomas v. Dep't of Hous. and Urban Dev.*, 124 F.3d 1439,1442 (Fed. Cir. 1997). Materiality depends on "the nature and effect of the violation in light of how the particular contract is viewed, bargained for, entered into, and performed by the parties." *Stone Forest*, 973 F.2d at 1551. In determining materiality courts often look to whether the breached obligation is an important part of the contract. *See Thomas*, 124 F.3d at 1442 (Fed. Cir. 1997) ("A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract.") (citing ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1104 (1964)). Cases from the Federal Circuit on this issue abound:

- In *Lutz v. United States Postal Serv.*, 485 F.3d 1377 (Fed. Cir. 2007), an employee appealed to the Board his demotion by the agency, and then he and the agency negotiated a settlement resolving the appeal. Under the terms of the settlement agreement, the employee would apply for disability retirement, and the employee waived his right to appeal. The agency agreed not to place negative statements in the paperwork it would be supplying to the office determining the disability retirement. However, statements and documents submitted by the agency prejudiced the disability proceedings. The court held

this was a material breach of the contract which terminated the employee's obligations under the contract, including his waiver of appeal.

- In *Hometown Fin., Inc. v. United States*, 409 F.3d 1360 (Fed. Cir. 2005), the government, through authorized regulators, expressly agreed to allow investors to count goodwill toward capital requirements of a failed thrift in exchange for the investor's assumption of the thrift's liabilities. The court held that a change in regulations eliminated such treatment, and was a material breach of the parties' contract.

- In *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999), the court stated that drastic modifications to the contract are a material breach. "Of course, the government may not, through a contracting officer's decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a 'drastic modification' in the performance required by the contract, the order is considered a 'cardinal change' that constitutes a material breach of the contract. Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause."

- In *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992), the Forest Service entered into a contract with a contractor under which the contractor would buy, cut, and remove timber in a national forest. The Forest Service, however, denied access to two of the units because of the enactment of the California Wilderness Act, 98 Stat. 1619. The court found that the Forest Service had materially breached the contract, thereby excusing the contractor from all further performance. The contract was not severable into different parcels. That is, the government could not hold the contractor to performance of the contract related to some of the parcels and not others.

Indeed, the immediately preceding case is factually similar to the case between EFSI and the government. In both cases, one party allegedly breached only a part of a contract but performed other parts. Based on the Circuit's material breach jurisprudence discussed above, the Court determines that EFSI materially breached the Contract by discontinuing performance of a ten-year contract to provide utilities, including operating and maintaining the facilities necessary to provide those utilities. EFSI commenced performance of the Contract on or about April 1, 2000. Complaint ¶ 14. By November 2001, it had substantially completed the capital improvements necessary to comply with its contract to provide utility services to the Army for ten years as required. Solicitation ¶¶ B.1.1, C.1.1, C.4.1., C.18. Providing the utility services included operating and maintaining the facilities needed to provide those utility services. The Army was buying utility services from EFSI; it was not buying a plant to provide utility services. In fact, the Army specifically did *not* want to own a plant providing utility services, it wanted only to be a customer of a business providing those services. The failure of EFSI to continue operating the facility is a material breach of the Contract. *See Penn. Exchange Bank*, 170 F. Supp. at 632–33 (holding that the failure to fulfill the services that were the ultimate objective of the contract was a material breach). As an analogy, when the government buys paper, it does not want to buy the paper mill that makes the paper; it just wants the paper. Certainly, the price of the paper partially compensates the paper manufacturer for the capital costs of the paper mill, but this does not mean the government is buying the paper mill.

There is another ground to find EFSI in material breach. On December 3, 2001, EFSI discontinued its performance of the Contract and on December 21, 2001, EFSI filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Complaint ¶ 22.[15] With an exception discussed in subsection 3 below, it is also the law that a contracting party's status of insolvency or bankruptcy, and its subsequent inability to perform under a contract, constitutes a material breach. *See Penn. Exchange Bank*, 170 F. Supp. at 632 (citing *Central Trust Co. of Illinois v. Chicago Auditorium Ass'n*, 240 U.S. 581, 591 (1916); *Rhoem v. Horst*, 178 U.S. 1 (1900); *Pennsylvania Steel Co. v. New York City R. Co.*, 198 F. 721, 743 (2d Cir. 1912)) (observing that "it is an implied condition in every contract that the promisor will not permit itself, through insolvency or acts of bankruptcy, to be disabled from making performance"). *See generally* 15 WILLISTON ON CONTRACTS § 43:29 (4th ed. 2000) (stating that "historically, the filing of a petition in bankruptcy by or against a party to a contract has been regarded as the equivalent of an anticipatory breach of an executory agreement."). Accordingly, EFSI was in material breach arguably as early as December 3, 2001, when it discontinued performances under the Contract, and certainly by December 21, 2001, when it filed a petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

**2. Consequences of a material breach**

What, then, are the legal consequences of a material breach? A basic statement of the law applicable to this issue is: a party who materially breaches a contract relieves the non-breaching party from all of the non-breaching party's contract obligations to the breaching party. Even assuming, *arguendo*, that the Army had breached the Contract by failing to pay for all capital improvements, the prior material breach doctrine absolves the Army here from any further liability to EFSI.

In *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1251 (Fed. Cir. 2007), the court declared that the prior material breach doctrine provides that "when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Faced with two parties to a contract, each of whom claims breach by the other, courts will "often . . . impose liability on the party that committed the first material breach." (internal citation omitted). In that case, the government entered into an agreement with Long Island Savings in connection with Long Island Saving's acquisition of another bank. The Contract contained certain capitalization requirements set by the government and to be met by Long Island Savings. In addition, Long Island Savings had to certify that the bank was not in violation of applicable law. The CEO of Long Island Savings, who had certified that the bank was not in violation of the law, was subsequently convicted and disbarred for improperly accepting compensation from a law firm that provided services to the bank. This fraud was imputed to the Long Island Savings. The government later changed the capitalization requirements. Long Island Savings sued the government for damages related to the changed capitalization requirements. The court held that Long Island Saving's "false

[15] The Contract at issue in this case was terminated for default on February 26, 2002. Complaint ¶ 24. EFSI is no longer providing Fort Hamilton with the utility services contracted for and the Army is no longer paying EFSI any portion of the periodic outlined in the Contract as explained in the opening sections of this opinion.

certification constitutes an uncured material failure of performance that precludes [Long Island Saving's] claim for damages." *Id*. at 1251–52.

The prior material breach doctrine also prevented the first party to breach the Contract from recovering in *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004), *cert den*., 543 U.S. 1146 (2005). In that case, the owners of a federally-subsidized, low-income housing complex sued the United States government for breach of contract by the Department of Housing and Urban Development ("HUD") for failure to approve rent increases. The owners, however, had submitted false data to HUD in violation of the contract, which prohibited "any false statements or misrepresentations to HUD in connection with HUD mortgage insurance, loan processing or administration of the contract." The false data was proved through a prior plea agreement. The court said, "when a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance . . . . In resolving disputes among parties who each claim that the other has breached, courts will often . . . impose liability on the party that committed the first material breach." *Id.* at 1334 (internal quotations omitted).

Another case in accord with these decisions is *Lary v. United States Postal Serv*., 472 F.3d 1363 (Fed. Cir. 2006). In that case, the employee's sleep apnea often caused him to be late for work, and, upon the employee's challenge of his removal for tardiness, the employee and the USPS entered into a settlement agreement whereby the USPS agreed to provide within two weeks the documents necessary for the employee's disability retirement application. USPS failed to provide the documents within that period, and the employee's application was subsequently denied. USPS argued that the breach was not material because the employee could have filed a timely, incomplete application. The court held, however, that the breach was material since production of the documents was an important obligation under the agreement. The employee was thus entitled to reinstatement with back pay, a new removal decision, and prompt production of the documents for a new retirement application.

Older cases of the Federal Circuit do not specifically cite the "prior material breach doctrine," but are in accord with that doctrine. *See Malone v. United States*, 849 F.2d 1441 (Fed. Cir. 1988). In *Malone*, the government awarded Malone a contract to paint and refurbish 265 houses. The contract required the officer to accept an exemplar of the work before Malone could proceed. After Malone completed the exemplar, the CO was evasive about accepting the work. However, the CO did not object when Malone continued to paint other houses and also made continuing progress payments to Malone. When approximately 70% of the work had been completed, the CO objected to certain priming of bare spots. The court held that the CO's evasive conduct misled Malone into performing roughly 70% of its contractual obligation in reliance on a workmanship standard the CO later found unacceptable. In light of the CO's evasiveness, and the consequent interference this caused in Malone's performance, the court held that the government's conduct in this case rose to the level of a material breach of contract. "This breach provides Malone with a legal right to avoid the contract, discharges Malone's duty to perform, and relieves Malone of the default termination and its consequences." *Id*. at 1446.

The same result occurred in *Link v. Dep't of Treas.*, 51 F.3d 1577 (Fed. Cir. 1995), in which the United States Customs Service terminated Link for nonperformance. However, the

parties entered into what was called a "last-chance" settlement agreement. Pursuant to this agreement the employer agreed to rehire Link on the condition that Link would comply with certain training and review of his work. The employer agreed that Link's work would be peer-reviewed by the same standard as that applied to other employees. In the last-chance agreement, Link waived his right to administrative appeal of any subsequent termination. After he was terminated a second time, Link claimed that the government had breached the last-chance agreement by failing to have his work peer-reviewed and failing to evaluate his work at the same standard as other employees. Link's appeal of his termination was dismissed because of the waiver provision. Link claimed that the waiver provision was inapplicable because the government's material breach of the last-chance agreement relieved him of any obligations under it. The court agreed, determining that, in essence, the government's material breach of the agreement terminated Link's obligations including his waiver, and reinstated Link's appeal.

The same result occurred in *Thomas*, 124 F.3d 1439, cited above. In that case, the employee and the government entered into a settlement agreement in which the government agreed that it would not release any adverse information about employee and would state that the employee had resigned for personal reasons. The employee agreed to waive his rights to appeal of his termination. However, the government breached the contract when it informed a prospective employing agency of a recommended adverse action against the employee. The employee then appealed his termination. The Federal Circuit held that the government's material breach of the contract relieved the employee from the provisions of the contract, including the waiver of appeal provision, and allowed the employee to appeal.

**3. Traditional exceptions to the material breach rule are not applicable**

There exist several exceptions to the material breach rule. The one applicable here is if the Contract's obligations are "divisible" (the term "severable" is also used) rather than "entire" (non-divisible), the non-breaching party must still perform its duties associated with the divisible portion of the Contract if the breaching party has also performed its duties as to that divisible portion of the Contract. *See generally* CORBIN ON CONTRACTS § 35.8, "Entire" and "Divisible" as Terms of Confusion. In essence, this is what EFSI is arguing. EFSI is claiming that the Army's obligation to pay the portion of the contract price, the portion that is attributable to the amortization of the capital improvements, is divisible from the remaining portions of the Contract. In other words, because EFSI performed its duties to provide the capital improvements, it argues that the Army is required to pay for the capital improvements. The Court rejects this argument.

Professor Williston's views concerning whether the negotiated promises of a contract are considered divisible (or "independent" from one another) or are mutually dependent on the performance of the other (a contract in the "entirety') are illuminating. To Williston, "an important factor to be considered is whether the parties reached their agreement regarding the various promises as a whole, or whether the agreement was reached by regarding each promise and counter-promise as a unit . . . ." 15 WILLISTON ON CONTRACTS § 45.10 (4th ed. 2000). "If there is but a single assent to a whole transaction involving several things, a contact is entire, but if there is a separate assent to each of the several things involved, it is divisible . . . ." *Id.* The test, to Williston, is whether the parties "consented to all the promises as a single whole so that

there would have been no bargain whatever if any promise or set of promises were deleted . . . . Before a contract may be considered divisible [therefore], it must be apparent that either the parties assented separately to successive divisions of the contract upon performance of which the other party is bound, or that there are categories with such identifiable lines of demarcation that it becomes apparent the parties assented separately to several things." *Id.*

Similarly, the RESTATEMENT (SECOND) OF CONTRACTS § 240 (1981) establishes two criteria for a divisible contract: (1) "apportionment"—the parties' performances can be apportioned into corresponding pairs of part performances; and (2) "agreed equivalents"—the parts of each pair of performances are agreed equivalents. While the former is often easily discerned—"The process of apportionment is essentially one of calculation . . . It is enough, however, if the price of separate items is separately stated in the agreement itself" *Id*., comment (d);—the latter is frequently more difficult to resolve and involves "assessing the essence of the agreement and the mutual performances obligated thereunder. . . ."[16]

Case law has applied these basic precepts. In *Brett Arnold, P.C. v. United States*, 98 Fed. Appx. 854 (Fed. Cir. 2004), Arnold entered into a contract with HUD in which he agreed to provide closing services for the sale of HUD-owned residential properties in the Dallas-Fort Worth area of Texas. Arnold apportioned the work to four separate offices under his control. HUD terminated the contract after one of Arnold's offices repeatedly failed to wire closing funds to HUD within the time periods specified in the contract. Arnold challenged the contract termination, arguing that the contract should have been divisible, he should have been allowed to continue as HUD's closing agent, and only the office which failed to perform should have been removed from the contract. The court found Arnold's argument unavailing, however, recognizing that the timely wiring of closing proceeds was the essence of the contract. Arnold himself contracted to serve as a closing agent and was responsible for the contract—that the failings could be attributed to a particular office did not make the contract divisible. The court held that the failure of any particular office under Arnold's control was the failure of Arnold himself, and, accordingly, the entire contract was rightfully terminated.

In *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992), the Forest Service entered into a contract with a contractor under which the contractor would buy, cut, and remove timber from a national forest. The Forest Service, however, denied access to two of the units because of the enactment of the California Wilderness Act, 98 Stat. 1619. The court found that the Forest Service had materially breached the contract, thereby excusing the contractor from all further performance. The contract was not severable into different parcels. The court opined that the

> consequence of, and remedy for, breach of a contract depends in part upon whether the contract was divisible. If only a severable portion of a contract was

---

[16] 17A AM. JUR. 2D 443, CONTRACTS § 418 (1991) attempts to clarify this concept by saying the following: "In construing a contract to determine whether it is entire or severable, many of the courts have regarded the singleness or apportionability of the consideration as an important factor—that is, if the consideration is single, the contract is entire, but if the consideration is expressly or by necessary implication apportioned, the contract is severable."

> breached, the non-breaching party can recover damages for that portion of the contract but its remaining contractual duties are not discharged. However, if a contract is not clearly divisible, in accordance with the intention of the parties, the breaching party can not require the non-breaching party to continue to perform what is left of the contract.
>
> *There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated.* Unless justice so requires, courts should hesitate to rewrite a contractual arrangement after a material breach by one party, for the standard remedies of law and equity usually can accommodate the requisite adjustment of obligations. The choice of remedy is generally with the non-breaching party, and only in exceptional circumstances will equity require the non-breaching party to continue to perform the remainder of the contract.

*Stone Forest Industries*, 973 F.2d at 1552 (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 237 & 240; *Penn. Exch. Bank*, 170 F. Supp. 629 (looking to contract terms to ascertain divisibility)) (emphasis added).

Similarly, in *Aptus Co. v. United States*, 62 Fed. Cl. 808 (2004), *cert den*., *Lin v. United States*, 547 U.S. 1113 (2006), the court noted that in "[d]etermining whether portions of the work under a single contract are divisible from the balance of the contract is not an easy question, as there is no bright line rule for determining contract severability." *Aptus Co.*, 62 Fed. Cl. at 812 (citing JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 963 (3d ed. 1995)). "'Numerous tests have been declared by the courts and text writers by which to determine whether a contract is severable or entire. In the main, they all declare the general rule that the intent of the parties, as gleaned from the four corners of the instrument, must determine the question.'" *Id*. (quoting *Penn. Coal & Coke Corp. v. United States*, 70 F. Supp. 136, 108 Ct. Cl. 236, 250 (1947)). What is more, the holding of the court is also pertinent to the case at bar: "Viewing the contract in that light, we determined that the parties did not intend for portions of the work to be severable from the balance of the agreement at the time the parties entered the contract. . . . Perhaps more probative, however, is the nature of the work required by the contract, and the contract's overarching purpose." *Id.* at 812.

Applying the holdings of these above cases to the one at bar leads to the inexorable conclusion that the intent of both EFSI and the Army was that their promises of performance were to be dependent on one another. The privatization nature of the Contract and the purpose of the capital improvements—to effectuate the efficiency of the utility services to be provided—along with the fact that the payments for the capital improvements were amortized and together with the service charges to be paid (minus the credit for the purchase of the utility infrastructure) over the ten-year period of the Contract in monthly installments and not initially as a lump-sum payment—all demonstrate the dependent nature of the promises. All these components are linked, the performance of one triggering the performance of the others. This is what the parties bargained for.

Indeed, that a contract contains multiple steps is not necessarily in itself indicative that performance of these steps are severable. As stated in *Stone Forest*, discussed above, "There is a

presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Id*. at 1552. The contract between EFSI and the government is the same; the agreement to reimburse EFSI for its capital improvements was in consideration of EFSI's agreement to provide the utility services for ten years.

This presumption is especially true if the early steps are necessary for, but incidental or preparatory to, the unfulfilled step that is the bargained-for essence of that contract. An example is *Penn. Exchange Bank*, 170 F. Supp. 629. In this case, the manufacturer on February 29, 1952, entered into a contract divided into several "steps" in preparation to the ultimate step—the manufacture of "Microwave Magic Tees," a device that can control microwave transmissions. The purpose of this contract was to have ready, in case of war, a manufacturer, who had constructed the facilities and was otherwise qualified, to promptly produce the Microwave Magic Tees. Some of the steps were completed when the manufacturer entered bankruptcy. *Id.* at 631. The plaintiff assignee filed suit for the amount of money it claimed was due for the entire contract; the government counterclaimed for the monetary amount for any unfinished work and obtaining a new manufacturer, arguing that the manufacturer had not only the duty to complete the preparatory steps, but to stand ready to produce the magic tees if called upon to do so. *Id.* The court ruled in favor of the government, holding that the contract was not divisible and that the purpose of the contract was essentially the government purchasing an option that the plaintiff, not another contractor, would retain the necessary information and materials and remain ready to produce the items if needed. *Id.* at 632–33. The government was therefore entitled to recover damages for the breach of the contract, the measure being whatever the cost of preparing another manufacturer to stand by, willing and ready to take the final step of production.[17] *Id*. at 633. The court noted that this ruling could be considered "a heavy price for plaintiff to have to pay for its insolvency," but justified its harshness because "the defendant ought not to pay this cost . . . through plaintiff's fault, it did not get what it bargained for." *Id.*

This clearly mirrors the situation before this Court. EFSI's part performance, partial completion of the capital improvements prior to EFSI's breach, does not justify what is essentially the imposition of punishment— coercing the government to complete (and the taxpayers to fund) the government's obligations under the Contract while EFSI's duties remain outstanding.

EFSI's bankruptcy filing also raises the issue of divisibility. In bankruptcy courts and appeals from decisions of bankruptcy court decisions, some debtors attempt to divide

---

[17] To be fair, the court did subtract from the government's recovery part of the cost of the preparatory steps and certain tools. *Id.* Presumably, these could be used by the new manufacturer while "standing by" to produce the Microwave Magic Tees. The plaintiff in *Penn. Exchange Bank* sought recovery of the balance of the contract price and summary judgment on the government's counterclaim—not payments for work already completed, which the government had already paid. This is unlike the situation at bar where the issue is whether the promise to upgrade the utility infrastructure was dependent on EFSI's other promise—the supplying of utility services. Nevertheless, *Penn. Exchange Bank* is cited for the proposition that performance of what appear to be divisible segments of a contract can be considered non-divisible because the promises to perform are contingent upon one another.

unprofitable portions of contracts from profitable ones, keeping the profitable parts, and discharging the unprofitable parts. Section 365 of the Bankruptcy Code provides that a debtor, subject to court approval, may reject any executory contract. *See* 11 U.S.C. § 365(a). The intent is to allow the debtor "to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). However, unless the Contract is divisible, the debtor cannot pare off some parts of the Contract and keep others. "[W]here an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others." *Id.*; *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (explaining that "the often-repeated statement that the debtor must accept the contract as a whole means only that the debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement"). But, "if a single contract contains separate, severable agreements the debtor may reject one agreement and not another." *Stewart Title,* 83 F.3d at 741.

A Fifth Circuit case, applying District of Columbia law, has a debtor attempting to do something similar to what EFSI is attempting to do here. *See Mirant Corp. v. Potomac Elec. Power Co.* (*In re Mirant Corp.*), 197 Fed. Appx. 285 (5th Cir. 2006). It must be noted that *Mirant* was an on-going case and the court said, "This appeal is not the first time these parties have been before us, *see In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004), and we recognize that it may not be the last." *Id*. at 285. In *Mirant*, Mirant was attempting to sever parts of its contract as EFSI is attempting to do here. *Mirant* differs from the situation between EFSI and the Army in that Mirant was willing to perform some parts of its contract after bankruptcy.

Mirant agreed to buy certain electrical generating facilities from Potomac with the plan of then selling electricity to former customers of Potomac. This was a utility privatization contract similar to the Contract between EFSI and the Army, the difference being that the customers are various people and businesses, not the Army. In *Mirant*, Potomac already had some $5 billion of preexisting agreements with some customers to provide electricity, called Purchase Power Agreements ("PPAs"). The assignability of those PPAs to Mirant was not clear, and as part of the contract between Mirant and Potomac, if some or all of those PPAs could not be assigned, the parties had an alternative provision in the contract called the "back-to-back" arrangement. The back-to-back arrangement would cost Mirant substantial sums of money per month to operate, although it would also modify the purchase price Mirant was to pay Potomac. Even though most of the PPAs were assignable to Mirant, five were not and Potomac informed Mirant that the back-to-back arrangement in the contract would be used for those five contracts. This resulted in costs of $10–15 million per month to Mirant. Meanwhile, Mirant had filed for bankruptcy. Mirant attempted—and was still attempting at the date of the opinion—to sever the back-to-back portion of the contract from the remaining portion of the contract, thereby relieving itself of the $10–15 million in monthly costs. The Fifth Circuit's observation holds true as well for the case at bar: "it is evident that a single theme lies behind the thousands of pages generated in this litigation: Mirant's unrelenting and unjustified effort to avoid a legitimate contractual obligation it now views as a bad deal." *Id*. at 285.

Mirant was claiming the back-to-back segment of the contract is divisible from the remaining portions of the contract, just as EFSI is claiming in this case. In *Mirant*, the Fifth

Circuit stated that in order to determine severability the court must look at: (1) whether the parties assented to all of the promises as a single whole; (2) whether there was a single consideration or separate consideration allocated to separate performances; (3) whether the respects parts or each performance were the agreed equivalents of the other. The Fifth Circuit found no language in the contract or other relevant evidence that would support a finding of any intention of the parties to treat the back-to-back provision as severable. This Court adopts the reasoning of the *Mirant* court and makes the same findings in this case: ESFI and the Army assented to all of the promises in the privatization contract as a single whole, there was one consideration to be paid to EFSI, and the performance of EFSI and the Army were agreed equivalents to each other. Therefore, the Contract between EFSI and the Army is not severable.

Another bankruptcy case, where a party attempted to re-characterize the contract and then sever a part off, comes from the Seventh Circuit, which applied Colorado law. In that case, *In re: United Air Lines, Inc., Debtor*, 453 F.3d 463 (7th Cir. 2006), United Airlines entered into an agreement with the County of Denver ("Denver") to lease ground space and facilities at the Denver International Airport. Instead of Denver building the facilities, the parties agreed that United would build the facilities it wanted and Denver would pay for them. One difference between the *United Air Lines* case and EFSI is that in *United Airlines*, title to the facilities was to remain with Denver at all times. Denver paid for the facilities through the issuance of $ 261,415,000 in tax-exempt municipal bonds, and the facilities were built pursuant to the contract. United was to indirectly pay off these bonds through the payment of "facilities rentals" under the lease. After United entered bankruptcy in 2002, United sought to have the bond-related portions and the "facilities rentals" sections of the agreement severed and treated as a loan rather than rental payments. This was advantageous for United because the loan could be discharged or modified in the bankruptcy proceeding but the lease, as an ongoing obligation, had to be paid. The bankruptcy court ruled that the agreement could not be severed, and it further concluded that, taken as a whole, the agreement was a lease not a loan. This ruling of the bankruptcy court was affirmed by the district court and the Seventh Circuit. *In re: United Airlines*, 453 F.3d 463.

Based on the above, this Court determines that the part of the installment payments that represents the amortized capital improvements is not severable from the Contract. The Contract provides for both the utility service charges and amortized capital improvements to be paid to EFSI in monthly installments. There is no evidence that the portion of the installment payments attributable to the capital improvements was, at the time the Contract was entered into, severable. There is, however, a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated. *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (stating that a contract must be construed "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."). The Contract might be divisible into monthly installments and EFSI entitled to any monthly installments attributable to services provided before it breached the Contract, but that issue is not currently before the Court. The present issue is whether the portion of the installment payments attributable to the costs of the capital improvements is severable from the remaining portions of the Contract. The Court holds that it is not, and that EFSI is not entitled to any portion of the Contract amount after it materially breached the Contract. This is a privatization contract, not simply a contract for the sale to the Army of certain infrastructure. The overarching purpose is to provide certain utility services at a fixed price for a period of ten years. As an analogy, when a

person goes into a restaurant to buy a hamburger, part of the cost of the hamburger is the cost of the plate on which the hamburger is to be served. If, between the time the customer orders the hamburger and the time the hamburger is transferred to the customer, the restaurant files bankruptcy and refuses to serve the customer's hamburger, the customer need not pay the portion of the price of the hamburger that is attributable to the plate. This is true even if the restaurant gives the customer the plate instead of the hamburger. The Army never contracted to buy the plate. EFSI is now attempting to force the Army to pay for the plate (the infrastructure to provide the utilities) that the Army never contracted for in the first place. The Contract provided that EFSI would own the plate— *i.e.*, the utilities and the upgrade—and placed the risk of damage and price increases on EFSI. Under these circumstances, it would be absurd to turn around and now place the risk of EFSI's nonperformance—of EFSI's material breach—on the Army.

EFSI is attempting to try something similar to what United tried to argue in *United Airlines*. EFSI is attempting to re-characterize its contract with the Army as a construction contract, or, alternatively, as part construction and part services contract. However, neither is a valid characterization of the privatization contract between the parties.

**E. Do FAR §§ 52.241-10, 52.249-8 and 52.249-10 Require EFSI To Be Compensated**

Having interpreted the Contract's provisions in context, its terms as a unitary whole, there is still the issue of whether the Army must compensate EFSI for EFSI's partial completion of the capital improvements under what can be termed the "termination provisions." In other words, are there specific provisions of the Contract that in essence would act as a liquidated damage provision waiving or superseding the material breach doctrine here by requiring payment to EFSI for its part performance? EFSI proffers two arguments in support of this contention. Its first argument is that the Termination Liability Clause, FAR § 52.241-10,[18] by nature of its inclusion

---

[18] In its entirety, FAR § 52.241-10 provides:

> (a) If the Government discontinues utility service under this contract before completion of the facilities cost recovery period specified in paragraph (b) of this clause, in consideration of the Contractor furnishing and installing at its expense, the new facility described herein, the Government shall pay termination charges, calculated as set forth in this clause.
>
> (b) Facility cost recovery period. The period of time, not exceeding the term of this contract, during which the net cost of the new facility, shall be recovered by the Contractor is_____ months. [Insert negotiated duration.]
>
> (c) Net facility cost. The cost of the new facility, less the agreed upon salvage value of such facility, is $____. [Insert appropriate dollar amount.]
>
> (d) Monthly facility cost recovery rate. The monthly facility cost recovery rate which the Government shall pay the Contractor whether or not service is received is $____. [Divide the net facility cost in paragraph (c) of this clause by the facility's cost recovery period in paragraph (b) of this clause and insert the

into the Contract by paragraph H.8[19] and C.4.7[20] of the Solicitation, was intended to apply to *both*

resultant figure.]

(e) Termination charges. Termination charges = $_____. [Multiply the remaining months of the facility's cost recovery period specified in paragraph (b) of this clause by the monthly facility cost recovery rate in paragraph (d) of this clause and insert the resultant figure.]

(f) If the Contractor has recovered its capital costs at the time of termination there will be no termination liability charge.

Subsections (b) through (e) set forth a formula through which the "termination charges" are to be computed based on the amortization period of the contract, the cost of the facility, and the monthly amortized payment amount.

[19] H.8 of the Solicitation reads as follows:

TERMINATION LIABILITY
The termination liability of the parties with respect to the provision of electric, natural gas, potable water and wastewater utility service under this contract shall be based on FAR 52.241-10 Termination Liability (Feb. 1995). See Section I, Contract Clauses.

[20] ¶ C.4.7, Disposition Upon Expiration or Termination, in its entirety, states:

Upon expiration or termination of this contract, the Government shall have the option to negotiate a sole source contract with the Contractor or reacquire the facilities as described in Section H. Reacquisition of the utility facilities will be performed only when it is determined to be in the best interest of the Government. This determination may be based upon, but not be limited to, the following: where life-cycle cost analysis based on costs incurred during the term of this contract indicate that it is more cost effective for the Government to own and operate the system after expiration of this contract; poor performance by the Contractor; determination that the Contractor has not dealt fairly with the Government in pricing of services or in installation of additional (excess or unnecessary) distribution/collection facilities in order to make more profit; or failure of the Contractor and the Government to negotiate a new contract. The Contractor's unrecovered investment will be determined as set forth in Paragraph H.8, Termination Liability. See also Termination for Default, Termination for the Convenience of the Government, and Termination Liability, in Section I, Contract Clauses.

terminations for convenience *and* terminations for default,[21] which was how the Contract was terminated.

In support of its position, EFSI contends that paragraph H.8 did not specify that FAR § 52.241-10 was to only apply to termination for convenience situations, thus it clearly was intended to apply to default situations as well. Pl. Cross-Motion at 17. But, this argument is weak because it ignores the opening lines of FAR § 52.241-10, which states that it applies if "the *Government* discontinues utility service under this contract. . ." *See, e.g.*, *C. Sanchez & Son Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993) (holding that "a contract is read in accordance with its express terms and the plain meaning thereof"); *Hills Materials Co v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) (noting that wherever "possible, words of a contract should be given their ordinary and common meaning"). This, of course, contemplates a situation whereby the Army opts out of the privatization contract for its own purposes (perhaps privatization is no longer in vogue, or there are national security reasons for a delay in implementing the Contract, or there is a lack of funding available—simply put, there could be myriad pragmatic or policy reasons for the Army to delay or end the privatization program). Although not free from doubt, the better view is that FAR § 52.241-10 applies solely to termination for convenience. *See Cmty. Heating & Plumbing Co.*, 987 F.2d at 1579; *Brunswick Corp.*, 951 F.2d at 337 (holding that mere disagreement over meaning of a provision by the parties does not render the provision ambiguous).

Furthermore, the parties never negotiated and filled-in the numerical provisions, including the required "salvage value" of the capital improvements. EFSI argues that the fill-in provisions could not be determined until either the end of the contract period or when the Contract was terminated for default by the Army. Pl.'s Cross-Mot. for Summ. J. at 23.

---

[21] Both terms are defined in the FAR as follows:

> Termination for convenience means the exercise of the Government's right to completely or partially terminate performance of work under a contract when it is in the Government's interest.
>
> Termination for default means the exercise of the Government's right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations.

48 C.F.R. 2.101(b). Professors Nash and Cibinic distinguish the two types of termination largely by the rights attached to each type of termination. As to termination for convenience: "This clause gives the Government the broad right to terminate without cause and limits the contractor's recovery to costs incurred, profit on work done, and costs of preparing the termination settlement proposal." JOHN CIBINIC, JR. AND RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 1073 (3d ed. 1995). As to a termination for default: "The Government is not liable for the costs of unaccepted work—the contractor is entitled to receive payment only for work accepted by the Government; The Government is entitled to the return of progress, partial, or advance payments . . . The contractor is liable for excess costs of reprocurement or completion; and [t]he contractor is liable for actual or liquidated damages." *Id.* at 902.

Likewise, it argues that the present market value for the utility upgrades should be substituted in place of salvage value. *Id*. But the two are not synonyms; salvage value is equated not with what the market brings upon sale of a tangible item, but instead with the value of an asset *after* its "useful life."[22] This implies that there may conceivably be no market value left to salvage and that the parties therefore would need to negotiate an arbitrary measure of value to create what is in essence a liquidated damage provision. This certainly could be done before the Contract was executed, and buttresses the Court's finding that this provision was intended to apply to a situation where it is the Army that discontinues the Contract and terminates it for its own convenience.

Additionally, the fact that the negotiation over these terms was never done is tantamount to an unilateral mistake by EFSI, which is not excusable by law. *See ConocoPhillips v. United States*, 501 F.3d 1374, 1379–80 (Fed. Cir. 2007) (holding that reformation of a contract was not warranted on the ground of mutual or unilateral mistake where it was incumbent on the contractor to investigate certain contract issues before entering into a contract). *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 153 (stating that the result of a unilateral mistake as to a basic assumption is that a contract becomes voidable if the mistaken party does not bear the risk of the mistake and (a) the mistake makes enforcement of the contract unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake). However, enforcement of the contract here is not unconscionable. Were it not for the default by EFSI, both parties would have continued to perform the Contract, and done so happily. Certainly then, enforcing the Contract itself would not be unconscionable. Further, the mistake of not filling in the missing blank terms did not take away the only avenue for determination of who owed what in the Contract—it merely removed that particular FAR provision from providing a basis for recovery for EFSI. Common law contract principles still apply in evaluating potential recovery in this case, so it is not unconscionable to enforce the Contract as contemplated. In *Liebherr Crane Corp. v. United States*, 810 F.2d 1153 (Fed. Cir. 1987), the Federal Circuit affirmed a similar determination in a construction contract case. There, the plaintiff failed to read the specifications of a solicitation carefully, and after being awarded the Contract, sought reformation based on its mistake in judgment. However, the court in *Liebherr* held that the plaintiff's mistake in judgment was not a basis for reformation. The court did not want to allow the plaintiff to "take advantage of its own gross neglect." *Id*. at 1158. Similarly, EFSI's failure here to fill out the terms of the FAR provision does not provide it with a basis for reformation of the Contract. EFSI's failure to fill out the blanks was a unilateral mistake that removed FAR § 52.241-10 from the Contract; is should not now, having failed to negotiate the terms of that provision, be allowed to rely on it and fill-in terms after the fact.

---

[22] Salvage value is an estimate of the amount that will be realized at the end of the useful life of a depreciable asset through sale or other disposal. Frequently, depreciable assets have little or no salvage value at the end of their estimated useful life and, if immaterial, the amount may be ignored. JAN R. WILLIAMS & JOSEPH V. CARCELLO, GAAP GUIDE LEVEL A: RESTATEMENT AND ANALYSIS OF CURRENT FASB STANDARDS § 12.04 (2007).

Besides its argument based on FAR §52.241-10, EFSI has a fall-back position—one based on FAR § 52.249-8(f) (Fixed-Price Supply and Service)[23]—which requires the government to pay for services and supplies delivered and accepted, in accordance with case law. To EFSI, it would thus require the Army to pay it for the capital improvements because they are "supplies delivered and accepted." Pl.'s Cross-Mot. for Summ. J. at 24. FAR § 52.249-8(f) is included in Section I of the Solicitation. Solicitation ¶ I.46. EFSI cites *John C Kohler Co. v. United States*, 204 Fed. Cl. 977 (1974), a case in which the court held that the government impliedly accepted a boiler from a contractor because it had custody of, and operated, the boiler over a prolonged period of time. EFSI argued that the capital improvements it made were impliedly accepted by the Army because the improvements are currently in the Army's possession.

But EFSI has one overwhelming problem here: the capital improvements portion of the privatization Contract does not constitute a contract for supplies and, to be sure, EFSI offers no evidence that the parties intended "supply" to mean capital improvements in that provision. It is not exactly clear why EFSI essentially urges that this Court find an ambiguity in the application of the term "supplies delivered and accepted." "Supplies" are indeed defined as "all property except land or interest in land. . ." including "public works, building and facilities . . . and the alteration or installation of any of the forgoing." 48 C.F.R. § 2.101. This characterization is broad enough to include specific capital improvements because, obviously, such improvements are "property" within the meaning of 48 C.F.R. § 2.101. But, this still does not resolve the problem because 48 C.F.R § 2.101 applies only to supply contracts and the activity for which EFSI wishes to be compensated is construction. If this Court adopts EFSI's argument, then the distinction between supply and services contracts on the one hand, and construction contracts on the other, would be obliterated because all construction contracts rely on supplies. One does not construct things out of wishes and gossamer. That these are two separate contract activities is mirrored by the two correlative separate default provisions—FAR § 52.249-8, covering services and supplies, and FAR § 52.249-10,[24] covering default on fixed-price construction contracts. Because FAR § 52.249-8 does not apply to the construction portion of the Contract, the capital improvements are not by definition "supplies," and the issue in *Kohler* of acceptance of supplies is inapplicable.

Finally, the Court notes that the Contracting Officer opined in his final decision that FAR § 52.249-8(f) was most probably included in the Contract erroneously, and that the parties really intended to incorporate the more apt FAR § 52.249-10, the default provision for fixed-price

---

[23] In part, FAR § 52.249-8(f) provides, "The government shall pay contract price for completed supplied delivered and accepted." 48 C.F.R. § 52.249-8.

[24] FAR § 52.249-10 (Fixed-Price Construction), which was not actually incorporated into the Contract, provides, in part, "If the contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in the contract. . .the Government may, by written notice to the Contractor, terminate the right to proceed with the work. . . ." 48 C.F.R. § 52.249-10(a). What is telling about the provision, however, is what is *not* included—language similar to FAR 52.249-8(f), which provides a basis for recovery by a defaulting contractor despite the default.

construction.[25] Nevertheless, whether the *Christian* doctrine (discussed above) applies, or this provision was incorporated for some other reason, is of no moment; it simply does not provide for recovery for construction costs where there has been a termination for default. To construe it as such, where the default is the result of a material breach of contract, would be to overturn perhaps centuries of common law contract law applying that doctrine.

## IV. DEFENDANT'S MOTION TO DISMISS COUNTS III AND IV FOR LACK OF JURISDICTION

### A. Standard for Motion to Dismiss for Lack of Jurisdiction

Concerning the motion to dismiss for lack of jurisdiction, even though it is defendant who proffers the motion, the plaintiff has the burden of establishing this Court's subject matter jurisdiction over its claims. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The jurisdictional grant to this Court for contract actions of comes from the Tucker Act, 28 U.S.C. § 1491 (2000). *Texas Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 899 (Fed. Cir. 2005) (citing *Quality Tooling Inc. v. United States*, 47 F.3d 1569, 1572–73 (Fed. Cir. 1995)). In addition, this Court has jurisdiction over claims arising out of the Contracts Disputes Act of 1978, 41 U.S.C. § 609(a)(1). *See* 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with a contractor arising under section 10(a)(1) of the Contracts Disputes Act of 1978 [41 U.S.C. § 609(a)(1)] . . . ."); *Tooling Inc*., 47 F.3d at 1572–73 ("The Tucker Act, in conjunction with the CDA, purports to make the Court of Federal Claims the exclusive trial court for hearing disputes over government contracts that fall under the CDA").

This Court is a court of limited and special jurisdiction, *Dynalectron Corp. v. U.S.*, 4. Cl. Ct. 424, 428, *aff'd,* 758 F.2d 665 (Fed. Cir. 1984) (decision involves predecessor court to this Court), and neither the Tucker Act nor the CDA grants unlimited jurisdiction to this Court. Indeed, this Court has no jurisdiction over tort claims against the United States. "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, . . . [but] in cases *not* sounding in tort." 28 U.S.C. § 1491(a)(1) (2000) (emphasis added).

In addition to having no jurisdiction in tort cases, the Court of Federal Claims has no jurisdiction over most equitable claims. *See Trauma Serv. Group, Ltd. v. United States*, 33 Fed. Cl. 42, (1995), *aff'd*, 104 F.3d 1321 (Fed. Cir. 1997). Thus, the court in *Aetna Casualty and Surety Co. v. U.S.*, 655 F.2d 1047 (Ct. Cl. 1981) dismissed plaintiff's unjust enrichment claim because it was equitable in nature. That court said that a

---

[25] The CO based his assumption on FAR § 36.101(c), which provides, in relevant part:

> A contract for both construction and supplies or services shall include (1) clauses applicable to the predominant part of the work . . . or, (2) if the contract is divided into parts, the clauses applicable to each portion.

> claim based on unjust enrichment/equitable lien is also beyond our jurisdiction. Those doctrines, however, are based not on agreement but are equitable in nature. Both proceed from a perception that a party ought to be bound rather than from a conclusion that a party has agreed to be bound. Plaintiffs' unjust enrichment/equitable lien theory of recovery is therefore based upon a contract implied in law, over which this court has not been given jurisdiction.

In *AT&T v. U.S.*, 124 F.3d 1471, 1479 (Fed. Cir. 1997), *vacated on other grounds*, 136 F.3d 793 (Fed. Cir. 1998), the court likewise recognized that:

> It is well established that the Court of Federal Claims does not have the power to grant remedies generally characterized as those implied-in-law, that is, equity-based remedies, as distinct from those based on actual contractual relationships. Quantum meruit is the name given to an implied-in-law remedy for unjust enrichment. As a general rule, it falls outside the scope of relief available through the Court of Federal Claims. (citing *Trauma Service Group v. United States*, 104 F.3d 1321, 1324–25 (Fed. Cir. 1997).

While it is true that the Federal Circuit and Court of Claims have permitted *quantum meruit* ***recovery***, this occurs in the very limited circumstance where a plaintiff provides services or goods[26] to the government pursuant to an *attempted* express contract, but either some defect prevents an express contract from actually coming into existence or the government simply refuses to pay. *See Perri v. United States*, 340 F.3d 1337, 1343–44 (Fed. Cir. 2003) (citing *Gould, Inc. v. United States,* 935 F.2d 1271 (Fed. Cir. 1991); *United States v. Amdahl Corp*., 786 F.2d 387, 393 (Fed. Cir. 1986); and *Prestex, Inc. v. United States*, 162 Ct. Cl. 620, 320 F.2d 367 (1963)). In this type of case, a contract is found if a meeting of the minds can be inferred, "as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules*, 516 U.S. at 424 (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597 (1923)). "For contracts with the United States, however, an implied-in-fact contract—just as an express contract—requires an authorized agent of the Government." *Trauma Service Group v. United States*, 104 F.3d at 1326 (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)). Importantly, an implied-in-fact contract will not be found if an express contract already covers the same subject matter. *Id.*; *see also Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed. Cir. 1990).

**B. Does the Court Have Jurisdiction over Counts III and IV**

In Count III, EFSI seeks reimbursement for the certain capital improvements and upgrades to Fort Hamilton's potable water, natural gas and electrical distribution systems, storm

---

[26] The predecessor to the Federal Circuit, the Court of Claims, applied *quantum meruit*, translated "as much as he merited," to recovery on any implied in fact contract, whether for goods or services. *Quantum valebant,* translated "as much as it was worth," has traditionally applied to implied in fact contracts involving goods. *Urban Data Systems, Inc. v. U.S.*, 699 F.2d 1147, 1154–55 n. 8 (Fed. Cir. 1983). The distinction however, is not significant, as courts have used *quantum meruit* to refer to both. *See United States v. Amdahl*, 786 F.2d 387 (Fed. Cir. 1986).

and wastewater, and sewer systems predicated under the theory of, as EFSI terms it, "Quantum Meruit/Unjust Enrichment." Pl. Cmpl. at 11. In addition, in Count IV, EFSI seeks payment for certain operation and maintenance services reimbursement based on the same legal theory. Pl.'s Cmpl. at 12. EFSI explains in its cross-motion for summary judgment that both Counts are an alternative theory of recovery if EFSI was not compensated under the terms of the Contract itself. Perhaps realizing that this Court lacks jurisdiction over such claims (*see AT&T*, 124 F.3d at 1479; *see also Trauma Service Group*, 104 F.3d at 1324–25), EFSI re-christened its theory as one for *quantum meruit* recovery based on an implied-in-fact contract between the parties. Pl.'s Cross-Mot. Summ. J. at 32.

Indeed, EFSI encourages the Court to ignore the words "unjust enrichment" in its Complaint, and instead focus on the facts it pleaded, alleging that those facts provided a sufficient basis for a *quantum meruit* recovery. *Id*. at 36. EFSI argues that if the Termination Liability clause was inapplicable or unenforceable, then the Contract itself failed to address certain rights of the parties upon termination, and therefore an implied-in-fact contract would arise between the parties regarding termination liability. *Id*. at 35. EFSI further argues that it should recover because the Army agreed to pay EFSI for the utility system upgrades regardless of why the Contract was terminated. *Id*. at 36. In the alternative, if the Court rejects EFSI's "encouragement," it asks the Court to consider their motion papers as one to amend the complaint to add this seemingly new theory of recovery. *Id*. at 37.

It is transparent that EFSI's argument, at its heart, is one for equitable unjust enrichment. This is so not simply because the termination liability provisions underscoring Counts III and IV are inapplicable or unenforceable, but because EFSI is in reality telling the Court to ignore the plain meaning of the Contract and its own material breach. Accordingly, no matter in what words one couches it—"unjust enrichment," "*quantum meruit*," or even simple "fairness"—this is an equitable claim over which the Court has no jurisdiction.

To be sure, EFSI cannot have both an express contract and an implied-in-law contract covering the same performance. The law will not imply a contract when one already exists. The law will look only to the express contract between the parties. Therefore, EFSI's argument fails because there is no implied-in-fact contract to pay EFSI for its capital improvements under the circumstances of this case. There is no evidence that the Army agreed to pay for EFSI's capital improvements as something separate and apart from EFSI's duty to fulfill its part of the Contract. Instead, EFSI materially breached the express Contract and was terminated for its default. *See Nematollahi v. United States*, 38 Fed. Cl. 224, 235 (1997) (granting summary judgment on the grounds that "there can be no implied-in-law contract and, thus, no claim for unjust enrichment, when an express contract covering the same subject exists").

Finally, the Court notes the late date of EFSI's request to amend its complaint, a request made in its responsive brief. Pl.'s Cross-Mot. for Summ. J. at 37. While motions to amend a complaint are liberally granted, this does not grant a party the right to flout the Rules of this Court, which were promulgated to assure proper notice to litigants and an orderly system of justice. RCFC 7 & 15. The time frame provided by the Rules of this Court assures proper notice to adverse parties. *See Resource Recycling Corp., Inc. v. United States*, 56 Fed. Cl. 612, 617–18 (2003) (quoting *Cubic Defense Sys. v. United States*, 45 Fed. Cl. 450, 466–68 (1999)) (rejecting

tactics that would contravene notice requirements and thereby constitute "litigation by ambush"). Accordingly, EFSI's late proffer to amend its complaint is properly denied.

## V. CONCLUSION

For the above-mentioned reasons, the government's motion to dismiss Counts III and IV of EFSI's complaint is **GRANTED**. The government's motion for summary judgment is **GRANTED**, and EFSI's cross-motion for summary judgment is **DENIED.** The parties shall confer and discuss appropriate final resolution of the previously-consolidated case, *Liberty Mutual Insurance Co. v. United States* (No. 04-254), in light of this opinion. The parties shall file in the instant matter a Joint Status Report by **April 15, 2008**, updating the Court as to the parties' progress in resolving whatever issues remain.

**IT IS SO ORDERED.**

s/ Lawrence J. Block

Lawrence J. Block
Judge